Judge James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PAULA R. MOOREHEAD, Plaintiff, v. MICHAEL CHERTOFF, Secretary, U.S. Department of Homeland Security, Transportation Security Administration, Defendant. | **NO. C05-01767-JLR** **DEFENDANT'S MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT** (Note on the Motion Calendar for February 9, 2007) |

Defendant Michael Chertoff, Secretary of the United States Department of Homeland Security, Transportation Security Administration, by and through his attorneys, John McKay, United States Attorney for the Western District of Washington, and Marion J. Mittet, Assistant United States Attorney for said District, respectfully moves pursuant to FED. R. CIV. P. 12 (b) (1) and (6) to dismiss Plaintiff Paula Moorehead's complaint for lack of jurisdiction and for failure to state a claim upon which relief can be granted. Defendant further moves for Summary Judgment pursuant to FED. R. CIV. P. 56 (c) because, when viewing the facts in the light most favorable to Ms. Moorehead, as a matter of law the Secretary of the United States Department of Homeland Security is entitled to Judgment as to all claims. In support of the motion, Defendant submits the following memorandum with attached exhibits and Declarations.



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

## I. INTRODUCTION

Plaintiff Paula Moorehead, an employee of the Transportation Security Administration ("TSA") at the Seattle Tacoma International airport (SeaTac) during the relevant time period, has filed suit against TSA alleging that TSA (1) violated the Equal Pay Act ("EPA"), 29 U.S.C. §206(d); and (2) discriminated against her on the basis of gender (female) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*. ("Title VII"). Specifically, Ms. Moorehead, who was hired by TSA as a Transportation Security Screener, alleges that her starting salary was less than that of at least one male co-worker. Ms. Moorehead additionally alleges that her supervisor discriminated against her on the basis of sex because he reassigned the responsibility for acting as Lead Screener from Ms. Moorehead to a male co-worker.

Initially, the Government respectfully submits that Ms. Moorhead's EPA claim should be dismissed because she filed suit in District Court after the two year statute of limitations period. Furthermore, to the extent that Ms. Moorehead is seeking more than $10,000 in damages for any alleged EPA violation, exclusive jurisdiction would lie with the Court of Federal Claims. Finally, Ms. Moorehead's Title VII claim should also be dismissed because she did not timely exhaust her administrative remedies. Regardless, however, of the issue of timeliness, Defendant submits that Ms. Moorehead cannot make a prima facie case of discrimination under the EPA, nor can she make a prima facie case of gender discrimination in violation of Title VII, and summary judgment should be granted to Defendant.

As to Ms. Moorehead's EPA claim, it is undisputed that some males, and also some females, were given a slightly higher starting salary than most of the hirees, depending on whether or not they had specialized experience that was credited by the contractor representative who was doing the hiring. Given that the percentage of males and females who were given a starting salary bump is undisputedly almost the same, Ms. Moorehead cannot show that she was paid less because of her sex. Furthermore, assuming



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

*arguendo* a prima facie case, Defendant has a legitimate factor other than sex (crediting prior relevant experience) for the starting salary differentials. Ms. Moorehead has absolutely no evidence that her gender was considered in any way and summary judgment should be granted to Defendant as to this claim.

Likewise, Ms. Moorehead cannot make a prima facie case of discrimination in violation of Title VII. During the relevant time period, Ms. Moorehead's supervisor, Ron Danielson, supervised two teams of Security Screeners. Because there were no Lead Screener positions allocated to the teams, Mr. Danielson informally delegated individual Screeners to temporarily act as Lead Screeners. In January of 2003, Ms. Moorehead was assigned the Acting Lead Screener duties, replacing a male co-worker who had been the Acting Lead Screener. Then, in March of 2003, Mr. Danielson reassigned the Acting Lead Screener duties from Ms. Moorehead to another male co-worker. It is undisputed that none of the Screeners temporarily acting in the lead position received any salary compensation for temporarily taking on the additional responsibilities. The temporary assignments were not official personnel actions, and no paperwork was generated reflecting a permanent change in status. Ms. Moorehead clearly had no entitlement to be permanently assigned as a Lead Screener, and the fact that she was rotated into and out of the assignment is not an adverse action.

Even assuming that Ms. Moorehead could set forth a prima facie case, she cannot show pretext. There is no evidence whatsoever that Ms. Moorehead's gender was a factor in the decision to give another Screener the opportunity to act as a Lead Screener. In fact, if anything Ms. Moorehead was given more favorable treatment than most of the males. Despite the fact that there were more males than females on her team, Ms. Moorehead undisputedly was the second Screener to be rotated into the Acting Lead Screener position. Accordingly, summary judgment should be granted to Defendant as to this claim.



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

# II. FACTS

## A. GENERAL BACKGROUND

On November 19, 2001, following the terrorist attacks of September 11, 2001, Congress passed the Aviation and Transportation Security Act ("ATSA"), and created TSA to protect the nation's transportation systems, including civil aviation. ATSA, Pub. L. No. 107-71, 115 Stat. 597 (Nov. 19, 2001). This Act established a series of challenging, but critically important milestones toward achieving a secure air travel system. Included among these milestones was a Congressionally mandated deadline that TSA hire and deploy Security Screeners at all United States airports not later than one year after the date of enactment. ATSA, Pub. L. No. 107-71, Title I, § 110(c), 115 Stat. 597, 616 (codified at 49 U.S.C. § 44901 note). Accordingly, TSA became responsible for appointing, training, and deploying Transportation Security Screeners ("Screeners") for airport employment, instead of the private sector Screeners who had, prior to September 11, 2001, been responsible for security screening at airports within the United States. *See* Declaration of Paul H. Sheldon (Sheldon Dec) at ¶ 4.

In order to comply with the Congressionally mandated deadlines and to meet its goal of getting a work force of Screeners up and running within a year, TSA awarded a contract to NCS Pearson, a Minneapolis-based human resources firm. Through this contract, NCS Pearson was responsible for the recruitment and hiring of a federal security screening work force, including Screeners, Lead Transportation Security Screeners ("Lead Screeners") and Supervisory Transportation Security Screeners ("Supervisors"). *Id* at ¶ 5.

In April of 2002, after learning of inconsistencies in the starting salaries NCS Pearson was offering new hires, TSA issued an Interim Human Resource (HR) Guidance on Salary Determinations for Transportation Security Screeners, SV-0019-Pay Band ("Guidance"). The Guidance provided that, unless an exception for specialized experience applied, new appointments were to be made at the minimum rate for the pay band established for the job category. Screeners were paid at the D pay band, and the base



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

salary (minimum rate) for the D band in 2002, was $23,600. A locality adjustment, which was calculated separately for various cities and other locations around the country, was added to the base salary. Sheldon Dec at ¶¶ 6-7.

Under the Guidance, appointments could be made at a rate above the minimum rate of the D band when applicants had specialized experience that demonstrated that they possessed the skills and abilities to successfully perform the duties of the position. Specialized experience had to be in or related to the work of the position to be filled. The rationale for this exception was that applicants with specialized experience would likely achieve a higher level of performance more quickly and with less cost than an applicant with no such specialized work experience. The ability to offer a higher-than-minimum starting salary to more highly qualified individuals also enhanced TSA's ability to attract and retain those with the highest qualifications to perform important security functions with reduced costs associated with training and other performance start up costs. In addition, the one-year requirement addressed the rapidly-changing nature, processes and equipment of security screening and the threats that screening was intended to counter. Thus, more recent specialized experience could be of greater value to TSA's mission. The sex of the applicant was not a factor to be considered by HR Representatives when they made salary determinations. Current or recent specialized experience could be possessed and demonstrated by any applicant, notwithstanding his or her gender since such experience was evaluated according to the criteria in the Guidance. *Id* at ¶¶ 8-11.

Personnel representatives of NCS Pearson interviewed applicants for Screener positions and made starting salary determinations based on the information and experience indicated on each job application. Nationwide, over 2.2 million applications for employment were received. Qualified candidates were identified using computer based tests, a structured interview, physical tests, medical tests, and information gleaned from background checks. Only those applicants who passed all parts of the application process were given job offers. It was not until the time of the job offers that NCS Pearson's HR



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Representative evaluated the prior work experience to see if the applicant rated a starting salary bump. In less than ten months, NCS Pearson evaluated, assessed, approved, made salary determinations, made job offers, and coordinated orientation of over 60,000 Screeners, Leads, and Supervisors nationwide. The speed necessary to accomplish this gargantuan task by the Congressionally-mandated deadline inevitably led to some deviation from established policies and procedures. Sheldon Dec ¶¶ 12-13.

Specifically, in 2002 at SeaTac, NCS Pearson hired 1039 Screeners, including 699 males and 340 females. Twenty of the women (equaling 5.9%) were hired at salaries that exceeded the minimum rate and fifty of the men (equaling 7.1%) were hired at salaries that exceeded the minimum rate. *Id* at ¶14.

**B. FACTS SPECIFIC TO MS. MOOREHEAD'S TITLE VII CLAIM.**

Plaintiff Paula Moorehead was hired by TSA on October 13, 2002. At all relevant times, Ms. Moorehead was a Screener performing checked baggage screening at the Northwest Airlines location at SeaTac. At SeaTac, checked baggage screening became fully operational, as required by law, on December 31, 2002. 49 U.S.C. § 44901 (as added by ATSA § 110). Ron Danielson and Kevin Palmer were Ms. Moorehead's first-line supervisors. *See* excerpts from Deposition of Paula Moorehead attached hereto as Exhibit A at pp. 6-7; *see also* Declaration of Ronald L. Danielson (Danielson Dec). Mr. Danielson and Mr. Palmer jointly supervised two teams of baggage Screeners. One team of approximately seven or eight Screeners, including Ms. Moorehead, was assigned to screen baggage at Northwest Airlines. The other team, consisting of approximately fifteen Screeners, was assigned to screen baggage at Southwest Airlines. Danielson Dec.

Although some Lead Screeners were hired in the initial wave of hiring at SeaTac, there were only a few and, as a result, not all Screener teams had a permanent lead Screener position allocated. In particular, neither of the two Screener teams supervised by Mr. Danielson and Mr. Palmer had been assigned a permanent Lead Screener position. In fact, during the relevant time period, there were no openings at SeaTac for the position of



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Lead Screener. It was not until approximately August of 2004, that a Lead Screener opening was announced. Exhibit A at p. 11; Danielson Dec; *see also* Declaration of James McDowell (McDowell Dec).

As it began its federal screening operations around November 2002, because of the shortage of permanent Lead Screener positions, SeaTac generally followed an informal practice of temporarily delegating Lead Screener responsibilities, usually on a rotational basis, to one of the Screeners. As a result, such Screeners were known informally as Acting Lead Screeners, although they received no additional compensation, nor were Standard Form 50s issued for this temporary assignment of responsibilities. Generally, Screeners were assigned to teams and one Screener would be assigned lead responsibility. Exhibit A at p. 12; Danielson Dec; McDowell Dec.

In mid-January 2003, Mr. Danielson temporarily assigned the Lead Screener responsibilities to Ms. Moorehead. As an acting Lead Screener, Ms. Moorehead led a team of about eight other Screeners (Jim Arealvo – male, Chris Benson – male, Lambert Lactaoen – male, John Haley – male, Ken Keating – male, Steven Keeler – male, Curtis Smith – male, and Geraldine Ternorio – female) in the checked baggage screening operations for Northwest Airlines. Ms. Moorehead was not the first Acting Lead Screener for this team; she was preceded by Jimmy Arealvo, who performed these responsibilities from about January 1 through mid-January 2003. Exhibit A at pp. 9-11; Danielson Dec.

According to Ms. Moorehead, she was advised by Mr. Danielson on March 18, 2003, that he was going to rotate the lead duties on her days off. Then, a couple of days later, Mr. Danielson told Ms. Moorehead that he was going to rotate the acting lead duties on a weekly basis. The next day Ms. Moorehead verbally complained to Al Cesar, the Manager of Screening Operations, about Mr. Danielson's decision to rotate the lead duties. Exhibit A at pp. 14-16. Subsequently, on March 27, 2003, Mr. Danielson assigned Ms. Moorehead back to her regular screener duties and he assigned a male co-worker, Lambert Lactaoen, to be the Acting Lead Screener. Exhibit A at p. 18 ; *See also* March 31, 2003,



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Letter of Protest written by Ms. Moorehead attached hereto as Exhibit B. Mr. Danielson made the change in part because he did not think that Ms. Moorehead was doing a good job as the acting lead, and in part because he wanted to give other Screeners a chance to assume the responsibilities. Initially, Mr. Danielson had no set criteria for deciding whom to assign Lead Screener duties, and he usually chose whomever he felt would do a good job. Subsequently, he decided to rotate Screeners into the acting lead spot based on overall Government seniority, including military service. Mr. Danielson specifically chose Mr. Lactaoen because he believed that he (Lactaoen) had more Government service than the other team members. Gender was not a factor in deciding who should be temporarily designated as an Acting Lead Screener. Danielson Dec.

On March 31, 2003, Ms. Moorehead wrote a letter to local management officials documenting her complaint. Exhibit B. Her first sentence in her March 31st written complaint reads:

> I am completing this [personnel action] form in an effort to resolve this matter prior to the expiration of the 45-day limit to file a discrimination complaint under regulation 29 C.F.R. part 1614.

*Id.*

Ms. Moorehead subsequently initiated contact with an EEO Counselor on May 14, 2004. *See* Counselor's Report attached hereto as Exhibit C. The Agency's directive to its employees, dated October 16, 2002, provides that discrimination complaints be reported via either telephone or in writing to the Office of Civil Rights. *See* Agency Directive attached hereto as Exhibit D. Thereafter, on or about December 31, 2003, Ms. Moorehead filed a formal complaint of discrimination.

On August 13, 2004, Ms. Moorehead requested a hearing before the Equal Employment Opportunity Commission (EEOC). The case was assigned to Administrative Judge (AJ) Zulema Hinojos-Fall, who issued a Notice of Intent to Consider Issuance of Decision Without a Hearing on November 8, 2004, after reviewing the Report of Investigation. On May 25, 2005, the AJ issued her decision without hearing, finding in relevant part that (1) the Complainant failed to timely contact an EEO counselor; (2) the



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Complainant failed to establish a prima facie case of sex discrimination; and (3) the Agency had articulated legitimate, non-discriminatory reasons for its actions which the Complainant had not shown to be pretextual. *See* AJ Decision attached hereto as Exhibit E. The Department of Homeland Security's Final Agency Decision ("FAD") was mailed to Ms. Moorehead on July 11, 2005, and received by her and her counsel on July 25 and 27, 2005. The instant complaint was filed on October 20, 2005.

## C. FACTS SPECIFIC TO MS. MOOREHEAD'S EPA CLAIM

Ms. Moorehead claims that, sometime in February of 2003, she was told by co-worker Lambert Lactaoen that he was earning one dollar an hour more than she was. Exhibit A at pp. 27, 41. Ms. Moorehead also claims that, in November of 2003, she read a memorandum supposedly written by Administrator James Loy which allegedly acknowledged that there were pay disparities among Screeners that would not be addressed by the Agency. Compl. ¶¶ 2.c. In actuality, however, Mr. Lactaoen was hired at the same salary as was Ms. Moorehead.[1] *See* Appointment Documents for Paula Moorehead and Lambert Lactaoen attached hereto as Exhibits F and G. As to the Loy memorandum, TSA has no information pertaining to such a document and Ms. Moorehead undisputedly has no copy of such a memorandum. There was a June 6, 2003, memorandum by a Richard A.Whitford which discussed salary issues, which Ms. Moorehead has since acknowledged refers to the same issues that she claims were discussed in the phantom document allegedly authored by James Loy. Exhibit A at pp. 34-35; McDowell Declaration. The Whitford memorandum, however, does not say what Ms. Moorehead claims. This memorandum, instead, references other issues, including a problem that existed whereby certain individuals were hired in a supervisory capacity, and when these individuals started working there were no supervisory jobs available and, as a

---

[1] Although Ms. Moorehead originally filed suit because she was under the mistaken impression that her co-worker Lambert Lactaoen was given a higher starting salary, she has now, after receiving information during discovery showing that some males and some females were offered higher starting salaries, identified from the group of fifty males who received higher starting salaries, twenty-two individuals whom she believes to be comparators.



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

result, they received Screener wages. *See* Whitford Memorandum attached hereto as Exhibit H. It is undisputed that Ms. Moorehead was not hired as a Supervisor, nor was she hired as a Lead Screener. Exhibit A at p. 6. Consequently, this memorandum is not relevant to Ms. Moorehead's EPA claim.

Ms. Moorehead's application package was reviewed by a representative of NCS Pearson and she was interviewed by a representative of NCS Pearson. The NCS Pearson representative determined, based on his or her assessment of Ms. Moorehead's experience, what her starting salary should be. Ms. Moorehead was offered a job at the base salary level for Screeners, which in 2002 was $23,600 plus a locality pay adjustment. Exhibit G. Although most Screeners, both males and females, were also started at the base salary level, as stated previously, some Screeners were given a slightly higher starting salary depending on the value placed on his or her prior experience.

At SeaTac, of the 699 men who were hired, fifty were given a starting salary bump, and of the 340 women who were hired, twenty were given a starting salary bump. The files[2] of the Screeners who were given a salary bump show that the NCS Pearson representatives consistently, for both males and females, considered the following criteria in determining whether to give a salary increase: Screening or other similar security work experience, including the number and types of equipment certifications and the number of those pieces of equipment with which a candidate had training and/or actual work experience; law enforcement experience, including police, firefighting and correctional officer experience; military experience; management experience (not limited to security, law enforcement or military); and degrees, perhaps limited to the Bachelor's level or higher, without regard to the field of study. Finally, NCS Pearson took into account whether a candidate had qualified for the higher-paid positions of Lead Screener or

---

[2]The files of the individuals who received salary bumps were produced in discovery and identified by number rather than name. Pertinent parts of the files of the twenty-two males, now identified by Ms. Moorehead as comparators, have been attached to the Declaration of Paul Sheldon and are also identified by number.



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Supervisor. Sheldon Dec at ¶¶ 17-18.

As to Ms. Moorehead, although her application showed that she had four months' experience as a Screener and that she was certified in the use of a hand-held wand, no other factors are indicated, such as law enforcement, military service; an advanced degree, managerial experience or a higher previous salary. Sheldon Dec at ¶ 19.

## III. ARGUMENT

### A. MS. MOOREHEAD'S DISPARATE TREATMENT CLAIM MUST BE DISMISSED FOR FAILURE TO TIMELY EXHAUST ADMINISTRATIVE REMEDIES AND THE EQUAL PAY ACT CLAIM MUST ALSO BE DISMISSED BECAUSE PLAINTIFF FILED IN DISTRICT COURT OUTSIDE OF THE STATUTE OF LIMITATIONS. FURTHERMORE, TO THE EXTENT THAT MS. MOOREHEAD IS SEEKING MORE THAN $10,000 IN DAMAGES FOR THE ALLEGED EQUAL PAY ACT VIOLATION, EXCLUSIVE JURISDICTION LIES WITH THE UNITED STATES COURT OF FEDERAL CLAIMS.

#### 1. Motion to Dismiss Standard.

For purposes of a motion to dismiss, the allegations of the complaint are normally taken as true. *Hughes v. Rowe*, 449 U.S. 5, 10 (1980). The motion will be granted if it appears that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief. *Id.*

Under Rule 12(b)(1), subject matter jurisdiction may be challenged at any time by the parties, by the Court *sua sponte*, or upon appeal. *United States v. Cotton*, 535 U.S. 625, 630 (2002); *Miguel v. Country Funding Corp.*, 309 F.3d 1161, 1163-64 (9th Cir. 2002). Once jurisdiction is challenged, the plaintiff bears the burden of establishing jurisdiction. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936). A plaintiff must establish jurisdiction by a preponderance of the evidence. *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 403-04 (9th Cir. 1996). Furthermore, a plaintiff cannot rely merely upon allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt*, 298 U.S. at 189.

Specifically, claims must be dismissed under Rule 12(b)(1) if, considering the factual allegations in the light most favorable to the plaintiff, the claims: (1) do not arise



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

under the federal Constitution, law or treaties, or fall within one of the other enumerated categories of Article III, Section 2, of the Constitution; (2) do not constitute a "case or controversy" within the meaning of that section; or (3) are not claims described by any jurisdictional statute. *Baker v. Carr,* 369 U.S. 186, 198 (1962); *D.G. Rung Indus., Inc. v. Tinnerman,* 626 F. Supp. 1062, 1063 (W.D. Wash. 1986).

When considering a motion to dismiss for lack of jurisdiction, the Court is not restricted to the face of the pleadings, but may review any evidence to resolve factual disputes concerning the existence of jurisdiction. *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988, *cert. denied*, 489 U.S. 1052 (1989); *Biotics Research Corp v. Heckler*, 710 F.2d 1375, 1379 (9th Cir. 1983). A federal court is presumed to lack subject matter jurisdiction until plaintiff establishes otherwise. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994); *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989). Therefore, the plaintiff at all times bears the burden of proving the existence of subject matter jurisdiction. *Stock West* at 1225; *Thornhill Publishing Co., Inc. v. Gen'l Tel & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss should be granted where the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Tyler v. Cisneros*, 136 F.3d 603, 607 (9th Cir. 1998). When deciding a motion to dismiss based upon either lack of subject matter jurisdiction or failure to state a claim, this Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Walleri v. Fed. Home Loan Bank*, 83 F.3d 1575, 1580 (9th Cir. 1996).

In the instant case, even accepting the facts as stated in Ms. Moorhead's Complaint as true, the Court should dismiss her claims under Rule 12(b)(1) & (6), since she has failed to establish this Court's jurisdiction to adjudicate those claims, and/or she has failed to state a claim upon which relief can be granted.



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**2. Failure to Exhaust.**

It is well settled that for claims of discrimination in federal employment to be actionable in a United States District Court, a federal employee must first exhaust the administrative remedies provided by 29 C.F.R. §1614. *Leorna v. United States Dep't of State*, 105 F.3d 548, 550 (9th Cir. 1997); *Boyd v. U.S. Postal Service*, 752 F.2d 410, 415 (9th Cir. 1985). Exhaustion of administrative remedies is a necessary precondition to a civil action in this Court. *Rivera v. United States Postal Service*, 830 F.2d 1037, 1039 (9th Cir. 1987), *cert. denied*, 486 U. S. 1009 (1988); *Vinieratos, v. United States*, 939 F.2d 762, 770-771 (9th Cir. 1991). A Title VII plaintiff must follow the administrative process and may not either avoid it entirely or abandon it before it has concluded. *Id*; *Tanious v. Internal Revenue Service*, 915 F.2d 410, 411 (9th Cir. 1990); *Boyd* at 413-414. The purpose of the exhaustion requirement is twofold: To give notice of the alleged violation, and to give the agency a chance to investigate and conciliate the claim. *Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir. 1994). *See Ong v. Cleland*, 642 F.2d 316, 318-20 (9th Cir. 1981).

Initially, to timely exhaust administrative remedies as to any discrimination claim, a federal employee is required to initiate contact with an EEO Counselor within forty-five (45) days of the alleged discriminatory conduct, and to file a formal complaint within fifteen (15) days of being advised that informal counseling has ended. 29 C.F.R. §1614.105(a)(1); 29 C.F.R. §1614.105(d),106(b).

The Ninth Circuit has dismissed numerous employment discrimination claims where employees have failed to exhaust their administrative remedies in a timely fashion. For instance, failure to seek EEO counseling within the requisite period has resulted in dismissal. *See Johnson v. United States Treasury Dept.*, 27 F.3d 415, 416 (9th Cir. 1994) (failure to bring grievance within the designated time period was fatal to plaintiff's discrimination claim); *Miles v. Dep't of the Army,* 881 F.2d 777, 780 (9th Cir. 1989) (affirming dismissal where plaintiff neglected to seek EEO counseling within the allotted



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

time period); *Boyd v. United States Postal Service*, 752 F.2d 410, 414-15 (9th Cir. 1985) (plaintiff's discrimination claim dismissed where he failed to give notice to EEO counselor within requisite time after allegedly discriminatory acts). Similarly, courts have dismissed lawsuits on timeliness grounds where the employee has missed the deadline for filing the formal EEO Complaint. *See Wilkins v. Daley*, 49 F. Supp. 2d 1, 2 (D.D.C. 1999) (dismissal proper when plaintiff filed her formal complaint five days after expiration of 15-day deadline); *Davis v. United States Postal Service*, 142 F.3d 1334, 1339-40 (10th Cir. 1998); *Miller v. Runyon*, 32 F.3d 386, 389-90 (8th Cir. 1994) (affirming dismissal when plaintiff filed her formal complaint five days after expiration of 15-day deadline). Courts have even dismissed cases where a plaintiff missed the 15-day deadline by one day. *Blount v. Shalala*, 32 F. Supp. 2d 339, 340 (D. Md. 1999).

Furthermore, it is well settled that the time period for filing a complaint "begins to run when the facts that would support a charge of discrimination would have been apparent to a similarly situated person with a reasonably prudent regard for his rights." *Boyd v. U.S. Postal Service*, 752 F.2d 410, 414 (9th Cir. 1985). In the case of a discrete action (such as in the instant case), the time period begins to run when the person knows of the action at issue. Once an action is taken against an employee that he or she considers to be adverse, the employee is on notice and has an obligation to investigate further in order to safeguard his or her rights." *Fausto v. Reno*, 955 F. Supp. 286, 292 (S.D.N.Y. 1997) (internal quotations and citations omitted). *See Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 352 (5th Cir. 2001) ("a one-time employment event, including the failure to hire, promote, or train and dismissals or demotions, is the sort of discrete and salient event that should put the employee on notice that a cause of action has accrued").

In the instant case, Ms. Moorehead claims that Mr. Danielson told her on March 18, 2003, and again a couple of days later, that he planned to rotate the Lead Screener responsibilities among the team members. As a result, on or about March 20, 2003, Ms.



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Moorehead verbally protested the discussed changes to her Manager. Thereafter, on or about March 27, 2003, Mr. Danielson advised Ms. Moorehead that he was rotating the acting lead responsibilities from Ms. Moorehead to Lambert Lactaoen. Despite the fact that as of the 18th or 20th of March, Ms. Moorehead was on notice that she was not going to stay in the Acting Lead Screener position, she did not initiate contact with the EEO office until May 14, 2003, more than 45 days after the allegedly discriminatory event. Accordingly, this claim should be dismissed for failure to timely exhaust administrative remedies.

**3. Jurisdiction for Equal Pay Act Claim.**

Jurisdiction to hear Equal Pay Act cases depends on the Tucker Act. *Barnes v. Levitt,* 118 F.3d 404 (5th Cir. 1997)*, cert. denied*, 118 S.Ct. 1839 (1998). EPA claims must be brought either in the Court of Federal Claims or in the Federal District Court where the plaintiff resides. *Parker v. King*, 935 F.2d 1174 (11th Cir. 1991). However, the Court of Federal Claims has exclusive jurisdiction over an EPA claim brought by a federal employee where the amount in controversy exceeds $10,0000. 28 U.S.C. §§ 1346 (a) (2); 1491; *Warren v. Alexander*, 21 FEP cases 664 (N.D. Ga. 1979).

In the instant case, Ms. Moorehead's Complaint does not specify the exact amount of damages she is claiming under the EPA. However, unless Ms. Moorehead stipulates that she is seeking less than $10,000 in damages, her EPA claim must be severed from her Title VII claim and either dismissed for lack of jurisdiction or transferred to the Federal Court of Claims.

**4. Statute of Limitations under the Equal Pay Act**

A Plaintiff alleging violations of the EPA must bring suit within two years after the date on which the cause of action accrues unless the violation is wilful, in which case the action must be brought within three years. *Mclaughlin v. Richmond Shoe Co,,* 486 U.S. 128 (1988).

In the instant case, Ms. Moorehead has testified that she believed as early as



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

February of 2003, that she was paid less than at least one male co-worker. However, Ms. Moorehead did not file suit in District Court until October of 2005, several months beyond the two year statute of limitations.

**B. NOTWITHSTANDING THE ISSUE OF TIMELINESS, MS MOOREHEAD CAN NOT MAKE A PRIMA FACIE CASE OF SEX DISCRIMINATION, AND ASSUMING *ARGUENDO* A PRIMA FACIE CASE, SHE HAS NO EVIDENCE OF PRETEXT. THEREFORE, SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANT.**

**1. Summary Judgment Standard.**

Federal Rule of Civil Procedure 56 (c) provides that a district court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In the present case, defendant is entitled to summary judgment as a matter of law because there are no disputed issues of material fact.

In *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1047 (9th Cir. 1995), the Ninth Circuit succinctly described the showing a party moving for summary judgment must make and the corresponding burden a party opposing summary judgment must carry in order to thwart the motion. A party seeking summary judgment must "identify those parts of the record that indicate the absence of a genuine issue of material fact." *Id*. at 1048 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)). Once the party seeking summary judgment meets its burden, the nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324). Case law has established, however, that where the moving party has successfully carried its burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. (quoting *Matsushita*, 475 U.S. at 586). Further, if the evidence proffered by the party opposing the motion is "merely colorable, or is not significantly probative," summary



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

judgment may appropriately be granted. *Id*. (quoting *Liberty Lobby*, 477 U.S. at 249-50). "The possibility that the plaintiff may discredit the defendant's testimony at trial is not enough for the plaintiff to defeat a properly presented [summary judgment] motion." *United Steelworkers of America v. Phelps Dodge*, 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc).

With these standards in mind, this Court should dismiss Ms. Moorehead's lawsuit.

**2. No Evidence of Gender Discrimination.**

Ms. Moorehead alleges that her supervisor, Ron Danielson, rotated her out of the Acting Lead Screener position because of her gender in violation of Title VII. Accordingly, it is Ms. Moorehead's burden to initially establish that there is some substance to her allegation of discrimination, either by direct proof of discriminatory motive, or by circumstantial evidence.

Where, as here, a plaintiff has no direct evidence that she was discriminated against on the basis of her gender, she must prove her case by circumstantial evidence, the basic framework for which is set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To do so, she must present a body of evidence such that, were it not rebutted, the trier of fact could conclude that unlawful discrimination did occur. If Ms. Moorehead meets the burden of presenting a prima facie case, then the agency has the burden to articulate legitimate and nondiscriminatory reasons for its actions. If the agency meets this burden, Ms. Moorehead must then demonstrate that the agency's articulated reasons are a mere pretext for unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089 (1981). The ultimate burden of persuasion remains at all times on Ms. Moorehead. *Id.* at 256.

**(a) No Prima Facie Case.**

Generally, in order to establish a prima facie case of discrimination based upon gender, a plaintiff must show that (1) he/she belongs to a protected class, (2) he/she was performing according to his or her employer's legitimate expectations, (3) he/she was subject to an adverse employment action, and (4) similarly situated individuals outside his/her protected class were treated more favorably. *See Reeves v. Sanderson Plumbing*, 530 U.S. 133, 142 (2000); *Cornwell v.*



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

*Electra Central Credit Union*, 439 F.3d 1018 (9th Cir. 2006); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).

In the instant case, Ms. Moorehead cannot meet the third or fourth prong of a prima facie case under *McDonnell Douglas*. Ms. Moorehead cannot show that she was subjected to an adverse action, or that other employees who were not a member of her protected class were treated differently.

An adverse action is defined as a "materially adverse change in the terms and conditions of employment." *Hollins v. Atlantic Co*., 188 F.3d 652, 662 (6th Cir. 1999). Ms. Moorehead's job, however, was not adversely impacted because her supervisor rotated the Acting Lead responsibilities to another team member. It is undisputed that there was no additional salary compensation or extra benefits associated with taking on the Acting Lead Screener responsibilities. In fact, acting as a Lead Screener was totally voluntary and any Screener could decline to do so. Accordingly, there was no material change in the terms and conditions of her employment since her official status as a baggage Screener at all times remained unchanged. Furthermore, Ms. Moorehead had no entitlement to stay permanently in the Acting Lead position. Although Ms. Moorehead claims that she believed that if she remained in the Acting Lead Screener position for ninety days she could be permanently assigned to the position, her assumption defies logic. Exhibit A at pp 21-22. Ms. Moorehead acknowledges that there were no openings for permanent Lead Screener positions during the relevant time period. *Id.* Ms. Moorehead also acknowledges that she did not officially apply for the temporary assignment, nor was any official personnel action taken with regards to the temporary assignment. Exhibit A at pp. 12-13. She further acknowledges that nobody in manangement told her that she would be permanent after ninety days and that she had just heard "rumors" to that effect. *Id* at p. 22. Given the undisputed facts, it is difficult to understand how Ms. Moorehead can assert that she, out of all of her team members, had a right to stay permanently in the Lead position.

The fact of the matter is that a supervisor has the right to assign work as he or she sees fit. Accordingly, Mr. Danielson had the authority to assign Lead responsibilities to any one of his



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

subordinates. Although the Government acknowledges that a reassignment can be considered an adverse action if it seriously disadvantages an employee, generally "reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions". *Policastro v. Northwest Airlines, Incorporated*, 297 F.3d 535, 538 (6th Cir. 2002); *see generally*, *Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000). In the instant case, however, the allegedly discriminatory act could not even be considered a reassignment as envisioned in *Ray*, since it was not a permanent assignment. The fact that Ms. Moorehead might have wanted to continue acting as a Lead Screener and might have felt slighted by having the Lead responsibilities assigned to someone else does not create an adverse action. "An employee's subjective impressions as to the desirability of one position over another are not relevant". *Policastro* at 538; *see also Kocsis v. Multi-Care Mgmt. Inc*., 97 F.3d 876, 886 (6th Cir. 1996).

Finally, Ms. Moorehead cannot make a prima facie case because she cannot show that similarly situated males were treated more favorably. It is undisputed that a male co-worker, Jimmy Arealvo, was acting in the Lead capacity immediately prior to Ms. Moorehead and that, in fact, he was replaced by Ms. Moorehead. Furthermore, Ms Moorehead undisputedly was in the Acting Lead position longer than Mr. Arealvo, and she was rotated into the Acting Lead spot ahead of several other males. Exhibit A at pp. 11-13. Accordingly, rather than treating Ms. Moorehead less favorably than similarly situated males, it would appear that TSA gave Ms. Moorehead preferential treatment.

**(b) <u>Legitimate Non-Discriminatory Reasons</u>.**

Assuming *arguendo* that Ms. Moorehead could establish a *prima facie* case, the burden shifts to the defendant to rebut the presumption of discrimination by articulating a "legitimate, nondiscriminatory reason" for the decision at issue. *St. Mary's Honor Center*, 509 U.S. at 506-07; *Burdine*, 450 U.S. at 255. "It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *St. Mary's Honor Center*, 509 U.S. at 507; *Villiarimo v. Aloha Island*



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

*Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002) (emphasis added).

In the instant case, Mr. Danielson indicated that he decided to designate another team member to act in the Lead capacity because (1) he did not think that Ms. Moorehead was doing a good job while acting as a Lead Screener, and (2) he wanted to give other team members the opportunity to act as a Lead. These are legitimate reasons for making the change at issue and there is no evidence to suggest that gender played any part in the decision to assign another Screener to act in a Lead capacity.

**(c) <u>No Evidence of pretext</u>**

Once a defendant offers a legitimate, non-discriminatory reason for its employment action, a plaintiff may avoid summary judgment by offering evidence either that "a discriminatory reason more likely motivated the employer" to make the challenged decision, or that "the employer's proffered explanation is unworthy of credence." *Cornwell* at 1028. In other words, in the instant case, Ms. Moorehead must provide competent evidence that the presumptively valid reasons for TSA's actions were "in fact a coverup for a . . . discriminatory decision." *Id.*; *Brown v. Sierra Nevada Memorial Miners Hospital*, 849 F.2d 1186, 1192 (9th Cir. 1988). According to the Supreme Court, TSA's proffered reason "cannot be proved to be a pretext for discrimination unless it is shown *both* that the reason was *false, and* that discrimination was the real reason." *St. Mary's Honor Center*, 509 U.S. at 515 (citations omitted) (emphasis added)

In the instant case, Ms. Moorehead cannot provide even circumstantial evidence of pretext that would allow a reasonable jury to find for her by a preponderance of the evidence. As stated previously, Mr. Danielson had the authority to assign the Acting Lead duties to any one of his team members. There is absolutely no evidence that Mr. Danielson was favoring males over females. In fact, it is undisputed Ms. Moorehead was the second person on a team made up mostly of males to be designated as an Acting Lead Screener. As a result, it would appear that by choosing Ms. Moorehead over most of the males on the team, Mr. Danielson was favoring Ms. Moorehead rather than discriminating against her.

Mr. Danielson had sound business reasons for rotating another Screener into the Acting



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Lead position. Specifically, Mr. Danielson felt that Ms. Moorehead was not doing a good job and he wanted to give someone else an opportunity to do the job. Danielson Dec. There is no evidence that these reasons were pretextual. It is well settled that anti-discrimination laws are not vehicles for judicial second-guessing employment decisions, nor are they intended to transform the courts into personnel managers. *See Burdine*, 450 U.S. 259; *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509 (3rd Cir. 1993); *Merie v. Dacon*, 759 F.2d 989 (2nd Cir. 1987), *cert. denied*, 479 U.S. 1066 (1987); *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1223 (7th Cir. 1980).

Accordingly, Ms. Moorehead cannot meet her burden on this issue and TSA is entitled to summary judgment. *Wallis v. J.R. Simplot Company*, 26 F.3d 885, 890-891 (9th Cir. 1994).

## C. TSA DID NOT VIOLATE THE EQUAL PAY ACT

Ms. Moorehead alleges that TSA paid her less than at least one male co-worker in violation of the EPA. The EPA provides in pertinent part:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex.

29 U.S.C. § 206(d)(l).

In *Corning Glass Works v. Brennan,* 417 U.S. 188, 195 (1974), the Supreme Court said that "Congress' purpose in enacting the Equal Pay Act was to 'remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry - the fact that the wage structure of many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same'. S. Rep. No. 176, 88th Cong., 1st Sess., 1 (1963)." Accordingly, the fundamental principle of the EPA is that employees doing equal work should be paid equally, regardless of their gender. *Maxwell v. City of Tucson*, 803 F.2d 444, 445-46 (9th



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Cir. 1986); *see also Brinkley - Obu v. Hughes Training, Inc*. 36 F.3d 336, 343 (4th Cir. 1994).

In order to state a prima facie EPA case, a plaintiff bears the burden of establishing that employees of the opposite sex were paid different wages for substantially equal work. *Corning Glass Works v. Brennan*, 417 U.S. at 195; *Stanley v. University of Southern Cal*., 178 F.3d 1069, 1073-74 (9th Cir. 1999); *see* also *Maxwell* at 446. Jobs are equal if their performance requires "equal skill, effort and responsibility,' and they are performed under similar working conditions.' " *Forsberg v. Pacific Northwest Bell Tel. Co.*, 840 F.2d 1409, 1414 (9th Cir. 1988) (quoting 29 U.S.C. § 206(d)(1)).

Once a complainant has met his or her burden of establishing a prima facie case, an employer may avoid liability only if it can prove that the pay difference is justified under one of the four affirmative defenses set forth in the EPA: (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production of work (also referred to as an incentive or piecework system), or (4) a differential based on any other factor other than sex. 29 U.S.C. § 206(d)(1); *Corning Glass Works*, 417 U.S. at 196-97; *Kouba v. Allstate Insurance Co.*, 691 F.2d 873 (9th Cir 1982). Furthermore, "[t]he factor other than sex exception was intended by Congress to be a broad general exception." *Maxwell*, 803 F. 2d at 447.

In the instant case, the Government respectfully submits that Ms. Moorehead cannot show that TSA paid males, in general, higher wages than it paid females, in general, for substantially similar work. It is undisputed that most of the Screeners were hired at the base Screener salary which was $23,600 plus locality adjustment. Although the representatives of NCS Pearson gave higher than minimum salaries to some Screeners depending on prior specialized experience, there is no evidence that females were treated less favorably, since an approximately equal percentage of males and females were given a starting salary bump. Accordingly, there were some males, and also some females, who received higher starting salaries than Ms. Moorehead. In a situation such as the instant case involving over a thousand new hires, where males and females are demonstrably treated similarly, the fact that some individual males might have made more than Ms. Moorehead should not, in and of itself, establish a prima facie case of violation of the EPA.



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

*See generally, Angove v. Williams Sonoma, Inc,* 70 Fed. Appx 500, 508 (10th Cir. 2003) (In a situation where some managers, both male and female, made more money than Plaintiff and some, again both male and female, made less, the court determined no reasonable juror could conclude the difference between salaries had anything to do with gender). The Government acknowledges, however, that there are no cases completely on point, and that in most cases discussing the EPA generally, if one similarly situated employee makes more than an employee of the opposite sex the Courts will often find a prima facie case.[3] The statute, however, by its clear language, and by the documented congressional intent, is clearly intended to rectify situations where women as a whole are treated less favorably than males. That is not the case here. Males and females were to all intents and purposes treated equally. In fact, if Ms. Moorehead can make a prima facie case on these facts, so could all of the males who were also hired at the base salary level, given that an almost equal percentage of women got a starting salary bump.

Assuming *arguendo* that the fact that at least one male received a higher starting salary than Ms. Moorehead is sufficient to establish a prima facie case, TSA is still entitled to judgment, since the evidence overwhelmingly establishes that the starting salary differentials were based on a "factor other than sex." *See generally EEOC v. Romeo Cmty. Sch.*, 976 F.2d 985, 989 (6th Cir. 1992). Specifically, the evidence shows that the NCS Pearson representatives responsible for hiring the 1039 screening work force at SeaTac gave salary bumps to individuals with (1) screening or other similar security work experience (perhaps depending on the number of equipment certifications the individual held); (2) prior law enforcement experience, including police, firefighting and correctional officer experience; (3) prior military experience; (4) prior managerial experience ; and (5) advanced degrees. Additionally, the NCS Pearson representatives gave starting salary bumps in some situations where the candidate had been earning considerably more in his or her previous job. Sheldon Dec.

It is well settled that offering higher salaries based on the above listed factors does not violate the EPA. *See, e.g., Fallon v. State of Ill.*, 882 F.2d 1206, 1212 (7th Cir. 1989)

[3]Most cases, however, involve a much smaller universe of comparators.



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

("Employers may prefer and reward experience, believing it makes a more valuable employee, for whatever reason"). Furthermore, employers are entitled to use individualized qualifications as legitimate grounds for wage differences provided that such qualifications are not gender based. *Covington v. Southern Ill. Univ.*, 816 F.2d 317 (7th Cir. 1987) (education and experience of male professor were non-gender based reasons sufficient to justify wage disparity), *cert. denied*, 484 U.S. 848, 108 S. Ct. 146 (1987); *Dey v. Colt Const. & Development Co.,* 28 F.3d 1446, 1462 (7th Cir. 1994) (when a company negotiates a different starting salary comparable to what an individual earned at a previous job, the pay differential is based upon a factor other than sex); *Hutchins v. International Brotherhood of Teamsters*, 177 F.3d 1076,1081 (8th Cir. 1999) ("A differential that is based on education or experience is a factor other than sex recognised by the Equal Pay Act"); *Irby v. Bittick*, 44 F.3d 949, 956 (11th Cir. 1995) (stating that "[e]xperience is an acceptable factor other than sex if not used as a pretext for differentiation because of gender"); *Pouncy v. Prudential Ins. Co.*, 668 F.2d 795, 803 (5th Cir. 1982) ("Different job levels, different skill levels, previous training, and experience: all may account for unequal salaries in an environment free of discrimination.").

It is also well settled that if an employer makes a business decision to offer a higher salary based on prior experience, it is not the court's province to second-guess an employer's business judgments. *Fallon v. State of Ill.*, 882 F.2d 1206, 1212 (7th Cir. 1989). The Court's role is limited to determining whether a policy was applied "reasonably in light of the employer's stated purpose as well as its other practices." *Kouba v. Asllstate Ins. Co.*, 691 F.2d 873, 876 (9th Cir. 1982). Even the presence of subjectivity or informality in the structure or administration of a policy cannot, standing alone, support an inference of discrimination. *Taylor v. White*, 321 F.3d 710, 717 (8th Cir. 2003).

In the instant case, given that an almost equal percentage of males and females were given starting salary bumps, NCS Pearson's practice of giving a starting salary bump based on certain prior qualifications was applied consistently regardless of the gender of the applicant. Even if one could argue that Ms. Moorehead should also have gotten a starting salary bump because she had



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

four months prior screening experience, the fact that a mistake might have been made in her case still does not mean that the EPA was violated. *See Timmer v. Michigan Department of Commerce*, 104 F.3d 833 (6th Cir. 1997) (a wage disparity due to a mistake is also a defense within the fourth exception to the EPA). Furthermore, if the NCS Pearson Representative made a mistake in not crediting Ms. Moorehead's approximate four months of prior experience as a Screener, the mistake was also made with male applicants. Ms. Moorehead's male co-worker, Lambert Lactaoen, also had prior screening experience and he did not get a starting salary bump. *See* relevant part of Lambert's Lactaoen's Application for Employment attached as Exhibit I. Accordingly, the mere fact that an applicant had a few months prior screening experience, without any other additional specialized experience, obviously was not considered enough to merit a higher than starting salary, regardless of gender.

## IV. CONCLUSION

For the foregoing reasons, the Government respectfully asks this Court to grant its Motion to Dismiss and/or for Summary Judgment.

DATED this 17th day of January, 2007.

Respectfully submitted,

JOHN McKAY
United States Attorney

s/Marion J. Mittet
MARION J. MITTET, WSBA #12758
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Telephone: (206) 553-7970
Fax: (206) 553-4073
E-mail: jamie.mittet@usdoj.gov

OF COUNSEL
GILLIAN FLORY
Attorney Advisor
Dept of Homeland Security
Transportation Security Admin.
601 S. 12th Street, TSA-2
Arlington, VA 22202-4204
Telephone (571) 227-2670

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 17, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

John C. Montoya
Attorney at Law
999 Third Avenue, Suite 3800
Seattle, Washington 98104-4023
PH: 352-0500
FX: 286-8265
E-mail: Jcmforlaw@aol.com

DATED this 17th day of January, 2007.

s/Kathleen Cline
KATHLEEN CLINE
Legal Assistant
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: (206) 553-7699
Fax: (206) 553-4073
E-mail: kathleen.m.cline@usdoj.gov

# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

---

PAULA R. MOOREHEAD, Plaintiff,

v.

MICHAEL CHERTOFF, Secretary, U.S. Department of Homeland Security, Transportation Security Administration, Defendant.

No. C05-01767-JLR

---

DEPOSITION UPON ORAL EXAMINATION OF

PAULA R. MOOREHEAD

---

Taken at 700 Stewart Street, Suite 5220; Seattle Washington.

REPORTED BY: Thad Byrd, CCR
REPORTED ON: December 12, 2006

SEATTLE DEPOSITION REPORTERS
600 University Street, Suite 320
Seattle, Washington 98101 PH: (206) 622-6661

Page 6

Security Administration, referred to as TSA?
A. Yes.
Q. What is your position at this time?
A. I'm currently a transportation security officer.
Q. And is that the same thing as a transportation security screener?
A. Yes.
Q. Was the position referred to previously as a screener, and now it's referred to as an officer?
A. Yes.
Q. And what area are you currently working in?
A. In baggage.
Q. When were you hired by TSA?
A. 10/13/2002.
Q. And what position were you hired in as?
A. A screener.
Q. To your knowledge, were people hired at that time as lead screeners?
A. Yes.
Q. When did you know that people were hired as lead screeners? When did you first become aware of that?
A. Right away.
Q. And were you hired as a lead screener?
A. They told me when I took the assessment and went in for the job interview that the lead screener and

Page 7

supervisor positions were already full.
Q. And correct me if I'm wrong, but you didn't file any EEO complaint at that time about not being hired as a lead screener, did you?
A. No.
Q. And in October when you were hired by TSA, immediately prior to that where had you been working?
A. I was a prior screener at the airport.
Q. Working for what company?
A. ICTS.
Q. And were you working in the baggage area at that time, too?
A. No. I was working as a gate screener.
Q. And how long had you been working for ICTS at the time that you transferred over to TSA?
A. Approximately six and a half months.
Q. And prior to starting your job with ICTS, where had you been employed before that?
A. Seaprint. I was unemployed before that for a few months. Prior to that I worked for a printing company called Seaprint.
Q. Prior to working for ICTS, had you had any other screener experience?
A. No.
Q. Had you worked for the Federal Government before

Page 8

working for TSA?
A. No. TSA was not in existence at that time.
Q. And have you ever been in the military?
A. In the Army reserves.
Q. You're in the Army reserves now?
A. No.
Q. How long were you in Army reserves?
A. Four years.
Q. When did you stop being a reserve?
A. In 1992.
Q. Were you ever active military?
A. No.
Q. When you started working for TSA in October, where were you first assigned to work?
A. The first three months we were -- everybody was working at the check points, and then January 2003 part of us went to baggage.
Q. When you say in the first three months everybody was working at the check points, were you rotating around the various check points?
A. No. I was assigned to one specific check point for the first three months, and then in -- after the three months passed, part of us went down to baggage because there was a mandate that we had to check a hundred percent of bags.

Page 9

Q. So some people went to baggage and others stayed at passenger check points?
A. Yes.
Q. When you say check points, are you referring to the security screening for the passengers as they go into the waiting area for their flights?
A. Yes.
Q. And excuse me if I refer to this awkwardly, I'm not that familiar with the setup with baggage screeners myself.
So in January you were assigned to baggage. Were you working with a particular team at that time?
A. Yes. I was assigned second shift to work the Northwest ticket counter.
Q. And what is second shift?
A. The second shift worked from -- I believe it was 12:30 to 8:30 or 9:00.
Q. And how many people were on your team at that time?
A. There was approximately six or seven people.
Q. And in January, to the best of your recollection, who were your team co-workers?
A. Do you want me to list them all by name?
Q. Yes, thank you.
A. Curtis Smith.
Q. Curtis Smith?

Page 10

A. Yes. John Haley, Chris Bensen, Lambert Lactoen, Steven Keeler and Jimmy Arevero. It's A-R-L-E-V-O, I think is the last name.
Q. A-L-A-V-E-O did you say?
A. A-R-L-A-V-O, I think.
Q. "Arlavo"?
A. I'm not sure how to pronounce the last name.
Q. We have the spelling somewhere. I think it's something like "Arevero."
Were there any other females on the team with you?
A. Not at first. I was the only female.
Q. And then at some point did another female get assigned to that team?
A. Geraldine Trevino.
Q. And when did Geraldine get assigned to the team?
A. I'm not sure. Approximately a month or so later.
Q. And who was your supervisor in January?
A. Kevin Palmer and Ron Danielson.
Q. They were your first line supervisors?
A. Yes.
Q. And who was your second line supervisor?
A. Actually, those two shared the area. So when one was off, the other one was usually there.
Q. And was there somebody above them that if you needed

Page 11

to report to somebody if they weren't around you could go to?
A. Yes. In the beginning it was Ron Giddings. He was an acting screening manager, and towards the end it was Al Ceasar.
Q. And he was the screening manager?
A. Yes.
Q. And in January when you were first assigned to the baggage area with this particular team, did you have anybody that was a permanent lead screener?
A. No. They had no permanent leads assigned to that area.
Q. Sometime in January you were selected to act as lead screener; is that correct?
A. Yes.
Q. And who selected you?
A. Ron and Kevin.
Q. And had anybody been acting as lead screener prior to you?
A. Jimmy Arevero.
Q. And how long had Jimmy been in that position?
A. A couple weeks.
Q. How did you learn that you were selected to act as lead screener in January?
A. I had asked to be moved to a busier location, because

Page 12

we had a lot of down time at that location. And Ron and Kevin didn't really want to give me up, so they had selected me to be the lead of that area.
Q. Did they tell you verbally?
A. Yes.
Q. Did both of them tell you or --
A. Yes.
Q. (Continuing) -- just one?
Did they tell you together, or did one tell you first and then the other?
A. They both told me together.
Q. To the best of your knowledge, at that time was there a posted vacancy for a lead screener?
A. No.
Q. And did you fill out an application for that position?
A. No.
Q. Were you interviewed by anybody other than just having Ron and Kevin talk to you?
A. No.
Q. Did you receive any salary increase for serving as lead screener?
A. No.
Q. Did you receive anything in writing confirming your position as acting lead screener?

Page 13

A. No.
Q. When Jimmy -- I'll just refer to him as Jimmy -- was moved out of the acting position as lead screener, was he unhappy, do you know, to be removed from that assignment?
A. No.
Q. Did you ever talk to him about it?
A. No, I did not.
Q. Did he ever say anything to you about you being put in that position instead of him?
A. No.
Q. Did he ever act as if he was unhappy with you being in that position?
A. No.
Q. Did you ever have any conflicts with him when you were in that position as acting lead screener?
A. No.
Q. Did you have any conflicts with any of your co-workers when you were in that position?
A. Lambert Lactoen.
Q. And then what sort of conflict did you have with Lambert?
A. Lambert was aggressive. He would do -- he would try to interfere with the first shift. When they were still working, he would try and go and calibrate machines and stuff and interrupt their working conditions, or he was

Page 14

really rough. He'd kick the machinery around. He would just be really rough with it.
And a couple of times I had asked him not to do that, and finally I went to my supervisors to ask if they could talk to him, because it wasn't working with me.
Q. In general, when you would tell him to do something, would he do it --
A. Yes.
Q. (Continuing) -- or did you have other problems with him?
A. He would complain sometimes, but in the end he would usually do it.
Q. Did you have any conflicts with any of the other team members during the time that you were acting as lead?
A. No.
Q. Do you know if any of the other team members wanted an opportunity to act as lead?
A. No. A couple of days before I was taken out of the position, Ron Danielson came to me and my co-workers about rotating leads. And myself, Curtis Smith, John Haley and Steven Keeler said that we didn't want to do the rotating leads, and so I talked to Al Ceasar about it.
He went to talk to Ron Danielson about it, and they decided to rotate the leads on my days off. But a few days after that happened, they took me out of the

Page 15

position.
Q. Let me get back to my original question.
Did any of your co-workers ever say to you that they wanted an opportunity to serve as an acting lead?
A. No.
Q. Do you know if any of them ever said anything to Ron Danielson or Kevin Palmer?
A. No.
Q. You don't know; is that what you're saying?
A. I don't know.
Q. And you said that Ron came and talked to you about rotating the acting lead position?
A. Yes.
Q. What did he say specifically about why he wanted to do that?
A. He didn't give me a reason. And when me and my co-workers found out that he wanted to do that, they had told me they didn't really want to do that. So we had asked to talk to Al Ceasar about it, who was our screening manager at the time.
Q. The other co-workers, since they weren't in the position as acting lead, did they say why they cared?
A. No.
Q. And did you actually go talk to Al Ceasar?
A. Yes.

Page 16

Q. Do you recall when that was?
A. The same day.
Q. And how long was that before you were rotated out?
A. Two days.
Q. And what did Al say to you specifically to the best of your recollection?
A. He just -- we all stated our opinions about not wanting to rotate leads on a daily basis or a weekly basis, and he went and talked to Ron Danielson about it. And then Ron Danielson approached me the next day and said that he'd rotate them on my days off.
Q. When you talked to Al, did he say anything specifically to you or he just said he would talk to Ron?
A. He just said he would talk to Ron.
Q. When you were serving in the capacity as acting lead screener, did Ron Danielson or Kevin Palmer or for that matter Al Ceasar ever criticize you about your performance?
A. No.
Q. Were you ever reprimanded or talked to about doing puzzles, working crossword puzzles?
A. No. Kevin Palmer -- when we had down time, we used to sit behind the ticket counter where nobody could see us and do them, and Kevin Palmer was right there with us during the down times.

Page 17

Q. Did you ever tell Ron Danielson that you were having trouble keeping track of some of your screeners?
A. Yes.
Q. Can you tell me what that was about?
A. There was a couple of screeners that if you would send them on break, they would -- and say, "come back in 20 minutes," they would disappear for the rest of the day.
And so the first time this happened to me, I took a note of it. And they -- the next day I approached them and asked them where they went. They said they went to help out at Alaska.
The second time that these two gentlemen disappeared on me, I went to Ron Danielson, who was the only supervisor there in my zone at the time, and said these two gentlemen are disappearing. This is not the first time, and I don't know what to do about it, because at that time we weren't given the authority to reprimand our co-workers.
Q. And who were the two gentlemen?
A. Chris Bensen and Jimmy Arevero.
Q. And forgive me if I've asked you this before. I think I might have, but I can't recall.
How did you get along with the other members of your team when you were in an acting lead position?
A. Most of time we all got along great.

Q. When you talked to Chris Bensen and Jimmy Arevero about disappearing from the area, what were their reactions?
A. They just kind of blew it off, kind of laughed about it.
Q. Who was rotated into the acting lead position after you?
A. Lambert Lactoen.
Q. And to your knowledge, had he expressed previously a desire to be acting lead?
A. He was offered the position before me and declined it. And about a week before they took me out of the lead position, Ron Danielson made a comment to me referring to Lambert, because Lambert had walked by me.
And Ron, when we were having a conversation, is saying, he's after your job. And a week later, I was removed and Lambert was put in.
Q. Do you take that as indicating that Lambert did have a desire to be in that position?
A. He never really expressed it before because he'd declined it.
Q. And he never expressed it to you?
A. No.
Q. How do you know that he had been offered it and declined it?



A. He told me.
Q. Did Ron Danielson ever tell you that?
A. No.
Q. In your complaint you indicated that Lambert Lactoen did not have greater seniority than you. What do you base that on?
A. I was hired one day before he was.
Q. Do you know whether he had prior government experience?
A. He had prior military experience.
Q. Active military?
A. Active military.
Q. Do you know if he had any other government experience?
A. No.
Q. Evidently you were unhappy when you were taken out of that acting lead position; am I correct?
A. I was upset the day that I was, yes, the way that it was handled.
Q. And how was it handled?
A. We had just come on our shift. It was about 12:30, and Ron Danielson approached me with Steven Keeler and Lambert Lactoen right in the middle of a bunch of high school kids leaving to go to fly out somewhere.
So he was telling us that whoever had the most



military experience between me, Lambert and Steven Keeler would be the lead, right in the middle of trying to get a flight out. He didn't pull us aside afterwards. He did it right out there where everybody could listen.
Q. And who was present at the time? You, Lambert and some high school students?
A. Steven Keeler, and there was a bunch of high school students that were flying out. We were screening a band of some kind.
Q. And did Steven Keeler say anything?
A. He was like, what was that all about? That was pretty much all he said at the time, because he -- we were all under the impression that everything was fine.
Q. Did Lambert say anything at that time?
A. No.
Q. Have you acted as a lead screener since that time?
A. On and off in the areas that I've worked on. Yes, I have.
Q. And in those periods of time when you've acted on and off, what would you say was the shortest time that you were acting as a lead?
A. One or two days at a time.
Q. What was the longest time that you've acted since as a lead?
A. About a month.



Q. And when were you taken out of the acting lead position?
A. March 27th, 2003.
Q. So you were in that position for approximately two and a half months?
A. Yes.
Q. Why did you think that you were entitled to be in the position permanently?
A. That was the way they presented it to me, Ron and Kevin.
Q. And can you tell me specifically how they presented it to you and made you think it was permanent?
A. They just said that as of tomorrow you'll be the permanent lead at Northwest when they told me that they had selected me as being the lead.
Q. But you knew there were no openings for a lead. You already said that.
A. Right.
Q. And somebody else had been acting as lead before you were put in that position, correct?
A. They didn't call it acting lead at the time. They just said the lead position, so we were all under the assumption that it was a permanent position, that they would put the paperwork through after you served your 90 days, and you'd be a permanent lead.

Page 22

Q. And what is this about serving 90 days?
A. At the time that I was an acting lead, there was a bunch of rumors going around. And one of them was that if you served 90 days in that position, all the supervisor had to do was put in the proper paperwork, whatever that may be, and you would get the pay as a lead.
Q. Did anybody in authority at TSA ever sit down and tell you that definitely after being in an acting position for 90 days you or anybody else would be made permanent?
A. The people in management never told us anything.
Q. So this was just a rumor that was going around the work place?
A. Yes.
Q. Did you ever see anything in writing that said that?
A. No.
Q. And you've indicated in the complaint that you filed in this lawsuit that you believe that the fact that you were taken out of that acting lead position was an act of discrimination; is that correct?
A. Yes.
Q. Now, is that discrimination based on the fact that you're female?
A. Yes.
Q. And why do you believe that you were taken out of that position because you're a female?

Page 23

A. Ron Danielson didn't think highly of the females that he worked with.
Q. And how do you know that?
A. Well, working with Ron as long as I did, he preferred the male screeners over the females, what few of us there were.
Q. And again, what specifically made you think that?
A. Well, the way that he treated the males versus the females. He treated them a little bit better.
Q. In what way?
A. It's kind of hard to describe. It was like he treated them as a buddy. But a female worker, I mean, he looked down on her.
Q. And again, are you just assuming that he looked down on you? Was there anything specifically that he did or said that made you think that he was looking down on you because you were a female?
A. No, just his actions and the way he talked to me. It was like he didn't really respect me as a person, as a lead.
He never -- he never gave me a verbal reprimand or a reprimand of any kind, but the way that he came across to me and to another -- Geri Trevino, he looked down on us because we were females and we were working there in baggage.

Page 24

Q. So it was nothing he said or did. It was just your feeling of how he was --
A. His actions.
Q. (Continuing) -- looking at you?
Now, Ron Danielson put you in the position as acting lead, correct?
A. Ron and Kevin.
Q. Along with Kevin?
A. They both did it verbally, and Kevin was the one that verbally told me.
Q. Now, do you believe that when Ron Danielson put you, a female, in that position as acting lead, that he was discriminating against the males by not putting them in it?
A. I don't know.
Q. And you at some point filed an EEO complaint regarding the fact that you were taken out of the acting lead position, correct?
A. Yes.
Q. When was that to the best of your recollection?
A. I called the 1-800 hotline in April of 2003. When I did not get a response from them, I sent a letter at the end of May of 2003.
Q. And how did you know to call the 1-800 hotline?
A. I have an employee handbook, and the instructions on

Page 25

how to file an EEOC complaint are in the employee handbook.
Q. Since you were removed from this acting position that we're talking about here, you were removed from it on March 27th, 2003, you've indicated that you have since then acted as a lead screener several times.
When you were rotated out of those subsequent acting lead screener positions, did you file a complaint that you were discriminated against?
A. No, because I was covering for the actual hired lead that was in the positions while they were gone.
Q. Prior to starting work with TSA, did you have experience in aviation or transportation-related screening other than your work for ICTS?
A. No.
Q. Did you have experience screening baggage before you went over to TSA?
A. What experience I had was what I learned at ICTS.
Q. And that was working the passenger check points?
A. Yes.
Q. Had you worked in the baggage area?
A. No.
Q. Because at the time they were not screening the baggage; is that correct?
A. Correct.

Q. I'm going to ask you about some various screening technologies, and let me know whether you did or did not have experience with them at the time you started with TSA.
Did you have experience with x-ray equipment?
A. Yes.
Q. Did you have experience with trace detection?
A. Yes.
Q. And did you have experience with physical searches?
A. Yes.
Q. Did you have experience with computed-aided searches?
A. CTX searches?
Q. Right.
A. No.
Q. Did you have experience with calibration and maintenance of security equipment?
A. Yes.
Q. And this was all the experience that you had for about six months while you were working for the previous contractor?
A. Yes.
Q. Did you have any other background in law enforcement? You've indicated that you didn't have active military service. Other than your reserves, did you have any other law enforcement experience?



A. No.
Q. Did you have any other experience that you believe qualified you specifically to be a screener?
A. I have 15 years customer service experience.
Q. Face-to-face customer service experience --
A. Yes.
Q. (Continuing) -- or on the phone?
A. Yes.
Q. Is that both?
A. Both.
Q. Okay. You indicated in your complaint that you filed in this lawsuit that one of your male co-workers made more money than you and was hired at a higher salary.
Who is that person that you're referring to?
A. The one I referred to was Lambert Lactoen.
Q. And what made you think that Lambert Lactoen was hired at a higher salary than you were?
A. He told me in general conversation.
Q. And what specifically to the best of your recollection did he tell you?
A. We were talking about the day that we were hired, how some people were able to negotiate for their wages and other weren't, and he told me that he was making a dollar an hour more an hour than I was because of his military experience.



Q. Had you told him what your hourly salary was?
A. Yes.
Q. What was your hourly salary when you were hired?
A. It was $12.70 an hour.
Q. Did you ever see any of his official paperwork?
A. Not then, no.
Q. So at that time your only basis for believing that men were paid more than you at the time you filed your complaint was because Lambert told you he made a dollar an hour more?
A. Yes, and there was a few other people we found out that were able to negotiate for higher wages that were male, too.
Q. And did you find that out before you filed your complaint in this lawsuit?
A. Yes.
Q. And who were those people?
A. Phillip Reed.
Q. Phillip Reed?
A. Phillip Reed, R-E-E-D, Casey Hueber.
Q. Hueber?
A. Last name I believe is spelled H-U-E-B-E-R.
Q. And who else?
A. Those were the only two before.
Q. And how were you lead to believe that Phillip Reed



was hired in at a higher salary than you?
A. He said -- he told a friend of mine that he was able to negotiate for his wages and get the higher pay, and then he showed proof.
Q. When was Phillip hired in comparison to when you were hired?
A. Around the same time I was.
Q. Do you know specifically when he was hired?
A. No. I don't know the hire date.
Q. And who did he tell that he was able to negotiate for his salary?
A. Michelle Dodd.
Q. Don?
A. Dodd, D-O-D-D.
Q. Do you have any idea what his background experience was?
A. The same as mine.
Q. Was he working for the same contract company?
A. Yes.
Q. Do you know if he had any prior government experience?
A. No.
Q. Do you know if he had any military experience?
A. I believe he is in the Coast Guard or something like that.

Page 30

Q. Do you know if he's been active military?
A. Yes.
Q. And how long did he work for ICTS? Do you know?
A. No.
Q. So you don't know if he was there longer than you?
A. No.
Q. And do you know what his salary was when he hired in?
A. No.
Q. Did you ever see any documentation as to his salary?
A. No. The only thing that I know regarding Phillip Reed was that he was able to negotiate for his wages. When we were all hired, we were told that we would start out at the salary that we had when we were working with ICTS plus locality, and some were able to negotiate and some weren't.
Q. So did you start out at the salary that you were at ICTS?
A. No. I wasn't allowed to negotiate for my wages.
Q. And did Phillip Reed start at the salary that he had with ICTS?
A. He started out at a higher salary.
Q. And what was his salary when he started out?
A. I don't know.
Q. How do you know it was higher than yours?
A. Because there was -- he showed documentation, not to

Page 31

me, but to Michelle Dodd.
Q. And what documentation he did show Michelle?
A. His check stub.
Q. Do you know what shift he worked for TSA?
A. No.
Q. Do you know if he got any premium adjustment for working night shift or swing shift?
A. I don't know.
Q. So she's assuming because she saw a pay stub that he was making more money?
A. From TSA?
Q. Correct.
A. Yes.
Q. Do you get shift differential depending on the shifts you work?
A. Yes.
Q. But you don't know what shift he was working?
A. No, not at the time.
Q. And for Casey Hueber, how do you know that he was hired at a higher salary?
A. Casey told me personally that he was able to negotiate for his wages.
Q. Assuming that he could negotiate for his wages, did he tell you what his wage was?
A. No.

Page 32

Q. So how do you know that he negotiated for a higher wage than you?
A. He said that he was able to do it.
Q. He said he was able to negotiate for his wages, but you've said that you didn't know what his wage was.
A. I didn't -- I didn't ask him what his wage was. When I found out that some screeners were allowed to negotiate for their wages and others weren't, I asked the people that I worked with at ICTS whether they were able to negotiate and whether they weren't.
Q. And I understand that you're saying he said that he could negotiate for his wages, but he didn't tell you what that wage was?
A. No.
Q. So how do you know that the wage was higher than yours if he didn't tell you what it was?
A. Because he told me he started out at a higher wage than what I did at $12.70 an hour.
Q. Did you tell him what you were making?
A. When I signed my contract, we all -- those of us who didn't negotiate signed a contract stating that we would accept the job at $23,600 plus locality.
Q. Right, and did you tell --
A. Yes.
Q. (Continuing) -- Casey that that's what you were

Page 33

making?
A. Yes.
Q. And what did he say?
A. He told me that he was able to negotiate for a higher wage.
Q. Do you believe that all male screeners were hired in at a higher salary than you?
A. I'm not sure.
Q. Do you know if there were some women who were hired in at higher salaries than you?
A. I'm not sure.
Q. Do you know if there were some men who were hired in at lower salaries?
A. No.
Q. You don't know?
A. I don't know.
Q. You indicated in your complaint that there was a memo that you saw from TSA by an individual named James Loy that talked about salary differentials; is that correct?
A. Yes.
Q. Where did you see that memo?
A. I got injured in October of 2004, and I was gone for approximately three weeks. When I came back, I was catching up on our daily briefing in our briefing book at work and saw the memo.

Page 34

Q. What was the date on the memo? Do you remember?
A. No.
Q. Do you have a copy of the memo?
A. No. We weren't allowed to take any information out of the area.
Q. And what did the memo say?
A. It basically said that they were aware that they had discrepancy in pay issues, and they weren't going to try and fix them. They were aware that some people were able to negotiate for their wages as far as prior screeners and others weren't, and they weren't going to fix that either.
There were other things in the memo, too, but I don't remember everything that was in there.
MS. MITTET: I'm going to mark an exhibit. For the record, I'm marking an exhibit that is a memorandum to Assistant Administrator for Aviation Operations, Federal Security Director from Richard A. Whitford.
(Exhibit #1 was marked for identification.)
Q. (By Ms. Mittet) Showing you what's been marked plaintiff's Exhibit #1 to your deposition, Ms. Moorehead, this is a June 6th, 2003 memo from a Richard Whitford that talks about a decision not being made to adjust the pay of contract screeners at this time.
Could this be the memo that you looked at?

Page 35

Because this talks about different pay issues.
A. This was not the memo. The memo I saw was an e-mail.
Q. It was an e-mail?
A. Yes. It was an e-mail from James Loy addressing these issues, but not in this length.
Q. But it was addressing the same issues as in here?
A. Yes.
Q. You indicated in your complaint that you filed in District Court that you have suffered emotional harm as a result of the discrimination that you alleged in your complaint, the alleged discrimination, I should say, that you alleged in your complaint.
What are you referring to when you say that?
A. Well, since I filed this complaint and management has found out that I filed a complaint, my co-workers look down upon me. I work in a very stressful environment. A few of my leads no longer -- I don't -- I no longer work with them. They're in another area now, but they made things very difficult for me.
Q. You're talking about your perception of events that happened after the complaint was filed?
A. Yes.
Q. But in the complaint, when you filed it, you said you suffered emotional harm. So I'm assuming that's harm that predates your filing the complaint.

Page 36

A. When I filed this complaint, I went through the process for the EEOC. And when I went through my chain of command, nothing was done. They just kind of swept it underneath the rug.
And then when I started the EEOC process, doing the mediation and all of that and it leaked out, some of my co-workers have made it literally hard for me to even stay there.
Q. You said you went through the chain of command before you filed your EEO complaint?
A. Yes.
Q. And can you tell me what you did?
A. When I was removed from the lead position in March of 2003, I approached my -- the other supervisor that did not remove me, Kevin Palmer, and asked him to move to a different work location, because I was going to file a complaint against Ron Danielson.
So Kevin moved me. He was able to swap me out with somebody to make it so that they wouldn't be short one person. I filed the complaint. I waited for upper management to respond. And when they didn't --
Q. I'm sorry, when you say you filed a complaint, you're talking about the complaint that you filed with EEO?
A. No. I filled out a personal action form with TSA, and I submitted it to HR. They never responded to it.

Page 37

Q. And when did you do that?
A. The end of March of 2003.
Q. And where did you get the form?
A. The form I got right there. It's a form that they carry there at the airport.
Q. Who specifically did you submit it to?
A. The HR person on duty was Terry Jones at that time at the airport.
Q. And what did you say in the form?
A. Well, there was a letter. There was a letter, and I explained the situation that had happened between me and Ron Danielson, my supervisor at the time, and asked for an investigation on it.
Q. Asked for an investigation as to why you were taken out of the acting lead screener position?
A. Yes, and nobody from headquarters -- our headquarters at SeaTac responded to that. So in the middle of April -- I gave them a couple weeks to respond. When they did not, I called the Office of Civil Rights, and left my phone number on their voice mail.
I never heard anything back from them. So the end of May of 2003, I filed -- I sent a letter to the Office of Civil Rights.
Q. And this is the emotional harm that you've suffered, the fact that it was difficult?

Page 38

A. Yes. Once I filed the EEOC complaint with the Office of Civil Rights, it got around because they would call to do an investigation. They'd call SeaTac Airport wanting to talk to me. That's when my emotional stress started, because it went -- it took not even two days after screening managers found out that I filed that people were just being downright ornery to me.
Q. Who specifically are you referring to?
A. My old supervisor.
Q. Who was that?
A. Jason Landon. He would make wise remarks.
Q. Jason who? What was the last name?
A. Landon.
Q. L-A-N-D-O-N?
A. Yes.
Q. What area were you working in when Jason Landon was your supervisor?
A. I was working at step.
Q. I'm sorry, what?
A. Step, it covered Delta Airlines and a few other airlines at the time.
Q. Did you say step?
A. Step, S-T-E-P.
Q. And was he a supervisor or a lead?
A. He was a supervisor.

Page 39

Q. And what specifically did he do?
A. He would just -- they would just make smart comments about me filing an EEOC complaint like, are you sure you really want to do this? And they would just make fun of me.
Q. Did you ever get a performance evaluation from Jason Landon?
A. I believe I've gotten one. It was -- at that time they were -- it was -- they either said you did your job or you didn't. I mean, it wasn't elaborate.
Q. So your performance evaluations are similar to pass/fails?
A. Similar, yeah.
Q. And did they ever give you a bad evaluation or did you pass?
A. No.
Q. So you did not get a bad evaluation for anything?
A. I never got a bad evaluation, but with Jason I never got a good one either. It was just, so you know how to do your job.
Q. Your system for evaluations, do you have a system for saying that you're doing a good job, an excellent job, or is it just you're doing a job or you're not?
A. At that time it was pretty much you're doing your job or you're not.

Page 40

Q. And Jason said that you were doing your job?
A. Yes.
Q. And anybody else that made comments to you?
A. There was a bunch of screeners that I worked with. A lot of my male co-workers were kind of mean to me because I filed an EEOC complaint.
Q. Did they say they were annoyed with you because you filed, or are you assuming it was because of that?
A. No. They were never annoyed with me. They would just I guess be a typical male. I mean, they just -- I don't know. They didn't really want me in that area because I was kind of speaking out about the working conditions that we were working underneath or whatever.
Q. You were speaking out about you being removed from the --
A. Yes.
Q. (Continuing) -- lead position, not working conditions in general; is that correct?
A. Yes.
Q. Did any of them specifically say anything to you about you being removed from the acting lead position?
A. No. I would just -- they would talk behind my back, and the rumors would get back to me.
Q. Did anybody say anything directly to you?
A. No.

Page 41

MS. MITTET: I don't have all that much more. I'd just like to take a little break.
MR. MONTOYA: Sure
(Recess taken.)
MS. MITTET: Back on the record again.
Q. (By Ms. Mittet) I just have a couple of finishing questions here, Ms. Moorehead.
You indicated that Lambert Lactoen told you that he was making a dollar more than you salary wise. When did he tell you that?
A. In a general conversation we were having. I'm not sure of the date, but it was prior to me being removed as a lead.
Q. Do you recall approximately how long before? Was it a week or two weeks? A month?
A. A month maybe.
Q. And when were you told by Michelle Dodd that -- I'm looking for the names of the other two gentlemen. I think you said Phillip and a Casey.
A. Phillip Reed and Casey Hueber.
Q. When did Michelle tell you that she thought they were hired in at a higher salary than you?
A. When I saw that e-mail.
Q. And when was that?
A. November of 2003.

# EXHIBIT B

March 31,2003

Description For Personnel Action Form
Dated March 31,2003
Paula L Moorehead
ID # 60152 SS[redacted]

To Whom It May Concern,

I am completing this form in an effort to resolve this matter prior to the expiration of the 45-day limit to file a discrimination complaint under regulation 29C.F.R. part 1614.

A few days prior to January 14, 2003 I had requested to transfer out of the Northwest ticket counter to a busier area. On January 14, 2003 just prior to completing my shift I was informed by Ron Danielson, my supervisor, starting tomorrow (Jan. 15th) I would be the permanent lead. Both Ron Danielson and Kevin Palmer stated they had given me this position because I had demonstrated the ability to take responsibility and get the job done without being asked, as they did not want to lose me.

Upon my arrival to work on March 18, 2003 Steve Keeler asked to talk to Ron and myself about Lambert Lactoen. Steve informed us that Lambert had confronted him in a very forceful manner about going to work prior to the start of our shift. Lambert seemed to feel that if he could not start work prior to our shift that no one else should either. It appears that Lambert missed the point, in that his actions resulted in interfering with others to perform their work while Steve's actions contributed directly in getting the work done and not delaying the passengers (see related personnel action form dated 3/31/03).

Later that night Ron informed us that he was going to rotate the leads on my days off. A couple of days later Ron came back to me once again and said he was going to rotate leads on a weekly basis. I did not have the opportunity to discuss this with him as it was at the end of our shift and his RDO's were the next two days. I discussed this with Al Cesar (my screening manager) the next day and told Al I was not interested in rotating. Steve Keeler, Curtis Smith, and John Haley also told Al they did not want a rotating lead. Al said he would talk to Ron when Ron came back from his days off. On Tuesday March 25,2003, Ron came to me and said that he was going to rotate leads on my days off (Sun. & Mon.), and on my next RDO's I needed to make him a list of rotating leads. Just as we started our shift on Thursday March 27, 2003 we were beginning to process bags for a group of high school students Ron came up and in the

Description For Personnel Action Form
Dated March 31,2003
Paula L Moorehead
ID # 60152 SSN[redacted]

presence of the students stated "who ever has the most military experience between Lambert, Steve and myself would be the lead," which meant that Lambert would be. Both Steve and I could not understand the logic of this since Lambert had been offered the position originally which he turned down and just a week earlier Ron had removed him as my back up lead. After he replied my decision stands we talked to Al Cesar and explained the situation. He said he would talk to Ron to find out why he did that and get back to us. A little while later Al came back and said he is supporting Ron's decision, asked if anything written had been made out about Lambert? We replied "no", before we could tell him we were still waiting for Ron to get back to us he walked away offering no further explanation.

**SONAPSOUS**

1) Both Lambert and I have previous military experience.
2) We were both acting lead screeners with ICTS.
3) We both took and subsequently passed the TSA test for lead / supervisor.
4) When he was offered the position of lead prior to me he turned it down. Military experience not withstanding.
5) With no complaints having been brought to my attention, verbal or written, my performance must be assumed satisfactory since lack of knowledge denies me the ability / opportunity to correct any deficiencies in my performance.
6) Not withstanding the credit given for veterans upon initial employment, is it in fact a policy for TSA to demote someone in order to favor / promote another based solely on prior military experience?

This statement is true and correct to the best of my knowledge.

Paula L Moorehead
Paula L Moorehead
ID # 60152 SSN[redacted]

TAB B
Page 36 of 47 Page

# EXHIBIT C

# EEO COUNSELOR'S REPORT

TSA-03-1295

## I. REQUIRED ELEMENTS

### A. AGGRIEVED PERSON

**Name:** Paula L. Moorehead

**Job Title/Series/Grade/Pay Band:**

Transportation Security Screener/SV-0019-D

**Place of Employment:**
Seattle-Tacoma International Airport
Seattle, WA

**Work Phone No.:** **Home Phone:** [redacted]

**Home Address:** [redacted]

**Email Address:**

### B. REPRESENTATION

☐ **Yes** **Name:**

**Address:**

**Telephone No.:**

☒ **No**

### C. CHRONOLOGY OF EEO COUNSELING

**Date of Initial Contact:** 5-14-03

**Date of Initial Interview:** 6-05-03

TAB B
Page 1 of 43 Pages

TSA-03-1295

**Date of Alleged Discriminatory Event(s):** 3/27/03

**Date of Final Interview:** 9/14/03

**Deadline for Timely Contact:** 5/10/03

**Reason for delayed contact beyond 45 day period, if applicable:**

Ms. Moorehead stated that the reason for delayed contact beyond the 45-day period is because according to the standard operating procedure, she was informed to follow the chain of command and tried to have the case resolved at the airport before contacting the office of Civil Rights.

**Date Counseling Report Requested:** 1/16/04

**Date Counseling Report Submitted:** 2/09/04

**D. BASIS(ES) FOR ALLEGED DISCRIMINATION**

- ☐ **Race (*Specify*):**
- ☐ **Color (*Specify*):**
- ☐ **National Origin (*Specify*):**
- ☒ **Sex (*Specify*):** female
- ☐ **Age (*Date of Birth*):**
- ☐ **Disability (*Specify*):**
- ☐ **Religion (*Specify*):**
- ☐ **Reprisal (*Specify*):**
- ☐ **Sexual Orientation (*Specify*):**

**E. ALLEGATIONS**

- ☐ APPOINTMENT
- ☐ ASSESSMENT PROCESS
- ☐ ASSIGNMENT OF DUTIES
- ☐ AWARDS
- ☐ CONVERSION TO FULL-TIME
- ☐ DUTY HOURS
- ☐ EVALUATION/APPRAISAL
- ☒ PROMOTION
- ☐ REASIGNMENT
- ☐ REINSTATEMENT
- ☐ REPRIMAND
- ☐ RETIREMENT
- ☐ SEXUAL HARASSMENT
- ☐ SUSPENSION

TSA-03-1295

- ☐ MEDICAL EXAMINATION
- ☐ PAY/PAY BAND (INCLUDING OVERTIME)
- ☐ HARASSMENT (NON SEXUAL/HOSTILE WORK ENVIRONMENT
- ☐ OTHER (*Specify*):
- ☐ TERMINATION
- ☐ TRAINING
- ☐ WORKING CONDITIONS

**F. PERSON(S) AGAINST WHOM ALLEGATION(S) WERE MADE**

Ron Danielson, Supervisory Transportation Security Screener

**G. DISCRIMINATION CLAIM(S)**

The aggrieved stated that based on her sex (female), when on March 27, 2003, she was denied a promotion as a Lead Transportation Security Screener, SV-0019-F, in her position as a Transportation Security Screener, SV-0019-D, at the Seattle-Tacoma International Airport

**H. REQUESTED REMEDY OR REMEDIES**

Promotion to a Lead Screener, SV-0019-F, with backpay effective March 27, 2003

**I. COUNSELOR ADVISED THE AGGRIEVED IN WRITING OF HIS/HER RIGHTS AND RESPONSIBILITIES**

☒ YES **DATE NOTICE MAILED:** 6/05/03

☐ NO

**J. AGGRIEVED ELECTED ANONYMITY**

☐ YES ☒ NO

**K. COUNSELOR EXPLAINED THE RIGHT TO ELECT EITHER ADR OR TRADITIONAL COUNSELING**

☒ YES ☐ NO

☒ **ADR Elected**

**Date Election Letter Mailed:** 6/05/03

☐ **Traditional Counseling Elected**

**Date Election Letter Mailed:**

# EXHIBIT D

**TRANSPORTATION SECURITY ADMINISTRATION**
Aviation Operations
**Directive from the Associate Under Secretary**

**AVO 400.16.1-1**

October 16, 2002

**Subject: Reporting Allegations of Civil Rights Violations**

1. PURPOSE: To establish procedures for reporting allegations of civil rights violations by TSA employees and by customers and passengers in the civil aviation system.

2. DISTRIBUTION: All AVO employees.

3. DEFINITIONS: An allegation of a civil rights violation is defined as an allegation of discrimination based on race, color, religion, sex, national origin, age, mental/physical disability, sexual orientation, or parental status.

4. DIRECTIVE: All allegations of civil rights violations shall be referred to the TSA Office of Civil Rights.

External Complaints: Allegations from passengers and customers that they have been discriminated against because of race, color, religion, sex, national origin, age, mental/physical disability, sexual orientation, or parental status should be reported via either:

Telephone: (202) 756–2233
In writing: U.S. Department of Transportation
Transportation Security Administration
Office of Civil Rights
400 Seventh Street SW, Mailstop TSA–6
Washington, D.C. 20590

Internal Complaints: Allegations from TSA employees, former TSA employees, or applicants for employment that they have been discriminated against because of race, color, religion, sex, national origin, age, mental/physical disability, reprisal for participating in an activity protected by the various civil rights statutes, or sexual orientation should be reported via either:

Telephone: 1–877–EEO–4TSA (1–877–336–4872)
In writing: U.S. Department of Transportation
Transportation Security Administration
Office of Civil Rights
400 Seventh Street SW, Mailstop TSA–6
Washington, D.C. 20590

Exhibit No. 4
Witness McDowell
Date 12-11-06
Mary Tevis, Reporter

# EXHIBIT E

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**909 First Avenue, Suite 400**
**Seattle, Washington 98104-1061**
**Voice: (206) 220-6883**
**Fax: (206) 220-6911**

| | | |
|---|---|---|
| PAULA R. MOOREHEAD,<br><br>Complainant,<br>V.<br><br>MICHAEL CHERTOFF,<br>Secretary,<br>U.S. Dept. Of Homeland Security,<br>Respondent Agency. | ) | EEOC Case No. 380-2004-00227X<br>Agency No. TSAF-03-1295<br><br>**DECISION WITHOUT A HEARING**<br>Pursuant to 29 CFR 1614.109(g)(3)(2001) |

## I. INTRODUCTION

This decision is issued without a hearing pursuant to 29 C.F.R. § 1614.109(g)(3) (2001) on the complaint of discrimination brought by Paula R. Moorehead ("Complainant") against Michael Chertoff, Secretary, U.S. Department of Homeland Security ("Agency"). The Complainant alleges that the Agency violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000aa, as amended ("Title VII"), when the Agency discriminated against her on the basis of sex (female).

## II. ISSUE

The issues in the present complaint are: (1) whether the Complainant's failure to contact an EEO counselor in a timely manner provides a procedural basis to dismiss the complaint and (2) whether the Agency discriminated against the Complainant on the basis of sex (female) when: (1) on March 25, 2003, the Complainant was allegedly demoted from her position as Acting Lead Transportation Screener at Seattle Tacoma International Airport; (2) on march 27, 2003, the Complainant was not selected for a Lead Transportation Security Screener, SV-0019-F position

at Seattle Tacoma International Airport; and (3) on or about November 17, 2003, the Complainant's regular days off were changed without her knowledge or consent.[1]

## III. FINDING

Based upon the record of investigation and all of the evidence presented therein, this Administrative Judge finds: (1) The Complainant failed to timely contact an EEO counselor; (2) the Complainant has failed to establish a *prima facie* case of sex discrimination and (3) assuming, *arguendo*, that the Complainant's claims are not barred for failure to timely contact an EEO counselor and that she has established a *prima facie* case of sex discrimination, the Agency has articulated legitimate, non-discriminatory reasons for its actions which the Complainant has not shown to be pretextual.

## IV. PROCEDURAL BACKGROUND

The Complainant initiated EEO counselor contact on March 14, 2003, alleging discriminatory actions by the Agency, on the basis of sex, which allegedly occurred on March 25,

---

1 Although the Complainant also alleges violations of the Equal Pay Act, no such allegation was accepted for investigation in the Agency's May 7, 2004 acceptance letter, which required the Complainant to object to the accepted issues within five (5) calendar days of receipt of the letter. There is no record that the Complainant made a timely objection as required. Therefore the allegation is not properly before this Administrative judge and has not been considered in this decision without a hearing. However, the record reflects that on October 13, 2002, the Compliant was hired by the Agency as a Transportation Security Screener at a yearly salary of $26,377.00, including locality pay. On the same date, the Agency also hired Lambert A Lactaoen (the co-worker identified by the Complainant as the comperator being paid a higher salary) as a Transportation Security Screener at same rate of pay. On June 13, 2004, the Complainant and Mr. Lactaoen received a salary increase to $28,908.00. See Agency's Correspondence File and Agency's Exhibit D.

2003, March 27, 2003 and November 17, 2003.[2] Following the issuance of final interview and right to file a complaint on December 1, 2003,[3] the Complainant made a timely request for an EEOC administrative hearing.

On November 8, 2004, this Administrative Judge notified the parties in the present complaint by Notice of Intent to Consider Issuance of a Decision Without Hearing that (1) a decision without hearing was being contemplated; and (2) the parties were requested to file objections and identify all material issues of disputed facts or credibility that would preclude the issuance of a decision without a hearing, within 15 days of receipt of the notice.[4] On December 22, 2004, the Complainant's counsel filed a notification of typographical error contained in this Administrative Judge's notice of intent to issue a decision without a hearing.[5]

On November 10, 2004, the Complainant withdrew its request for sanctions against the Agency for failure to provide requested records regarding the Complainant's claim under the Equal Pay Act based on the Agency having produced "significant" information related to that claim just prior to the Complainant having filed her motion.[6]

On November 12, 2004, the Agency filed a "statement regarding partial dismissal and requesting dismissal." On November 19, 2004, this Administrative Judge granted the Agency's

---

2 Agency's Correspondence File at EEO counselor's Report.

3 Id.

4 Correspondence File.

5 Id.

6 Id.

request for an extension of time to file a response to the issuance of a decision without a hearing, which had not been opposed by the Complainant's counsel.[7]

By memorandum dated December 14, 2004, the Complainant filed an objection the issuance of a decision without a hearing and identified four reasons as the basis for the objection: (1) the Agency had failed to give the Complainant a fair opportunity to present evidence during the investigation; (2) the manner in which the Agency had conducted its investigation was contrary to the requirements of 29 CFR 102 and MD-110; (3) the statement of the issues and bases contained in the Agency's letter of acceptance were incorrect and incomplete; and (4) a factual dispute as to the validity of the basis for the Agency's decision to remove and replace the Complainant as lead screener. [8]

However, the response offered in the Complainant's memorandum offers no evidence that would preclude summary judgment. "To survive a motion for summary judgment, the nonmoving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial by way of personal affidavits, or by the depositions, answers to interrogatories, and admissions on file."[9] Despite having been permitted additional time to do so, the Complainant submitted no evidence to support her argument that material fact issues are in dispute either as to her prima facie case or to rebut defendant's legitimate, nondiscriminatory reasons. The mere arguments of Complainant's counsel in her opposition memorandum, nakedly asserting the

---

7 Id.

8 Id.

9 Monaghan v. Adkins, No. 04-60336, 2004 WL 2725925, at *2 (5th Cir. Dec.1, 2004)

existence of fact questions, do not present the requisite evidence or satisfy the legal requirement necessary for success in opposing summary judgment.[10]

By memorandum dated December 15, 2004, the Agency requested the issuance of a decision without a hearing in its favor.

On January 6, 2004, the Parties December 20, 2004, joint request to stay discovery and other deadlines pending a decision regarding the issuance of a decision without a hearing was granted.[11] On January 11, 2005, the Complainant filed a correction to this Administrative Judge's January 6, 2004 notice and order, correctly pointing out that this Administrative Judge had mistakenly indicated that the Complainant had failed to respond to the notice of intent to issue a decision without a hearing.

Having carefully reviewed the memorandum of both Parties, this Administrative Judge finds that there are no issues of disputed fact or credibility that would preclude the issuance of a decision without a hearing.

## V. APPLICABLE LAW

The Commission's standard for issuance of a decision without a hearing is based on Federal Rule of Civil Procedure 56, the standard for summary judgment.[12] The Supreme Court has stated that summary judgment is appropriate when the adjudicator determines that no genuine

---

10 Mere "unsubstantiated assertions cannot constitute summary judgment evidence." Flourine On Call, Ltd. v. Fluorogas Ltd., 380 F.3d 849, 865 (5th Cir.2004).

11 Id.

12 Torres v. Runyon, 1993 WL 1508394 at *2, EEOC Appeal No. 01933434 (1993); Speed v. Runyon, 1993 WL 1507983 at *2, EEOC Appeal No. 01932870 (1993).

issue of material fact exists and the moving party is entitled to judgment as a matter of law.[13] A party opposing summary judgment must provide evidence sufficient to demonstrate the existence of a genuine issue of material fact.[14] In addition, disputed facts alone are not sufficient to preclude summary judgment because "the disputed facts must be outcome determinative under the governing law."[15] Furthermore, a party opposing a decision without a hearing may not rely on a claim, unsupported by any evidence or any specific allegation, that cross-examining witnesses would give rise to an issue of material fact.[16]

This Administrative Judge finds: (1) a hearing would not elucidate any new fact which would materially affect the outcome of the present complaint; (2) there is no genuine issue of material fact or genuine issue as to credibility in dispute; and (3) this complaint is appropriate for a decision without a hearing.

## VI. ANALYSIS AND FINDINGS

### A. Factual Background

The material facts are not in dispute. On October 13, 2002, the Compliant was hired by the Agency as a Transportation Security Screener. At all times relevant to the instant complaint, the Complainant worked as a Transportation Security Screener. The position of Lead Screener

---

13 Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).

14 Id.

15 Secretary of Labor, U.S. Department of Labor v. Lauritzen, 835 F.2d 1529, 1534 (7th Cir. 1987), cert. denied, 488 U.S. 898 (1988).

16 Speed v. Runyon, 1993 WL 1507983 at 4, EEOC Appeal No. 01932870 (1993) (such an unsupported claim constitutes a "fishing expedition").

remained unfilled in the airport area where the Complainant worked until August 2004.[17] Between November 2002 and August 2004, the Agency generally followed an informal practice of temporarily delegating Lead Screener responsibilities on a rotational basis.[18] Acting Lead Screeners received no additional compensation and Standard Form 50's were not issued for the temporary acting assignments.[19]

In mid January 2003, the Complainant was temporarily assigned an acting Leader Screener with responsibility for an eight screeners team.[20] The Complainant was not the first Acting Lead Screener for the team. She was preceded in that capacity by Jimmy Arealvo, who performed those responsibilities between January 1 and mid January 2003.[21]

In March 2003, the Agency began rotating the Acting Lead Screener assignment amongst all team members, based on total federal employment seniority service, including military service.[22] On March 27, 2003, Lambert Lactaoen replaced the Complainant as Acting Lead Screener.[23]

At all times relevant to the complaint, the Agency rotated the Screeners' work schedules

---

17 Record of Investigation (ROI), Tab F2.

18 Id. at Tab F5.

19 Id.

20 Id at Tab 4 and 6.

21 Id. at Tab 5.

22 Id.

23 Id. at Tab F2.

and days off.[24] Initially, the rotation occurred every 90 days but later, was changed to every six months.[25] On or about August 6, 2003, the Agency granted the Complainant's request for a schedule of Fridays and Saturdays off.[26] On or about November 17, 2003, the Agency rotated the Complainant's days off as part of the next scheduled rotation.[27] At least five other Screeners with weekend days off rotated out of their schedule.[28] The Screener job description indicates that the job includes "shift work on any day from Sunday through Saturday which may include irregular hours, nights and weekend shifts, holidays, changing shifts and split shifts."[29]

It is undisputed that at al times relevant to this complaint, the Complainant did not apply for the position of Lead Transportation Security Screener. It is also undisputed that on or about March 27, 2003, the Agency did not post, interview or select any employee for the position of Lead Transportation Security Screener at the Seattle Tacoma Airport duty station where the Complainant was assigned as no such position existed until August 2004.[30]

B. The Complainant's claims of sex based discrimination are untimely.

The Complainant verbally protested any rotation in the Acting Lead Screener position as

---

24 Id. at Tab F3.

25 Id. at Tab A.

26 Id.

27 Id. at Tab F3.

28 Id. at Tab A.

29 Id. at Tab F6.

30 Id. at Tab F2.

early as March 18, 2003 and then again on March 25, 2003.[31] By letters dated March 31, 2003 and April 8, 2003, the Complainant documented her complainant to local management officials.[32] The first letter of the Complainant's March 31, 2003 letter of objection to local Agency officials, included the following statement:

*"I am completing this (personnel action) form in an effort to resolve this matter prior to the expiration of the 45 day limit to file a discrimination complaint under regulation 29 C.F.R. part 1614."[33] The Complainant did not contact an EEO counselor until May 14, 2004, nearly a year later.[34]*

An aggrieved Federal civilian employee claiming discrimination in the workplace, must contact an EEO counselor prior to filing a formal complaint.[35] A Complainant must initiate EEO counselor contact within 45 days of the matter alleged to be discriminatory.[36] If the discriminatory incident is a personnel action, the 45 day time limit begins running from the effective date of the action.[37] The 45 day time period is measured in calendar days, not working days.[38] The counting of days in the time limit starts with the day after the effective date of the personnel action.[39] However, the limitation period is not triggered until a complainant could be

---

31 Id. at Tab A.

32 Id. at Tab B.

33 Id.

34 Id.

35 29 C.F.R. § 1614.105(a).

36 29 C.F.R. § 1614.105(a)(1).

37 Id.

38 29 C.F.R. 1614.604(a).

39 29 C.F.R. 1614.604(d).

held to reasonably suspect discrimination, but before all the facts that would support a charge of discrimination have become apparent.[40] The time limit is "treated as a statute of limitations for filing suit and is subject to waiver, equitable tolling, and estoppel."[41] Courts may evaluate whether it would be proper to apply such doctrines, although they are to be applied sparingly.[42] Therefore, absent special circumstances, failure to file a grievance or otherwise contact an EEO counselor within the specified time limit is fatal to a federal employee's discrimination claim.[43]

In the instant case, the Complainant evidenced both knowledge and understanding of the proper regulations governing her discrimination complaint and the 45 day EEO counselor contact requirement in her May 31, 2003 letter to the Agency and in her May 14, 2004 written correspondence to the EEO counselor.[44] Therefore, the Complainant can not ascribe her failure to contact an EEO counselor to a lack of awareness or understanding of the EEO process or to a lack of notification that she was being rotated out of the Acting Lead Screener position or that her scheduled days off were being changed. Absent exceptional circumstances that would trigger tolling, waiver or estoppel, the Complainant's allegations must be dismissed as a matter of law.

---

40 Howard v. Dalton, 1999 WL 91430 at *2, Appeal No. 01965648 (1999).

41 Johnson v. U.S. Treasury Dept., 27 F.3d 415, 416 (9th Cir. 1994) (quoting Miles v. Dept. of the Army, 881 F.2d 777, 780 (9th Cir. 1989).

42 See Baldwin County Welcome Center v. Brown, 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (per curiam) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants").

43 Id.

44 Id. at Tab B.

The Complainant urges acceptance of her time barred claims by contending that "she was informed to follow the chain of command and tried to have the case resolved at the airport before contacting the office of civil rights."[45] The Complainant does not identify the name of the individual who so informed her, the date on which she was informed or the circumstances under which the information was imparted to her. Having failed to articulate any special circumstances that would trigger tolling, waiver or estoppel, the Complainant's failure to timely contact and EEO counselor within the required 45 day statutory period for a Title VII action, bars her claims in the three distinct allegations of discriminatory conduct alleged by the Complainant.

In the instant case, the Complainant identifies three distinct employment actions as discriminatory events: (1) the March 25, 2003 rotation out of the Acting Lead Screener position; (2) a March 27, 2003 failure to select for a Lead Screener position; and (3) a November 17, 2003 change of her weekend days off schedule. Therefore, the complained of Agency actions can not be seen as a continuing violation. While the theory of continuing violations allows "a series of separate but related acts" to be considered one violation for the purpose of tolling, court have consistently held that "attempts at promotion are usually viewed as discrete employment acts."[46] "[T]he purpose of permitting a plaintiff to maintain a cause of action on the continuing violation theory is to permit the inclusion of acts whose character as discriminatory acts was not apparent

---

45 ROI at Tab B.

46 Lambert v. Washington Suburban Sanitary Commission, 93 F.Supp.2d 639, 642 (D.Md.2000) quoting Etefia v. East Baltimore Community Corp., 2 F.Supp.2d 751, 757 (D.Md.1998).

at the time they occurred."[47] The Complainant's testimony establishes that as early as March 31, 2003, she believed that her sex (female) played a role in her removal from the position of Acting Lead Supervisory Screener.[48] A claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that the court in National Railroad Passenger Corp. v. Morgan intended to bar in its holding.[49] Such is the case with the Complainant in the instant matter.

Moreover, the question of whether or not the Complainant's first contact with an EEO counselor on May 14, 2004 was timely, is clearly answered by the Supreme Court's recent holding in National Railroad Passenger Corp. v. Morgan,[50] which effected fundamental changes to the doctrine allowing administratively unexhausted claims in Title VII actions. Specifically, Morgan abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the ruling that each discrete incident of such treatment constitutes its own "unlawful employment practice" for which administrative remedies must be exhausted.[51] In Morgan, this rule applied to bar a plaintiff from suing on claims for which no administrative remedy had been sought, when those incidents

---

47 Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 446 (7th Cir.1994).

48 ROI at Tab B.

49 National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)

50 National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)

51 Id. at 110-13, 122 S.Ct. 2061.

occurred more than 300 days prior to the filing of plaintiff's EEO complaint. "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice."[52] While the Morgan court did not apply its holding to hostile work claims, those type of claims are not at issue in this case. Indeed, the Morgan curt identified the following discrete employment actions as not subject to the continuing violation exception: termination, failure to promote, denial of transfer, or refusal to hire.[53]

Application of this rule to incidents occurring prior to the timely filing of an EEO complaint is consistent with the policy goals of the Title VII statutes. First, requiring exhaustion of administrative remedies serves to put an employer on notice of a violation prior to the commencement of judicial proceedings. This in turn serves to facilitate internal resolution of the issue rather than promoting costly and time-consuming litigation.[54] Those policies are particularly important in the instant case, given that the Complainant claims that the Agency discriminated against her when it failed to promote her over a year before she contacted an EEO counselor.

Consistent with the Court's opinion in Morgan, the holding in this decision does not negate the relevance of allegedly discriminatory incidents which occurred after timely EEO contact. Although circumstances in which acts occurring after timely EEO contact provide

---

[52] Id. at 114, 122 S.Ct. 2061.

[53] See Morgan, 122 S.Ct. 2072-73.

[54] See Brown v. Gen. Servs. Admin., 425 U.S. 820, 832-35, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976).

evidence of employer motivation for prior actions may be unusual, Morgan does not bar an employee from using prior acts as background evidence in support of a timely claim."[55]

In the instant case, however, the Complainant's failure to contact an EEO counselor in a timely manner within the requisite 45 day time period after each discrete allegedly discriminatory act occurred is fatal to her claim. Failure to file a timely claim will bar any recovery for the Complainant.[56] Therefore, the Complainant's allegations of sex based discrimination are dismissed as a matter of law.

C. The Complainant has not established a *prima facie* case of Sex discrimination

Assuming that the Complainant's claims are not time barred, under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green,[57] a Complainant must first establish a *prima facie* case of sex discrimination.[58]

To establish a *prima facie* case of sex discrimination on her allegations that she was removed from the Acting lead Screener position on March 25, 2003 and that her work schedule was changed on November 17, 2003, the Complainant must show that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) a similarly situated person outside the protected class received more favorable

---

55 Morgan, 536 U.S. at 113, 122 S.Ct. 2061. *See also*: Lyons v. England, 307 F.3d 1092, 1109 (9th Cir.2002).

56 National Railroad Passenger Corporation, 536 U.S. 101, 109 (2002).

57 McDonnell Douglas Corp. v. Green 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),

58 Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344 (6th Cir.1998); Mitchell v. Toledo Hosp., 964 F.2d 577 (6th Cir.1992).

treatment.[59] The Complainant is clearly a member of a protected class. However, the Complainant has not identified that she suffered an adverse employment action or that similarly situated persons outside of her protected class received more favorable treatment. Therefore, having failed to establish the second and fourth prongs of the *prima facie* case of sex discrimination, the Complainant's allegations are dismissed as a matter of law.

Specifically, the Complainant's allegations that she suffered an adverse employment action when she was rotated out of the Acting Lead Screener position on March 25, 2003 and her work schedule was changed on November 17, 2003, fall far short of meeting the requisite legal showing of an adverse employment action, which is defined as a "materially adverse change in the terms and conditions of [plaintiff's] employment."[60]

It is undisputed that the Complainant was preceded in the Acting Lead Screener position by co-worker Jim Aravelo who preformed in that capacity from January 1 through mid-January 2003.[61] It is also undisputed that the position was "acting" as there was no such official job designation. Finally, it is undisputed that all rotating acting leads held the same job grade and received the same pay and benefits.[62] Similarly, it is undisputed that the position of Security Screener which the Complainant held required shift duty availability, that the Agency had been operating on a rotating work schedule system at all times relevant to the complaint and that at the

---

59 See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 (9th Cir.2002).

60 Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir.1999).

61 ROI at Tab F.

62 Id.; Agency Ex. D.

time the Complainant was rotated out of her work schedule at least five other security screeners who were holding weekend off were also rotated out of their schedule. Therefore, although the Complainant may have been reluctant to rotate out of the acting lead position and loath to give up her weekends off, the Agency's actions can not constitute adverse employment actions as a matter of law. A "bruised ego," a "mere inconvenience or an alteration of job responsibilities" is not enough to constitute an adverse employment action.[63]

Examples of adverse employment actions include firing, failing to promote, reassignment with significantly different responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation.[64] The complained of rotation out of an acting lead position and the rotation out of a weekends off schedule do not constitute cognizable adverse employment actions in the instant case. Nor is there any evidence that similarly situated employees were treated differently with respect to these actions. On the contrary, the undisputed evidence establishes that all Security Screeners in the Complainant's work group were subjected to rotation assignments in the acting lead screener position and in their days off schedules.[65] Having failed to establish a prima facie case of sex discrimination on the claim that she was rotated out of the Acting Lead position and out of her weekends off schedule, the Complainant allegations on these two issues are dismissed.

To establish a *prima facie* case of sex discrimination on her claim that on March 27, 2003

---

63 Kocsis v. Multi-Care Mgmt. Inc., 97 F.3d 876, 886 (6th Cir.1996)

64 Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998);

65 ROI at Tab F3 and Tab A.

she was not selected for the position of Lead Transportation Security Screener, the Complainant must establish that: (1) she is a member of a protected class; (2) applied or sought to be considered for an open position, (3) was qualified for the position, and (4) was rejected under circumstances giving rise to an inference of unlawful discrimination[66] or that ... the employer promoted ... a member of the opposite sex for the job."[67] It is undisputed that the Complainant did not apply for an open position. Therefore, although the Complainant has established the first and third prong of the *prima facie* case, this matter must be dismissed as a matter of law.

It is undisputed that at all times relevant to the instant claim, the Complainant did not apply for the position of Lead Transportation Security Screener.[68] Indeed, the Complainant could not have applied for such a position because it did not exist until August 2004.[69] Having failed to apply for the position, the Complainant's claim must be dismissed. "The application requirement is important to establishing" the *prima facie* case "because it shows that the decision-maker knew about the plaintiff and the plaintiff's interest in the position."[70]

Although the burden of establishing *prima facie* case of disparate treatment in an employment discrimination suit is not onerous, a Complainant must nevertheless establish all prongs of the applicable *prima facie* case. Having failed to do so, the Complainant's allegations

---

66 Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir.1996).

67 Jones v. Flagship Int'l, 793 F.2d 714, 724 (5th Cir.1986).

68 ROI at Tab F2, F5, and Ex. E.

69 ROI at Tab F2.

70 Walker v. Prudential Prop. & Cas. Ins. Co., 286 F.3d 1270, 1275 (11th Cir.2002).

must be dismissed.

D. The Agency has articulated legitimate, non-discriminatory reasons for its actions which the Complainant has not shown to be pre-textual.

Assuming, *arguendo*, that the Complainant's claims are not time barred and that she has established a *prima facie* case of sex discrimination, the Agency has nevertheless articulated legitimate, non-discriminatory reasons for rotating the Complainant out of the Acting Lead Screener position on March 25, 2003 and rotating the complainant's scheduled on November 17, 2003, which the Complainant has failed to establish are pretextual reasons.

The undisputed evidence supports the Agency's articulated reasons for its actions. Specifically, it is undisputed that at all times relevant to the instant complaint, the Agency operated on a rotational basis with respect to Acting Lead and days off work schedule assignments.[71] It is also undisputed that the Complainant's male co-workers were rotated in the manner as the Complainant.[72] Indeed, the Complainant replaced a male in the Acting Lead Screener position and was in turn replaced by a male after the Complainant served approximately two months is that capacity.[73] Similarly, in addition to the Complainant, five other Screeners were rotated out of their weekends off schedule at the same time as the Complainant. Therefore, the Complainant has not established that she was treated differently.

Where an employer gives specific reasons for its employment decisions, the burden is not on the employer to prove that the reasons stated are the real and valid reasons for the

---

71 ROI at Tab F5; Ex. E.Tab F5 and Agency's Exhibit D.

72 Id.

73 Id.

decision. Rather, the burden is on a Complainant to show by a preponderance of the evidence that the stated reasons are merely a pretext or cover up for sex discrimination. Because the Complainant has failed to meet this burden, the Complainant's allegations must be dismissed.

## VII. DECISION

Reviewing the entire record, this Administrative Judge finds that (1) The Complainant failed to timely contact an EEO counselor; (2) the Complainant has failed to establish a *prima facie* case of sex discrimination and (3) assuming, *arguendo*, that the Complainant's claims are not barred for failure to timely contact an EEO counselor and that she has established a *prima facie* case of sex discrimination, the Agency has articulated legitimate, non-discriminatory reasons for its actions which the Complainant has not shown to be pretextual.

NOTICE

Pursuant to 29 C.F.R. §§ 1614.109 and 1614.110 of the Commission's regulations, the Agency shall take final action on the present complaint by issuing a final order within 40 days of receipt of this decision notifying complainant whether the Agency will fully implement this decision and provide notice of complainant's right to appeal to the U.S. Equal Employment Opportunity Commission, the right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit and the applicable time limits for appeals and lawsuits. If the Agency's final order does not fully implement this decision, then the Agency shall simultaneously file an appeal in accordance with 29 C.F.R. § 1614.403 and append a copy of the appeal to the final order.

May 25, 2005

FOR THE COMMISSION:
Zulema Hinojos-Fall
Administrative Judge

*Copies mailed to:*

Paula R. Moorehead
P.O. Box 1007
Ravensdale, WA 98051

John C. Montoya, Esq.
999 Third Avenue #3800
Seattle, WA 98104-4023

Eileen Dizon Calaguas, Esq.
DHS - TSA
1001 Bayhill Drive, 2nd Floor
San Bruno, CA 94066-3061

# EXHIBIT F

**U.S. Department of Transportation**
**Transportation Security Administration**
**400 7th Street**
**Washington D.C. 20590**

Date: 10/09/02 Testing Location: Seattle, WA. (SEA)

Name: Moorehead, Paula
(Last, First Middle)

SSN: [redacted] DOB: [redacted]

Candidate ID#: 182444

I am pleased to offer you a conditional appointment as a Transportation Security Screener in the Department of Transportation, Transportation Security Administration (TSA). We look forward to your working as part of our team.

TSA's challenge to hire and deploy this new workforce is enormous, but we are on track to meet our hiring goals to federalize all passenger screening operations by November 19th and baggage screening by the end of this year. Our current fiscal year appropriation contains a limitation that restricts TSA's workforce size to no more than 45,000 "full-time, permanent positions." President Bush has asked the Congress to fund a considerably larger workforce of permanent employees in FY 2003. Due to our rapid growth, we are already close to reaching the 45,000 full-time, permanent position limit. Accordingly, in order to both to meet our Congressional requirement to have the new TSA federal passenger screening workforce in place by November 19th, and avoid violating the FY 2002 employee cap also established by Congress, **I am offering you an appointment to serve as a full-time "temporary" employee for a period not to exceed five years. You will receive the same pay and benefits as if you were in a permanent position, and will do the same work as screeners previously hired and those to be hired subsequently.**

During the five-year period, you may be converted to a permanent appointment without further competition. Upon passage of the FY 2003 budget, and if Congress approves the workforce size requested by the President and necessary to do this important job, it would be TSA's intention to convert employees hired under the temporary hiring authority to a permanent employee status.

This appointment is contingent upon the successful completion of your security background investigation and about problems that may surface in it. The following information is intended to answer the questions, which are asked most often.

TAB A

- The purpose of the background investigation is to ensure that applicants meet the TSA's personnel security standards. Background investigations are extremely thorough. At a minimum, the TSA will ensure that your credit history is satisfactory and that you do not have a criminal history. We will contact regional credit bureaus where you have lived, and conduct checks of local law enforcement agencies for jurisdictions in which you have resided, attended school, or been employed. Also, if you have served in the military, we will review your military records.

- We will withdraw an employment offer if the investigation reveals information that precludes a security and/or suitability clearance (e.g. serious credit problems, abuse of alcohol, history of illegal drug use outside of TSA guidelines, misrepresentations during the application process, etc.) In addition, applicants who have been convicted of a felony or domestic violence charge or who display a lack of candor during any phase of the hiring process will be automatically disqualified from further consideration.

- The TSA, which is firmly committed to a drug-free society and work place, realizes that qualified individuals may have used illegal drugs at some point in their past. It is the policy of the TSA that prospective employees will be required to pass a urinalysis test, which screens illegal drug use prior to final appointment.

It creates significant hardships for both the TSA and the applicant if this conditional offer must be withdrawn at the end of the background process. To prevent such hardship, we want to alert you to these potential problems now, at the outset, and invite you to discuss any concerns you may have. If you have any concerns you wish to discuss, please contact a Human Resources staff member at the TSA Assessment Center immediately.

Your salary will be at the D level with a base salary of 23,600.00 per annum. Additionally, you will receive a 11.77% locality pay salary for total salary of 26,377.72 Your locality percentage is based on your permanent duty location. Additional compensation may be earned for overtime performed in connection with your official duties, provided certain necessary requirements are met. Salary offers are not subject to renegotiation. **Depending on your hire date, it may take as long as three and a half weeks before your receive your first direct deposit check.** Your benefits will be the same as if you were being appointed into a permanent position and will be explained further at your orientation session.

It is very important that you properly complete all of the required paperwork during or prior to our orientation. As discussed with you previously, you must bring two types of personal identification with you to orientation to complete processing. Failure to submit the required paperwork will delay your orientation and hire date.

Should you elect not to accept this offer of employment with the TSA, we request that you notify a Human Resources staff member at 1(888) 218-1555 within 24 hours of receipt of this letter.

We look forward to having you join us at the TSA. You should find here a great opportunity for public service and a distinguished career in transportation security.

Sincerely Yours,

By: Amy Fren
Human Resources Representative

Approved: [signature]
TSA Representative

Accepted: Paula M. Moorehead
(Applicant Signature)

Permanent Duty Location: SEA
(Home Base Airport)

# EXHIBIT G

**U.S. Department of Transportation**
**Transportation Security Administration**
**400 7th Street**
**Washington D.C. 20590**

Date: 10/10/02 Testing Location: SEA

Name: Lactaoen, Lambert
(Last, First Middle)

SSN: [redacted] DOB: [redacted]

Candidate ID#: 1773570

I am pleased to offer you a conditional appointment as a Transportation Security Screener in the Department of Transportation, Transportation Security Administration (TSA). We look forward to your working as part of our team.

TSA's challenge to hire and deploy this new workforce is enormous, but we are on track to meet our hiring goals to federalize all passenger screening operations by November 19th and baggage screening by the end of this year. Our current fiscal year appropriation contains a limitation that restricts TSA's workforce size to no more than 45,000 "full-time, permanent positions." President Bush has asked the Congress to fund a considerably larger workforce of permanent employees in FY 2003. Due to our rapid growth, we are already close to reaching the 45,000 full-time, permanent position limit. Accordingly, in order to both to meet our Congressional requirement to have the new TSA federal passenger screening workforce in place by November 19th, and avoid violating the FY 2002 employee cap also established by Congress, **I am offering you an appointment to serve as a full-time "temporary" employee for a period not to exceed five years. You will receive the same pay and benefits as if you were in a permanent position, and will do the same work as screeners previously hired and those to be hired subsequently.**

During the five-year period, you may be converted to a permanent appointment without further competition. Upon passage of the FY 2003 budget, and if Congress approves the workforce size requested by the President and necessary to do this important job, it would be TSA's intention to convert employees hired under the temporary hiring authority to a permanent employee status.

This appointment is contingent upon the successful completion of your security background investigation and about problems that may surface in it. The following information is intended to answer the questions, which are asked most often.

- The purpose of the background investigation is to ensure that applicants meet the TSA's personnel security standards. Background investigations are extremely thorough. At a minimum, the TSA will ensure that your credit history is satisfactory and that you do not have a criminal history. We will contact regional credit bureaus where you have lived, and conduct checks of local law enforcement agencies for jurisdictions in which you have resided, attended school, or been employed. Also, if you have served in the military, we will review your military records.

- We will withdraw an employment offer if the investigation reveals information that precludes a security and/or suitability clearance (e.g. serious credit problems, abuse of alcohol, history of illegal drug use outside of TSA guidelines, misrepresentations during the application process, etc.) In addition, applicants who have been convicted of a felony or domestic violence charge or who display a lack of candor during any phase of the hiring process will be automatically disqualified from further consideration.

- The TSA, which is firmly committed to a drug-free society and work place, realizes that qualified individuals may have used illegal drugs at some point in their past. It is the policy of the TSA that prospective employees will be required to pass a urinalysis test, which screens illegal drug use prior to final appointment.

It creates significant hardships for both the TSA and the applicant if this conditional offer must be withdrawn at the end of the background process. To prevent such hardship, we want to alert you to these potential problems now, at the outset, and invite you to discuss any concerns you may have. If you have any concerns you wish to discuss, please contact a Human Resources staff member at the TSA Assessment Center immediately.

Your salary will be at the D level with a base salary of 23,600.00 per annum. Additionally, you will receive a 11,772 locality pay salary for total salary of 26,377.72 Your locality percentage is based on your permanent duty location. Additional compensation may be earned for overtime performed in connection with your official duties, provided certain necessary requirements are met. Salary offers are not subject to renegotiation. **Depending on your hire date, it may take as long as three and a half weeks before your receive your first direct deposit check.** Your benefits will be the same as if you were being appointed into a permanent position and will be explained further at your orientation session.

It is very important that you properly complete all of the required paperwork during or prior to our orientation. As discussed with you previously, you must bring two types of personal identification with you to orientation to complete processing. Failure to submit the required paperwork will delay your orientation and hire date.

Should you elect not to accept this offer of employment with the TSA, we request that you notify a Human Resources staff member at 1(888) 218-1555 within 24 hours of receipt of this letter.

We look forward to having you join us at the TSA. You should find here a great opportunity for public service and a distinguished career in transportation security.

Sincerely Yours,

By: ____________________
Human Resources Representative

Approved: ____________________
TSA Representative

Accepted: ____________________
(Applicant Signature)

Permanent Duty Location: SEA
(Home Base Airport)

# EXHIBIT H

*United States Department of Homeland Security*

**TRANSPORTATION SECURITY ADMINISTRATION**

June 6, 2003

**To:** Assistant Administrator for Aviation Operations
Federal Security Directors

**From:** Richard A. Whitford
Assistant Administrator
For Human Resources Management

**Subject:** Pay Administration Decisions

---

On May 5, 2003, the Transportation Security Administration Leadership Council rendered final decisions on several pay related issues within TSA. This memorandum transmits those decisions.

Contract Screeners - Issue

Approximately 29,000 contract security screeners applied for TSA screening positions. Many were told they would be hired by TSA, but were requested to stay with their screening company until the full transition of their airports. Additionally, many individuals occupying supervisory positions with the contractor were offered supervisory positions with TSA. However, by the time these individuals came to TSA all supervisory positions were filled and they were given basic or lead screener positions, with significant pay reductions.

Final Decision

A decision has been made not to adjust the pay of contract screeners at this time. We are prepared to explain the decision to any screener who inquires (Attachment 1 is provided for your information).

Conflicting Job Offer Letters – Issue

Many applicants were given job offer letters providing specific job titles and/or pay rates and, upon reporting for duty, were placed in lower paying positions.

Final Decision

In light of current budget constraints, and considering the difficulty in verifying the specifics of these cases, the decision has been made to close this issue without pay adjustments. (For example, we have become aware that "doctored" letters may have been created, and there is no way to authenticate the claims.) Two letters have been prepared explaining the decision to any screener who inquires about the pay adjustment (Attachments 2 and 3 are provided for your information).

2

**Cancelled Training - Issue**

Several employees who reported for training on August 4 or August 11, 2002, were told training was cancelled and to return home. Initially we thought there were 711 individuals in this situation, and on December 24, 2002, each was given a lump-sum payment to assist in lost compensation as the result of the cancellations. In January 2003, we started receiving calls from other screeners who claimed to be in the same situation.

**Final Decision**

In light of current budget constraints and considering the difficulty to verify cancellations, a decision has been made not to make any further lump sum payments.

**Comparability Equivalent Increase (CEI) Waivers – Issue**

Our interim policy on the January pay increase provided that employees who had disciplinary actions could not receive the CEI. Additionally, it stated that the Assistant Administrator, Aviation Operations, or his designee, could approve a waiver that would allow employees with disciplinary actions to receive the CEI, provided the waiver requests were received by January 31, 2003. Several waiver requests were sent to HR without proper approval, and forwarded to AvOps. As of this date none of the increases have been approved or processed.

**Final Decision**

FSDs may make CEI waiver decisions on a case-by-case basis, and submit SF-52s (894 Pay Adjustment actions) through AvOps for those that are approved. The SF-52's should contain an effective date of January 12, 2003.

Questions concerning these issues may be directed to Jan Karicher, (571) 227-2667, jan.karicher@dhs.gov.

Attachments

# EXHIBIT I

LACTAOEN, LAMBERT A
535702595

# Transportation Security Administration: Application for Employment

| 1 Job Title | 2 Grades Applying For | 3 Announcement Number |
|---|---|---|
| LEAD SCREENER | | |

| 4 Name (Last, First, MI) | 5 Social Security Number |
|---|---|
| LACTAOEN, LAMBERT A | [redacted] |
| 6 Address (Address, City, State, Zip, Country) | 7 Phone Numbers |
| [redacted] | [redacted] |
| [redacted] | Evening [redacted] |

8 Work Experience **Note Questions 2 through 6 were not asked of general screeners

1) **I have experience in identifying dangerous or deadly objects in baggage, cargo, and on passengers and preventing those objects from being transported onto the aircraft**
Yes

2) **I have performed the duties of a ground security coordinator (GSC) for an airline.**
I am not currently performing these duties, but I do have less than 1 year of experience

3) **I have performed the duties of a second-line/shift-supervisor or manager of airport security screeners.**
I am not currently performing these duties, but I do have less than 1 year of experience

4) **I have performed the duties of a checkpoint security supervisor (CSS) at an airport.**
I am not currently performing these duties, but I do have less than 1 year of experience

5) **I have performed the duties of an airport security screener-in-charge.**

6) **I have performed the duties of an airport security screener team/work leader.**
I am not currently performing these duties, but I do have less than 1 year of experience

7) **I have performed the duties of an airport security screener.**
I currently perform the duties, but have less than 1 year of experience

8) **Do you have experience performing calibration and maintenance on security equipment?**
I have never performed these duties

9) **Do you have experience performing security screening using a walk through metal detector/mangetometer?**
I currently perform the duties, but have less than 1 year of experience

10) **Do you have experience performing security screening of property using X-ray equipment?**
I currently perform the duties, but have less than 1 year of experience

11) **Do you have experience performing security screening of individuals using a hand held metal detector?**
I currently perform the duties, but have less than 1 year of experience

12) **Do you have experience performing security screening of property using explosive detection systems (EDS)?**
I currently perform the duties, but have less than 1 year of experience

13) **Do you have experience performing security screening of property using explosive trace detection (ETD)?**
I currently perform the duties, but have less than 1 year of experience