UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

| | | |
|---|---|---|
| PAULA R. MOOREHEAD, | ) | |
| Plaintiff, | ) | No. C05-01767-JLR |
| v. | ) | |
| MICHAEL CHERTOFF, Secretary, U.S. Department of Homeland Security, Transportation Security Administration, | ) | |
| Defendant. | ) | |

---

DEPOSITION UPON ORAL EXAMINATION OF

PAULA R. MOOREHEAD

---

Taken at 700 Stewart Street, Suite 5220; Seattle Washington.

REPORTED BY: Thad Byrd, CCR
REPORTED ON: December 12, 2006

SEATTLE DEPOSITION REPORTERS

600 University Street, Suite 320

Seattle, Washington 98101 PH: (206) 622-6661

Page 6

Security Administration, referred to as TSA?
A. Yes.
Q. What is your position at this time?
A. I'm currently a transportation security officer.
Q. And is that the same thing as a transportation security screener?
A. Yes.
Q. Was the position referred to previously as a screener, and now it's referred to as an officer?
A. Yes.
Q. And what area are you currently working in?
A. In baggage.
Q. When were you hired by TSA?
A. 10/13/2002.
Q. And what position were you hired in as?
A. A screener.
Q. To your knowledge, were people hired at that time as lead screeners?
A. Yes.
Q. When did you know that people were hired as lead screeners? When did you first become aware of that?
A. Right away.
Q. And were you hired as a lead screener?
A. They told me when I took the assessment and went in for the job interview that the lead screener and

Page 7

supervisor positions were already full.
Q. And correct me if I'm wrong, but you didn't file any EEO complaint at that time about not being hired as a lead screener, did you?
A. No.
Q. And in October when you were hired by TSA, immediately prior to that where had you been working?
A. I was a prior screener at the airport.
Q. Working for what company?
A. ICTS.
Q. And were you working in the baggage area at that time, too?
A. No. I was working as a gate screener.
Q. And how long had you been working for ICTS at the time that you transferred over to TSA?
A. Approximately six and a half months.
Q. And prior to starting your job with ICTS, where had you been employed before that?
A. Seaprint. I was unemployed before that for a few months. Prior to that I worked for a printing company called Seaprint.
Q. Prior to working for ICTS, had you had any other screener experience?
A. No.
Q. Had you worked for the Federal Government before

Page 8

working for TSA?
A. No. TSA was not in existence at that time.
Q. And have you ever been in the military?
A. In the Army reserves.
Q. You're in the Army reserves now?
A. No.
Q. How long were you in Army reserves?
A. Four years.
Q. When did you stop being a reserve?
A. In 1992.
Q. Were you ever active military?
A. No.
Q. When you started working for TSA in October, where were you first assigned to work?
A. The first three months we were -- everybody was working at the check points, and then January 2003 part of us went to baggage.
Q. When you say in the first three months everybody was working at the check points, were you rotating around the various check points?
A. No. I was assigned to one specific check point for the first three months, and then in -- after the three months passed, part of us went down to baggage because there was a mandate that we had to check a hundred percent of bags.

Page 9

Q. So some people went to baggage and others stayed at passenger check points?
A. Yes.
Q. When you say check points, are you referring to the security screening for the passengers as they go into the waiting area for their flights?
A. Yes.
Q. And excuse me if I refer to this awkwardly, I'm not that familiar with the setup with baggage screeners myself.
So in January you were assigned to baggage. Were you working with a particular team at that time?
A. Yes. I was assigned second shift to work the Northwest ticket counter.
Q. And what is second shift?
A. The second shift worked from -- I believe it was 12:30 to 8:30 or 9:00.
Q. And how many people were on your team at that time?
A. There was approximately six or seven people.
Q. And in January, to the best of your recollection, who were your team co-workers?
A. Do you want me to list them all by name?
Q. Yes, thank you.
A. Curtis Smith.
Q. Curtis Smith?

Page 10

A. Yes. John Haley, Chris Bensen, Lambert Lactoen, Steven Keeler and Jimmy Arevero. It's A-R-L-E-V-O, I think is the last name.
Q. A-L-A-V-E-O did you say?
A. A-R-L-A-V-O, I think.
Q. "Arlavo"?
A. I'm not sure how to pronounce the last name.
Q. We have the spelling somewhere. I think it's something like "Arevero."
Were there any other females on the team with you?
A. Not at first. I was the only female.
Q. And then at some point did another female get assigned to that team?
A. Geraldine Trevino.
Q. And when did Geraldine get assigned to the team?
A. I'm not sure. Approximately a month or so later.
Q. And who was your supervisor in January?
A. Kevin Palmer and Ron Danielson.
Q. They were your first line supervisors?
A. Yes.
Q. And who was your second line supervisor?
A. Actually, those two shared the area. So when one was off, the other one was usually there.
Q. And was there somebody above them that if you needed

Page 11

to report to somebody if they weren't around you could go to?
A. Yes. In the beginning it was Ron Giddings. He was an acting screening manager, and towards the end it was Al Ceasar.
Q. And he was the screening manager?
A. Yes.
Q. And in January when you were first assigned to the baggage area with this particular team, did you have anybody that was a permanent lead screener?
A. No. They had no permanent leads assigned to that area.
Q. Sometime in January you were selected to act as lead screener; is that correct?
A. Yes.
Q. And who selected you?
A. Ron and Kevin.
Q. And had anybody been acting as lead screener prior to you?
A. Jimmy Arevero.
Q. And how long had Jimmy been in that position?
A. A couple weeks.
Q. How did you learn that you were selected to act as lead screener in January?
A. I had asked to be moved to a busier location, because

Page 12

we had a lot of down time at that location. And Ron and Kevin didn't really want to give me up, so they had selected me to be the lead of that area.
Q. Did they tell you verbally?
A. Yes.
Q. Did both of them tell you or --
A. Yes.
Q. (Continuing) -- just one?
Did they tell you together, or did one tell you first and then the other?
A. They both told me together.
Q. To the best of your knowledge, at that time was there a posted vacancy for a lead screener?
A. No.
Q. And did you fill out an application for that position?
A. No.
Q. Were you interviewed by anybody other than just having Ron and Kevin talk to you?
A. No.
Q. Did you receive any salary increase for serving as lead screener?
A. No.
Q. Did you receive anything in writing confirming your position as acting lead screener?

Page 13

A. No.
Q. When Jimmy -- I'll just refer to him as Jimmy -- was moved out of the acting position as lead screener, was he unhappy, do you know, to be removed from that assignment?
A. No.
Q. Did you ever talk to him about it?
A. No, I did not.
Q. Did he ever say anything to you about you being put in that position instead of him?
A. No.
Q. Did he ever act as if he was unhappy with you being in that position?
A. No.
Q. Did you ever have any conflicts with him when you were in that position as acting lead screener?
A. No.
Q. Did you have any conflicts with any of your co-workers when you were in that position?
A. Lambert Lactoen.
Q. And then what sort of conflict did you have with Lambert?
A. Lambert was aggressive. He would do -- he would try to interfere with the first shift. When they were still working, he would try and go and calibrate machines and stuff and interrupt their working conditions, or he was

Page 14

really rough. He'd kick the machinery around. He would just be really rough with it.

And a couple of times I had asked him not to do that, and finally I went to my supervisors to ask if they could talk to him, because it wasn't working with me.
Q. In general, when you would tell him to do something, would he do it --
A. Yes.
Q. (Continuing) -- or did you have other problems with him?
A. He would complain sometimes, but in the end he would usually do it.
Q. Did you have any conflicts with any of the other team members during the time that you were acting as lead?
A. No.
Q. Do you know if any of the other team members wanted an opportunity to act as lead?
A. No. A couple of days before I was taken out of the position, Ron Danielson came to me and my co-workers about rotating leads. And myself, Curtis Smith, John Haley and Steven Keeler said that we didn't want to do the rotating leads, and so I talked to Al Ceasar about it.

He went to talk to Ron Danielson about it, and they decided to rotate the leads on my days off. But a few days after that happened, they took me out of the

Page 15

position.
Q. Let me get back to my original question.

Did any of your co-workers ever say to you that they wanted an opportunity to serve as an acting lead?
A. No.
Q. Do you know if any of them ever said anything to Ron Danielson or Kevin Palmer?
A. No.
Q. You don't know; is that what you're saying?
A. I don't know.
Q. And you said that Ron came and talked to you about rotating the acting lead position?
A. Yes.
Q. What did he say specifically about why he wanted to do that?
A. He didn't give me a reason. And when me and my co-workers found out that he wanted to do that, they had told me they didn't really want to do that. So we had asked to talk to Al Ceasar about it, who was our screening manager at the time.
Q. The other co-workers, since they weren't in the position as acting lead, did they say why they cared?
A. No.
Q. And did you actually go talk to Al Ceasar?
A. Yes.

Page 16

Q. Do you recall when that was?
A. The same day.
Q. And how long was that before you were rotated out?
A. Two days.
Q. And what did Al say to you specifically to the best of your recollection?
A. He just -- we all stated our opinions about not wanting to rotate leads on a daily basis or a weekly basis, and he went and talked to Ron Danielson about it. And then Ron Danielson approached me the next day and said that he'd rotate them on my days off.
Q. When you talked to Al, did he say anything specifically to you or he just said he would talk to Ron?
A. He just said he would talk to Ron.
Q. When you were serving in the capacity as acting lead screener, did Ron Danielson or Kevin Palmer or for that matter Al Ceasar ever criticize you about your performance?
A. No.
Q. Were you ever reprimanded or talked to about doing puzzles, working crossword puzzles?
A. No. Kevin Palmer -- when we had down time, we used to sit behind the ticket counter where nobody could see us and do them, and Kevin Palmer was right there with us during the down times.

Page 17

Q. Did you ever tell Ron Danielson that you were having trouble keeping track of some of your screeners?
A. Yes.
Q. Can you tell me what that was about?
A. There was a couple of screeners that if you would send them on break, they would -- and say, "come back in 20 minutes," they would disappear for the rest of the day.

And so the first time this happened to me, I took a note of it. And they -- the next day I approached them and asked them where they went. They said they went to help out at Alaska.

The second time that these two gentlemen disappeared on me, I went to Ron Danielson, who was the only supervisor there in my zone at the time, and said these two gentlemen are disappearing. This is not the first time, and I don't know what to do about it, because at that time we weren't given the authority to reprimand our co-workers.
Q. And who were the two gentlemen?
A. Chris Bensen and Jimmy Arevero.
Q. And forgive me if I've asked you this before. I think I might have, but I can't recall.

How did you get along with the other members of your team when you were in an acting lead position?
A. Most of time we all got along great.

Page 18

Q. When you talked to Chris Bensen and Jimmy Arevero about disappearing from the area, what were their reactions?
A. They just kind of blew it off, kind of laughed about it.
Q. Who was rotated into the acting lead position after you?
A. Lambert Lactoen.
Q. And to your knowledge, had he expressed previously a desire to be acting lead?
A. He was offered the position before me and declined it. And about a week before they took me out of the lead position, Ron Danielson made a comment to me referring to Lambert, because Lambert had walked by me.
And Ron, when we were having a conversation, is saying, he's after your job. And a week later, I was removed and Lambert was put in.
Q. Do you take that as indicating that Lambert did have a desire to be in that position?
A. He never really expressed it before because he'd declined it.
Q. And he never expressed it to you?
A. No.
Q. How do you know that he had been offered it and declined it?

Page 19

A. He told me.
Q. Did Ron Danielson ever tell you that?
A. No.
Q. In your complaint you indicated that Lambert Lactoen did not have greater seniority than you. What do you base that on?
A. I was hired one day before he was.
Q. Do you know whether he had prior government experience?
A. He had prior military experience.
Q. Active military?
A. Active military.
Q. Do you know if he had any other government experience?
A. No.
Q. Evidently you were unhappy when you were taken out of that acting lead position; am I correct?
A. I was upset the day that I was, yes, the way that it was handled.
Q. And how was it handled?
A. We had just come on our shift. It was about 12:30, and Ron Danielson approached me with Steven Keeler and Lambert Lactoen right in the middle of a bunch of high school kids leaving to go to fly out somewhere.
So he was telling us that whoever had the most

Page 20

military experience between me, Lambert and Steven Keeler would be the lead, right in the middle of trying to get a flight out. He didn't pull us aside afterwards. He did it right out there where everybody could listen.
Q. And who was present at the time? You, Lambert and some high school students?
A. Steven Keeler, and there was a bunch of high school students that were flying out. We were screening a band of some kind.
Q. And did Steven Keeler say anything?
A. He was like, what was that all about? That was pretty much all he said at the time, because he -- we were all under the impression that everything was fine.
Q. Did Lambert say anything at that time?
A. No.
Q. Have you acted as a lead screener since that time?
A. On and off in the areas that I've worked on. Yes, I have.
Q. And in those periods of time when you've acted on and off, what would you say was the shortest time that you were acting as a lead?
A. One or two days at a time.
Q. What was the longest time that you've acted since as a lead?
A. About a month.

Page 21

Q. And when were you taken out of the acting lead position?
A. March 27th, 2003.
Q. So you were in that position for approximately two and a half months?
A. Yes.
Q. Why did you think that you were entitled to be in the position permanently?
A. That was the way they presented it to me, Ron and Kevin.
Q. And can you tell me specifically how they presented it to you and made you think it was permanent?
A. They just said that as of tomorrow you'll be the permanent lead at Northwest when they told me that they had selected me as being the lead.
Q. But you knew there were no openings for a lead. You already said that.
A. Right.
Q. And somebody else had been acting as lead before you were put in that position, correct?
A. They didn't call it acting lead at the time. They just said the lead position, so we were all under the assumption that it was a permanent position, that they would put the paperwork through after you served your 90 days, and you'd be a permanent lead.

Page 22

Q. And what is this about serving 90 days?
A. At the time that I was an acting lead, there was a bunch of rumors going around. And one of them was that if you served 90 days in that position, all the supervisor had to do was put in the proper paperwork, whatever that may be, and you would get the pay as a lead.
Q. Did anybody in authority at TSA ever sit down and tell you that definitely after being in an acting position for 90 days you or anybody else would be made permanent?
A. The people in management never told us anything.
Q. So this was just a rumor that was going around the work place?
A. Yes.
Q. Did you ever see anything in writing that said that?
A. No.
Q. And you've indicated in the complaint that you filed in this lawsuit that you believe that the fact that you were taken out of that acting lead position was an act of discrimination; is that correct?
A. Yes.
Q. Now, is that discrimination based on the fact that you're female?
A. Yes.
Q. And why do you believe that you were taken out of that position because you're a female?

Page 23

A. Ron Danielson didn't think highly of the females that he worked with.
Q. And how do you know that?
A. Well, working with Ron as long as I did, he preferred the male screeners over the females, what few of us there were.
Q. And again, what specifically made you think that?
A. Well, the way that he treated the males versus the females. He treated them a little bit better.
Q. In what way?
A. It's kind of hard to describe. It was like he treated them as a buddy. But a female worker, I mean, he looked down on her.
Q. And again, are you just assuming that he looked down on you? Was there anything specifically that he did or said that made you think that he was looking down on you because you were a female?
A. No, just his actions and the way he talked to me. It was like he didn't really respect me as a person, as a lead.
He never -- he never gave me a verbal reprimand or a reprimand of any kind, but the way that he came across to me and to another -- Geri Trevino, he looked down on us because we were females and we were working there in baggage.

Page 24

Q. So it was nothing he said or did. It was just your feeling of how he was --
A. His actions.
Q. (Continuing) -- looking at you?
Now, Ron Danielson put you in the position as acting lead, correct?
A. Ron and Kevin.
Q. Along with Kevin?
A. They both did it verbally, and Kevin was the one that verbally told me.
Q. Now, do you believe that when Ron Danielson put you, a female, in that position as acting lead, that he was discriminating against the males by not putting them in it?
A. I don't know.
Q. And you at some point filed an EEO complaint regarding the fact that you were taken out of the acting lead position, correct?
A. Yes.
Q. When was that to the best of your recollection?
A. I called the 1-800 hotline in April of 2003. When I did not get a response from them, I sent a letter at the end of May of 2003.
Q. And how did you know to call the 1-800 hotline?
A. I have an employee handbook, and the instructions on

Page 25

how to file an EEOC complaint are in the employee handbook.
Q. Since you were removed from this acting position that we're talking about here, you were removed from it on March 27th, 2003, you've indicated that you have since then acted as a lead screener several times.
When you were rotated out of those subsequent acting lead screener positions, did you file a complaint that you were discriminated against?
A. No, because I was covering for the actual hired lead that was in the positions while they were gone.
Q. Prior to starting work with TSA, did you have experience in aviation or transportation-related screening other than your work for ICTS?
A. No.
Q. Did you have experience screening baggage before you went over to TSA?
A. What experience I had was what I learned at ICTS.
Q. And that was working the passenger check points?
A. Yes.
Q. Had you worked in the baggage area?
A. No.
Q. Because at the time they were not screening the baggage; is that correct?
A. Correct.

Page 26

Q. I'm going to ask you about some various screening technologies, and let me know whether you did or did not have experience with them at the time you started with TSA.
Did you have experience with x-ray equipment?
A. Yes.
Q. Did you have experience with trace detection?
A. Yes.
Q. And did you have experience with physical searches?
A. Yes.
Q. Did you have experience with computed-aided searches?
A. CTX searches?
Q. Right.
A. No.
Q. Did you have experience with calibration and maintenance of security equipment?
A. Yes.
Q. And this was all the experience that you had for about six months while you were working for the previous contractor?
A. Yes.
Q. Did you have any other background in law enforcement? You've indicated that you didn't have active military service. Other than your reserves, did you have any other law enforcement experience?

Page 27

A. No.
Q. Did you have any other experience that you believe qualified you specifically to be a screener?
A. I have 15 years customer service experience.
Q. Face-to-face customer service experience --
A. Yes.
Q. (Continuing) -- or on the phone?
A. Yes.
Q. Is that both?
A. Both.
Q. Okay. You indicated in your complaint that you filed in this lawsuit that one of your male co-workers made more money than you and was hired at a higher salary.
Who is that person that you're referring to?
A. The one I referred to was Lambert Lactoen.
Q. And what made you think that Lambert Lactoen was hired at a higher salary than you were?
A. He told me in general conversation.
Q. And what specifically to the best of your recollection did he tell you?
A. We were talking about the day that we were hired, how some people were able to negotiate for their wages and other weren't, and he told me that he was making a dollar an hour more an hour than I was because of his military experience.

Page 28

Q. Had you told him what your hourly salary was?
A. Yes.
Q. What was your hourly salary when you were hired?
A. It was $12.70 an hour.
Q. Did you ever see any of his official paperwork?
A. Not then, no.
Q. So at that time your only basis for believing that men were paid more than you at the time you filed your complaint was because Lambert told you he made a dollar an hour more?
A. Yes, and there was a few other people we found out that were able to negotiate for higher wages that were male, too.
Q. And did you find that out before you filed your complaint in this lawsuit?
A. Yes.
Q. And who were those people?
A. Phillip Reed.
Q. Phillip Reed?
A. Phillip Reed, R-E-E-D, Casey Hueber.
Q. Hueber?
A. Last name I believe is spelled H-U-E-B-E-R.
Q. And who else?
A. Those were the only two before.
Q. And how were you lead to believe that Phillip Reed

Page 29

was hired in at a higher salary than you?
A. He said -- he told a friend of mine that he was able to negotiate for his wages and get the higher pay, and then he showed proof.
Q. When was Phillip hired in comparison to when you were hired?
A. Around the same time I was.
Q. Do you know specifically when he was hired?
A. No. I don't know the hire date.
Q. And who did he tell that he was able to negotiate for his salary?
A. Michelle Dodd.
Q. Don?
A. Dodd, D-O-D-D.
Q. Do you have any idea what his background experience was?
A. The same as mine.
Q. Was he working for the same contract company?
A. Yes.
Q. Do you know if he had any prior government experience?
A. No.
Q. Do you know if he had any military experience?
A. I believe he is in the Coast Guard or something like that.

Page 30

Q. Do you know if he's been active military?
A. Yes.
Q. And how long did he work for ICTS? Do you know?
A. No.
Q. So you don't know if he was there longer than you?
A. No.
Q. And do you know what his salary was when he hired in?
A. No.
Q. Did you ever see any documentation as to his salary?
A. No. The only thing that I know regarding Phillip Reed was that he was able to negotiate for his wages. When we were all hired, we were told that we would start out at the salary that we had when we were working with ICTS plus locality, and some were able to negotiate and some weren't.
Q. So did you start out at the salary that you were at ICTS?
A. No. I wasn't allowed to negotiate for my wages.
Q. And did Phillip Reed start at the salary that he had with ICTS?
A. He started out at a higher salary.
Q. And what was his salary when he started out?
A. I don't know.
Q. How do you know it was higher than yours?
A. Because there was -- he showed documentation, not to

Page 31

me, but to Michelle Dodd.
Q. And what documentation he did show Michelle?
A. His check stub.
Q. Do you know what shift he worked for TSA?
A. No.
Q. Do you know if he got any premium adjustment for working night shift or swing shift?
A. I don't know.
Q. So she's assuming because she saw a pay stub that he was making more money?
A. From TSA?
Q. Correct.
A. Yes.
Q. Do you get shift differential depending on the shifts you work?
A. Yes.
Q. But you don't know what shift he was working?
A. No, not at the time.
Q. And for Casey Hueber, how do you know that he was hired at a higher salary?
A. Casey told me personally that he was able to negotiate for his wages.
Q. Assuming that he could negotiate for his wages, did he tell you what his wage was?
A. No.

Page 32

Q. So how do you know that he negotiated for a higher wage than you?
A. He said that he was able to do it.
Q. He said he was able to negotiate for his wages, but you've said that you didn't know what his wage was.
A. I didn't -- I didn't ask him what his wage was. When I found out that some screeners were allowed to negotiate for their wages and others weren't, I asked the people that I worked with at ICTS whether they were able to negotiate and whether they weren't.
Q. And I understand that you're saying he said that he could negotiate for his wages, but he didn't tell you what that wage was?
A. No.
Q. So how do you know that the wage was higher than yours if he didn't tell you what it was?
A. Because he told me he started out at a higher wage than what I did at $12.70 an hour.
Q. Did you tell him what you were making?
A. When I signed my contract, we all -- those of us who didn't negotiate signed a contract stating that we would accept the job at $23,600 plus locality.
Q. Right, and did you tell --
A. Yes.
Q. (Continuing) -- Casey that that's what you were

Page 33

making?
A. Yes.
Q. And what did he say?
A. He told me that he was able to negotiate for a higher wage.
Q. Do you believe that all male screeners were hired in at a higher salary than you?
A. I'm not sure.
Q. Do you know if there were some women who were hired in at higher salaries than you?
A. I'm not sure.
Q. Do you know if there were some men who were hired in at lower salaries?
A. No.
Q. You don't know?
A. I don't know.
Q. You indicated in your complaint that there was a memo that you saw from TSA by an individual named James Loy that talked about salary differentials; is that correct?
A. Yes.
Q. Where did you see that memo?
A. I got injured in October of 2004, and I was gone for approximately three weeks. When I came back, I was catching up on our daily briefing in our briefing book at work and saw the memo.

Page 34

Q. What was the date on the memo? Do you remember?
A. No.
Q. Do you have a copy of the memo?
A. No. We weren't allowed to take any information out of the area.
Q. And what did the memo say?
A. It basically said that they were aware that they had discrepancy in pay issues, and they weren't going to try and fix them. They were aware that some people were able to negotiate for their wages as far as prior screeners and others weren't, and they weren't going to fix that either.
There were other things in the memo, too, but I don't remember everything that was in there.
MS. MITTET: I'm going to mark an exhibit. For the record, I'm marking an exhibit that is a memorandum to Assistant Administrator for Aviation Operations, Federal Security Director from Richard A. Whitford.
(Exhibit #1 was marked for identification.)
Q. (By Ms. Mittet) Showing you what's been marked plaintiff's Exhibit #1 to your deposition, Ms. Moorehead, this is a June 6th, 2003 memo from a Richard Whitford that talks about a decision not being made to adjust the pay of contract screeners at this time.
Could this be the memo that you looked at?

Page 35

Because this talks about different pay issues.
A. This was not the memo. The memo I saw was an e-mail.
Q. It was an e-mail?
A. Yes. It was an e-mail from James Loy addressing these issues, but not in this length.
Q. But it was addressing the same issues as in here?
A. Yes.
Q. You indicated in your complaint that you filed in District Court that you have suffered emotional harm as a result of the discrimination that you alleged in your complaint, the alleged discrimination, I should say, that you alleged in your complaint.
What are you referring to when you say that?
A. Well, since I filed this complaint and management has found out that I filed a complaint, my co-workers look down upon me. I work in a very stressful environment. A few of my leads no longer -- I don't -- I no longer work with them. They're in another area now, but they made things very difficult for me.
Q. You're talking about your perception of events that happened after the complaint was filed?
A. Yes.
Q. But in the complaint, when you filed it, you said you suffered emotional harm. So I'm assuming that's harm that predates your filing the complaint.

Page 36

A. When I filed this complaint, I went through the process for the EEOC. And when I went through my chain of command, nothing was done. They just kind of swept it underneath the rug.
And then when I started the EEOC process, doing the mediation and all of that and it leaked out, some of my co-workers have made it literally hard for me to even stay there.
Q. You said you went through the chain of command before you filed your EEO complaint?
A. Yes.
Q. And can you tell me what you did?
A. When I was removed from the lead position in March of 2003, I approached my -- the other supervisor that did not remove me, Kevin Palmer, and asked him to move to a different work location, because I was going to file a complaint against Ron Danielson.
So Kevin moved me. He was able to swap me out with somebody to make it so that they wouldn't be short one person. I filed the complaint. I waited for upper management to respond. And when they didn't --
Q. I'm sorry, when you say you filed a complaint, you're talking about the complaint that you filed with EEO?
A. No. I filled out a personal action form with TSA, and I submitted it to HR. They never responded to it.

Page 37

Q. And when did you do that?
A. The end of March of 2003.
Q. And where did you get the form?
A. The form I got right there. It's a form that they carry there at the airport.
Q. Who specifically did you submit it to?
A. The HR person on duty was Terry Jones at that time at the airport.
Q. And what did you say in the form?
A. Well, there was a letter. There was a letter, and I explained the situation that had happened between me and Ron Danielson, my supervisor at the time, and asked for an investigation on it.
Q. Asked for an investigation as to why you were taken out of the acting lead screener position?
A. Yes, and nobody from headquarters -- our headquarters at SeaTac responded to that. So in the middle of April -- I gave them a couple weeks to respond. When they did not, I called the Office of Civil Rights, and left my phone number on their voice mail.
I never heard anything back from them. So the end of May of 2003, I filed -- I sent a letter to the Office of Civil Rights.
Q. And this is the emotional harm that you've suffered, the fact that it was difficult?

Page 38

A. Yes. Once I filed the EEOC complaint with the Office of Civil Rights, it got around because they would call to do an investigation. They'd call SeaTac Airport wanting to talk to me. That's when my emotional stress started, because it went -- it took not even two days after screening managers found out that I filed that people were just being downright ornery to me.
Q. Who specifically are you referring to?
A. My old supervisor.
Q. Who was that?
A. Jason Landon. He would make wise remarks.
Q. Jason who? What was the last name?
A. Landon.
Q. L-A-N-D-O-N?
A. Yes.
Q. What area were you working in when Jason Landon was your supervisor?
A. I was working at step.
Q. I'm sorry, what?
A. Step, it covered Delta Airlines and a few other airlines at the time.
Q. Did you say step?
A. Step, S-T-E-P.
Q. And was he a supervisor or a lead?
A. He was a supervisor.

Page 39

Q. And what specifically did he do?
A. He would just -- they would just make smart comments about me filing an EEOC complaint like, are you sure you really want to do this? And they would just make fun of me.
Q. Did you ever get a performance evaluation from Jason Landon?
A. I believe I've gotten one. It was -- at that time they were -- it was -- they either said you did your job or you didn't. I mean, it wasn't elaborate.
Q. So your performance evaluations are similar to pass/fails?
A. Similar, yeah.
Q. And did they ever give you a bad evaluation or did you pass?
A. No.
Q. So you did not get a bad evaluation for anything?
A. I never got a bad evaluation, but with Jason I never got a good one either. It was just, so you know how to do your job.
Q. Your system for evaluations, do you have a system for saying that you're doing a good job, an excellent job, or is it just you're doing a job or you're not?
A. At that time it was pretty much you're doing your job or you're not.

Page 40

Q. And Jason said that you were doing your job?
A. Yes.
Q. And anybody else that made comments to you?
A. There was a bunch of screeners that I worked with. A lot of my male co-workers were kind of mean to me because I filed an EEOC complaint.
Q. Did they say they were annoyed with you because you filed, or are you assuming it was because of that?
A. No. They were never annoyed with me. They would just I guess be a typical male. I mean, they just -- I don't know. They didn't really want me in that area because I was kind of speaking out about the working conditions that we were working underneath or whatever.
Q. You were speaking out about you being removed from the --
A. Yes.
Q. (Continuing) -- lead position, not working conditions in general; is that correct?
A. Yes.
Q. Did any of them specifically say anything to you about you being removed from the acting lead position?
A. No. I would just -- they would talk behind my back, and the rumors would get back to me.
Q. Did anybody say anything directly to you?
A. No.

Page 41

MS. MITTET: I don't have all that much more. I'd just like to take a little break.
MR. MONTOYA: Sure
(Recess taken.)
MS. MITTET: Back on the record again.
Q. (By Ms. Mittet) I just have a couple of finishing questions here, Ms. Moorehead.
You indicated that Lambert Lactoen told you that he was making a dollar more than you salary wise. When did he tell you that?
A. In a general conversation we were having. I'm not sure of the date, but it was prior to me being removed as a lead.
Q. Do you recall approximately how long before? Was it a week or two weeks? A month?
A. A month maybe.
Q. And when were you told by Michelle Dodd that -- I'm looking for the names of the other two gentlemen. I think you said Phillip and a Casey.
A. Phillip Reed and Casey Hueber.
Q. When did Michelle tell you that she thought they were hired in at a higher salary than you?
A. When I saw that e-mail.
Q. And when was that?
A. November of 2003.

# EXHIBIT B