UNITED STATES COURT OF FEDERAL CLAIMS
WASHINGTON, D.C.

| | |
|---|---|
| Paula R. Moorehead,<br>Plaintiff | ) |
| | ) |
| v. | ) C.A. No. 07-654 C<br>) GWM |
| The United States,<br>Defendant | ) |
| | ) |

AFFIDAVIT OF BARBARA B. HUTCHINSON

I, Barbara B. Hutchinson, am the attorney for Paula Moorehead, the plaintiff, in this action. The *Declaration of Paula Moorehead, dated January 31, 2007,* attached hereto as Exhibit 2, was executed by Ms. Moorehead on that date and is referenced in the *Plaintiff's Memorandum In opposition to Defendant's Motin to Dismiss and/or for Summary Judgment,* pp. 5-6, 8, *R. 23*, United States District Court Western District of Washington.

I swear, under penalty of perjury, that the foregoing statement is true and correct this 14th day of July 2008.

Barbara B. Hutchinson
Barbara B. Hutchinson

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| PAULA R. MOOREHEAD,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL CHERTOFF, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY, TRANSPORTATION SECURITY ADMINISTRATION,<br><br>Defendant. | NO. 2:05-cv-01767-JLR<br><br>**DECLARATION OF PAULA MOOREHEAD** |

I am over the age of 18 and competent to testify to the matters set forth below. I have first hand knowledge of the information set forth herein.

1. In October 2002, I applied for and was interviewed for the position of supervisory screener with the Transportation Security Administration (TSA) at SeaTac airport. I went through the testing and interviewing for this position on October 9, 2002. The interviewing and hiring process was done on this date. The interviews and testing took place at a hotel near the airport.



Law Office of John C. Montoya, PLLC
406 Boston Street
Seattle, WA 9809
(206) 352-0500 FAX (866) 613-5972

EXHIBIT 2

2. The process on October 9, 2002, was that each of us went from one conference room to another until we reached the end of the process where our salary was to be determined. When I reached this last stage, which is where the Decision Tool form, the salary determination form, is to be completed, I had my last two pay stubs from my then current employer with me as instructed. I offered them to the woman who was conducting the salary interview. She refused to look at my pay stubs when I offered them to her. She told me that my salary offer was the Pay Band D minimum, $23, 600 per year. She then said that I could "take it or leave it" and that "there are plenty of others out there that are looking for a job." I accepted the offer, feeling that this was my only choice. I was also told at this time that there were no more lead or supervisory positions available.

3. Not until after I was hired did I learn from some of my male co-workers that some of them were able to bargain for a higher starting salary.

4. I also learned, during discovery in my present lawsuit, that other males had been hired in the lead or supervisory positions after I had accepted employment on October 9, 2002. This is so despite the fact that I was told on this date that there were no more available lead or supervisory positions.

5. With my prior employer, ICTS, who had the screening contract at SeaTac before the creation of TSA, I had worked there as a lead screener for over four months.

6. I have reviewed the discovery materials provided by Defendant in this matter with respect to 50 male comparators. Specifically, I have reviewed the application materials of 19 male of these comparators who are identified by numbers. As to these 19 male comparators, I note the following:



Law Office of John C. Montoya, PLLC
406 Boston Street
Seattle, WA 98109
(206) 352-0500 FAX (866) 613-5972

a. ID 4: this person was hired off the street and had <u>no</u> prior experience directly related to passenger or baggage screening functions; he was rated at the "4" level on the Decision Form but he was not given a rating on the Work Experience form.

b. ID 41: this person was hired off the street and had <u>no</u> prior experience directly related to passenger or baggage screening functions; he was rated at the '3" level in all categories on the Decision Form and on the Work Experience form. Further, there is no evidence on his Decision Tool that Pearson (or TSA) considered whether he had a verifiable higher paying job offer at the time of his hire.

c. ID 166: this person was unemployed at the time of hire as a screener; he had <u>no</u> prior experience directly related to passenger or baggage screening functions; on the Work Experience form, he was rated a "3"; his application form discloses that he had no prior experience in airport screening, had no experience screening individuals with a hand held metal detector. Further, there is no evidence on his Decision Tool that Pearson (or TSA) considered whether he had a verifiable higher paying job offer at the time of his hire.

d. ID 224: this person had <u>no</u> prior experience directly related to passenger or baggage screening functions; he had never worked at an airport; he had no experience using a hand held metal detector,

e. ID 281: this person had only two months of experience as a security screener at an airport (compared to my over four months experience); he was earning $13,000 per year at the time of hire by TSA (compared to my annualized income of about $24,960 at the time of hire).



Law Office of John C. Montoya, PLLC
406 Boston Street
Seattle, WA 9809
(206) 352-0500 FAX (866) 613-5972

f. ID 376: this person had no prior experience as an airport screener; there is no indication that he ever worked at an airport; he received the exact same ratings as I on the Decision Form and the Work Experience Form. Further, there is no evidence on his Decision Tool that Pearson (or TSA) considered whether he had a verifiable higher paying job offer at the time of his hire.

g. ID 383: there is no evidence that this person ever worked at an airport as a passenger security screener; he was rated at the 3 level in all categories on both the Decision Form and the Work Experience form.

h. ID 446: this person had no prior experience directly related to passenger or baggage screening functions; he had never worked at an airport and was unemployed prior to applying for work with TSA; on the Decision Form, he was rated at the 3 level in two categories and rated at the 4 level in one category; on the Work Experience Form, he was rated at the 3 level. Further, there is no evidence on his Decision Tool that Pearson (or TSA) considered whether he had a verifiable higher paying job offer at the time of his hire.

i. ID 492: this person had no prior experience directly related to passenger or baggage screening functions; he was rated at the 4 level in one category on the Decision Form, at the 3 level in the other two categories on this form; he was rated at the 3 level on the Work Experience form. Further, there is no evidence on his Decision Tool that Pearson (or TSA) considered whether he had a verifiable higher paying job offer at the time of his hire.

j. ID 501: this person had about the same experience as I as an airport screener; he had the same rate of pay as I as a screener just prior to applying for the position at



Law Office of John C. Montoya, PLLC
406 Boston Street
Seattle, WA 9809
(206) 352-0500 FAX (866) 613-5972

TSA; he received the exact same ratings as I on the Decision Form and the Work Experience Form.

k. ID 505: this person did have prior experience as a screener but, in contrast to my ratings, he was rated at the 3 level in all categories on the Decision Form and on the Work Experience form.

l. ID 599: this person failed the competency portion of the screener assessment test and he should not have been considered further. I passed the competency exam.

m. ID 621: this person was not rated on the Work Experience Form; he was rated at the 4 level in three categories on the Decision Form; he had 5 months of screening experience; his rate of pay at time he applied for work with TSA was $12.00 per hour, the same as mine at the time.

n. ID 655: this person was rated at the 3 level on the Work Experience Form; he was rated at the 3 level in all categories on the Interview Decision Form; he had only a few more months experience than I as an airport screener and he was paid a dollar more per hour than I at the time of hire. His prior employer was a union shop so this wage rate was a negotiated wage rate.

o. ID 806: this person failed the TSA competency portion of assessment exam at the Baltimore, Maryland airport. He reapplied for work at SeaTac about four months later. In accordance with TSA's stated rules, he was not eligible to apply for a screener position at SeaTac for six months following his failing of the test in Baltimore. I passed the competency exam.

p. ID 836: this person had no prior experience directly related to passenger or baggage screening functions and had never been employed at an airport.



Law Office of John C. Montoya, PLLC
406 Boston Street
Seattle, WA 98109
(206) 352-0500 FAX (866) 613-5972

q. ID 953: this person was rated at the 4 level in two categories and at the 3 level in one category on the Decision Form; he was rated at the 4 level, the same as I, on the Work Experience Form; this person was unemployed at the time of his interview; further, there is no evidence on his Decision Tool that Pearson (or TSA) considered whether he had a verifiable higher paying job offer at the time of his hire.

r. ID 975: this person had almost the exact same screener experience as I (I had slightly more), and he received the exact same ratings as did I on the Decision Form and the Work Experience form.

s. ID 1023: this person had no prior experience directly related to passenger or baggage screening functions and had never been employed at an airport; he had prior experience working security at the Tacoma courthouse where he earned but $10.00 per hour. His ratings were the same as mine.

7. ID 383 received the highest starting salary of the male comparators. He was started at $32,972. As noted above, he had no prior airport experience as a screener and he was rated lower than I on the Decision Form and Work Experience Form. According to TSA own hiring and salary guidance, ID 383 was entitled to only the minimum starting salary. To put ID 383's starting salary in perspective, my salary to date, including locality pay increases, in four years has not reached the level of starting pay received by ID 383 in October 2002. In fact, I continue to be underpaid relative to all of my comparators with each paycheck, starting from my hire date.

8. ID 1023 received the third highest starting salary of the male comparators. He was started at $32,413. Like ID 383, he also had no prior experience as an airport screener



Law Office of John C. Montoya, PLLC
406 Boston Street
Seattle, WA 9809
(206) 352-0500 FAX (866) 613-5972

and, in accordance with TSA hiring guidance, he was not entitled to more than the minimum starting salary. At the time he applied, he was earning but $10.00 per hour compared to my $12.00 per hour.

9. Of the top four highest paid male comparators, ID #s 383, 984, 1023, and 4, I received the same or higher ratings than three of these four.

10. In addition to the discovery materials submitted by TSA for male comparators, TSA also submitted during discovery the hiring and application materials of 20 female applicants who received a higher starting salary than I. I have reviewed the materials submitted for these females along with the discovery materials submitted as to male comparators and have made the following calculations concerning the relative starting pay of females and male screeners:

a. Of the male screener work force hired by TSA at SeaTac airport, about 7.2% received a starting salary over the minimum; their average starting salary was $29,792 per year.

b. Of the female screener work force hired by TSA at SeaTac, 5.9 % received a starting salary over the minimum; their average starting salary was $29,229 per year.

11. Each of the above male comparators was hired at about the same time I was hired in 2002 under the same vacancy announcement. Each received a higher starting salary than I although each either did not have specialized experience that would entitle them to a higher wage rate, as set forth in TSA salary guidelines, or they received lower interview ratings than I or both or their experience was more than a year old as outlined in TSA salary guidelines. Further, two of them failed the competency exam



Law Office of John C. Montoya, PLLC
406 Boston Street
Seattle, WA 9809
(206) 352-0500 FAX (866) 613-5972

for a screener position at SeaTac and should not have been allowed to continue in the hiring process under TSA's rules.

12. I have attached as Exhibits 1 through 10, the "Decision Tool for Credible Experience and Salary Offer" for ID #'s 4, 41, 166, 224[1], 376, 446, 492, 953, 836, and 1023, respectively. The TSA April 26, 2002, Guidance on hiring and salary determinations stated that where, as in the case of these males, the applicant is unemployed at the time of application but who has a firm offer of a higher paying position, the interviewer is to review the applicants documents committing to the higher salary and document the salary on the Decision Tool for Credible Experience and Salary Offer. Exhibits 1 through 9 show that this required verification or documentation for these unemployed applicants was not made by the interviewer and that the salary of those identified above was set without regard to a firm offer of a higher paying position. TSA did not follow its own rules for setting the salaries of these males, each of whom received a higher starting salary than I.

13. With regard to filing my Equal Pay Act claim with the TSA Office of Civil Rights, one of my male co-workers made an off-hand comment to me and one other person while at work in March 2003 that his rate of pay was higher than mine because the Agency gave him credit for his military service. I had no way of verifying this remark at that time. In fact, I believed that the co-worker was likely engaging in unreliable bragging. At no time did I see this person's paycheck, pay stub, or any other document that would corroborate this male co-worker's statement. On about November 7, 2003, following my return to work from an on the job injury, I reviewed

---

[1] There is no Decision Tool for this person. The Work Experience Form is attached instead.



Law Office of John C. Montoya, PLLC
406 Boston Street
Seattle, WA 9809
(206) 352-0500 FAX (866) 613-5972

the Agency's "briefing" book, as required of all employees daily, and discovered a memo in the briefing book authored by James Loy, then a high ranking official of the Department of Homeland Security. This memo acknowledged the existence of disparities in rates of starting pay for screeners, but said that nothing would be done to remedy the disparities.[2] Based upon this memo that pay disparities existed among screeners for no apparent reason, I, for the first time, believed the Agency's pay policy, especially its policy as to starting rates of pay, may violate the EPA. I raised this issue with the OCR by letter dated November 18, 2003. See Exhibit 11 attached hereto. This letter was received at the OCR facility on November 24, 2003. See Exhibits 12 and 13 attached hereto. Thus, relative to when the Complainant acquired reliable information regarding possible pay disparities violative of the EPA, I timely raised this issue. The Agency, however, never responded to or acknowledged the Complainant's informal EPA claim.

14. Because TSA never responded to my informal EPA complaint, I filed a formal complaint with TSA regarding the EPA issue on December 28, 2003. See Exhibit 14 attached hereto. The TSA Office of Civil Rights, as it did with the informal EPA complaint, TSA failed to acknowledge receipt of or investigate my formal EPA complaint. TSA's receipt of my formal EPA complaint is documented by the return receipt from my express mail delivery of December 29, 2003. See Exhibit 15 attached hereto. Further, on May 23, 2004, I sent a letter to Crystal Riveria of the TSA Office of Civil Rights correcting her "acceptance letter" because Ms. Riveria did not include my EPA complaint in the issues accepted for investigation. I sent my May 23, 2004,

---

[2] The Loy memo was removed from the briefing book shortly after I read it. I do not have a copy of this memo because it was standard practice to remove and shred sensitive material from briefing book.



Law Office of John C. Montoya, PLLC
406 Boston Street
Seattle, WA 9809
(206) 352-0500 FAX (866) 613-5972

letter to Ms. Riveria by Express U.S. Mail. I never received a response from Ms. Riveria regarding this letter or the EPA complaint. Thereafter, TSA continued to ignore my EPA complaint.

15. After I was hired by TSA and had been working for a few months, I was asked by my two supervisors, Ron Danielson and Kevin Palmer, if I wanted to be the permanent lead at the Northwest ticket counter baggage area. Both of them came to me jointly. I agreed because I had asked both Danielson and Palmer earlier to transfer me to a busier location due to the boredom of where I had been. I was put into the lead position about January 15, 2003. Neither Danielson nor Palmer said anything to me at the time they put me into the lead position that this position was temporary or acting or that I would be subject to rotation in this position. Danielson said he wanted me in that position because I had shown the ability to take responsibility and get the job done.

16. I was not Danielson's first choice for this position. I was present when on about January 12 or 13, 2003, when Danielson asked Lambert Lactoen to be the lead. Lactoen said he did not want to be lead and was not made the lead at this time. Earlier, Danielson and Palmer selected another male for the lead position, Jimmy Arevalo. He only served a short while before he voluntarily quit the position.

17. With regard to the policy by my supervisors, Danielson and Palmer, as to rotating leads in our area in baggage, I recall that after I was removed and Lambert Lactoen was put in as acting lead, Lactoen was not rotated out of this position. Rather, as I recall, he remained as lead until about mid or late July 2003 when he suffered an on the job injury. As a result of the injury, he was off work for several months. But he



Law Office of John C. Montoya, PLLC
406 Boston Street
Seattle, WA 9809
(206) 352-0500 FAX (866) 613-5972

served as acting lead for about four months and was taken off only because of his injury. Danielson and Palmer were aware of this.

18. Similarly, Lester Digou, a fellow screener, was an acting lead in the Delta baggage area for at least seven months. He was not subject to rotation off his acting lead position. Both Danielson and Palmer were aware of this because they were responsible for the Delta baggage area. I worked with Digou at this time and had first hand knowledge of how long he served as acting lead. I was transferred out of the Delta area while Digou was still lead so I do not know how much longer he served as acting lead.

19. When I was pulled off the lead position, this was done by Danielson. I spoke to Palmer about two to three days after Danielson made his decision, Palmer asked me why Danielson did this. Palmer said to me that we were not having any problems. He added, "why fix something that is not broken."

20. About two weeks before I was pulled out of the lead position by Danielson, Palmer told me in a private conversation that once I had been in the lead position for 90 days, he was going to put through a recommendation to his manager to have my status as lead official changed to reflect my actual job.

I declare under the penalty of perjury that the information contained in this declaration are true and correct to the best of my knowledge.

DATED THIS 31st day of January, 2007.

Paula Moorehead

PAULA MOOREHEAD



Law Office of John C. Montoya, PLLC
406 Boston Street
Seattle, WA 9809
(206) 352-0900 FAX (866) 613-0972

JAN-31-2007 08:20 PM MOOREHEAD 252 833 1046 P.04