UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| PAULA R. MOOREHEAD,<br>Plaintiff,<br>v.<br>MICHAEL CHERTOFF, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY, TRANSPORTATION SECURITY ADMINISTRATOR,<br>Defendant. | No. 2:05-cv-01767-JLR |

DEPOSITION UPON ORAL EXAMINATION OF

PAUL H. SHELDON

9:00 a.m.
January 5, 2007
Suite 5220
Federal Courthouse
700 Steward Street
Seattle, Washington

**EXHIBIT 20**

Reported by Mary C. Tevis, CCR No. 29906

APPEARANCES

For the Plaintiff: John C. Montoya
Attorney at Law
Law Office of John C. Montoya
406 Boston Street
Seattle, Washington 98109
Phone: 206-452-0500
email: jcmforlaw@aol.com

For the Defendant USA: Marion J. Mittet
Assistant United States Attorney
U.S. Department of Justice
United States Attorney's Office
Suite 5220
700 Stewart Street
Seattle, Washington 98101
Phone: 206-553-2055
email: jamie.mittet@usdoj.gov

For the Defendant TSA: Gillian Flory (telephonically)
Attorney Advisor (Litigation)
Office of Chief Counsel
Transportation Security
Administration
601 South 12th Street TSA-2
Arlington, Virginia 22202
Phone: 571-227-2670
email: gillian.flory@dhs.gov



INDEX


| WITNESS | PAGE |
| --- | --- |
| Paul H. Sheldon | |
| Direct by Mr. Montoya | 4 |
| Cross by Ms. Mittet | 30 |
| Redirect by Mr. Montoya | 31 |


No EXHIBITS OFFERED



WHEREUPON, the following proceedings were held and testimony taken of the witness, who was called at the instance of the Plaintiff, to-wit:

PAUL H. SHELDON, witness herein, having been first duly sworn on oath by the court reporter, testified as follows:

DIRECT EXAMINATION

BY MR. MONTOYA:

Q. Okay, Mr. Sheldon, my name is John Montoya. As Ms. Mittet just explained, I represent Paula Moorehead in this matter, and what I would like you to do to start things off here is, could you give the correct spelling of your name, sir.
A. Yes. First name Paul, P-A-U-L, middle initial H. for Harold, and last name Sheldon, S-H-E-L-D-O-N.
Q. Okay, great, and is it okay if I call you Paul?
A. Certainly.
Q. Paul, have you given depositions before?
A. I do not believe so.
Q. Well, let me just give you a couple of basic ground rules and then we'll proceed from there. I'm going to be asking you a series of questions, and we will need from you, obviously, particularly in this case, an audible answer and an answer to the best of your ability and to the best of your memory.
I would ask that if you don't understand a question





that I've put to you that you ask me in turn to clarify it; in other words, make sure that you understand the question.
And if you, for whatever reason, need to take a break, that's fine. I would just ask that you answer the pending question.
A. Okay.
Q. Is that okay?
A. Yeah, it sounds fine.
Q. Okay, good. Let me just ask you this: Are you taking any medications this morning, or I guess it's afternoon your time?
A. Yes -- yes, I am.
Q. Okay, are you taking any medications that would affect your answers?
A. No, sir.
Q. And how is your memory in general today, Paul?
A. It's good.
Q. And just one last point: Make sure you allow me to finish my question before you answer it.
A. Okay.
Q. Okay?
All right, Paul, can you tell us what your current position is?
A. I'm a policy analyst in the Office of Human Capital, and

it's a policy division there, and I'm one of the policy writers.
Q. And that's with the Transportation Security Administration?
A. Yes.
Q. And how long have you held that position?
A. It's a little complicated. I'm been in the policy department with TSA since September of '02. Began as a policy analyst, became the director of that unit in '03, early '03, acting, permanently appointed in May of '03, and then because of my medical situation, in May of '05, went back to a policy analyst position so that I could, you know, be accommodated by working at home.
Q. So just to be clear, during the time period that I'm going to be focusing on primarily, which is late -- or probably I guess from the summer of 2002 through the end of 2002, at that time, can you clarify what your position was?
A. Yes. I was a policy analyst at that time.
Q. All right, and just briefly for the record, can you tell me what your duties were in that position at that time?
A. Well, my stated portfolio was in policies related to employment relations primarily. In actuality, we operated in anything that needed to be done in human resources at that time; in other words, I didn't work





only in employee relations; I worked across the board in human resources issues. As examples of the employment relations portfolio, I was working on the screeners uniform policy at that time, the grievance policy, reasonable accommodation, that sort of thing, and outside of that portfolio, an example would be working on developing the statement of work for the renewal of our contract that during '02 was with Pearson. The contract was up for renewal at the end of '02, so I had a lot of involvement with that bidding process.
Q. And by Pearson, you're referring to NCS Pearson?
A. Yes, sir.
Q. And NCS Pearson, as I understand it, was an entity that contracted with TSA to assist TSA with the initial hiring of screeners?
A. Yes, sir, among other things.
Q. Among other things, okay. I'm primarily concerned about the hiring issues and starting salary issues. Was that within the bailiwick of NCS Pearson's responsibilities?
A. Yes.
Q. So am I correct in assuming you were familiar with the relationship between TSA and NCS Pearson at that time with regard to NCS Pearson's hiring of screeners, interviewing of screeners, and salary determinations?
A. Yes.





Q. Now, I am correct in assuming then also that the relationship between Pearson and TSA was set forth in a contract document of some sort?
A. Yes.
Q. With regard to hiring of screeners, can you describe the responsibility that TSA gave to NCS Pearson?
A. In general terms. I may miss a couple of technical points.
Q. That's fine.
A. Essentially, they had the full responsibility up to and including making an offer of salary, establishing the hire dates and that sort of thing, proposed dates for training and hiring, with the caveat that a TSA official had to agree or sign off on the actual authorizing document, you know, the final hire document.
Q. Okay, so I want to kind of walk through that process a little bit, and answer to the extent that you know. Is it fair to assume that, first of all, whatever responsibility Pearson had, was that a responsibility that it had at all the TSA airports across the country, or was this unique to some airports?
A. We had five airports that we called -- I think we called them PPOs. They were airports that were designated by legislation to not be under TSA direct supervision; they were going to be privately run and used as a comparator





to the TSA-run airports. Apart from those five, I believe it is true that they had responsibility for hiring at all of the airports. I have this vague memory that there may have been another contractor that had a small number of airports, also, but I simply do not remember that as a matter of fact, but I know that Pearson had the largest majority by far, and I know that's an accurate statement.
Q. Okay, thank you.
Let me then shift the focus to the Sea-Tac Airport in the Seattle area.
A. Yes.
Q. Was that a TSA airport in the sense that Pearson was responsible for the hiring and interviewing the screeners; in other words, it wasn't one of the five designated PPOs?
A. That is correct: It was not a PPO; it was a TSA airport, and Pearson ran that process.
Q. Now, with regard to that process, Pearson conducted the initial interviewing and the initial screening; is that correct?
A. Yes, that's my understanding.
Q. And Pearson made at least the initial determination of whether an applicant was qualified for whatever position he or she was applying for?

Q. Okay. thank you.
(Telephone interruption.)
THE WITNESS: Excuse me. May I just take a call. please?
MS. MITTET: Yes. go ahead.
(Off the record.)
MR. MONTOYA: Okay. back on the record.
Q. Mr. Sheldon. you have some of the comparator -- or you have the comparator documents in front of you?
A. Yes.
Q. I don't want to go through all of those. I'm going to go through two or three of these.
Hang on just a moment.
A. Okay.
Q. I'm going to go through two or three of these. I just want to make sure my understanding is correct here.
Now. again just to back up a little bit. you would not have personally had the occasion to review these hiring documents during the time period in question?
A. That's correct.
Q. Okay. so is your reviewing them. or may have reviewed them very recently. this would be the first time you've seen those documents: is that correct?
A. Yes.
Q. Can you pull out. or however you have them arranged. can





you get your hands on No. 446?
A. Yes. I can. I have pulled it out here and have it available in front of me.
Q. Now. are your copies Bates-stamped at the bottom?
A. Yes.
Q. All right. so with 446. can you turn to Bates number 1451?
A. Yes. I have it.
Q. Okay, looking at 1451, now. what we're looking at is what's referred to as the Interview Decision Form. and again this is a form that would have been developed by Pearson?
A. That's correct.
Q. Okay. and this person. it appears from the form. that. looking at it going across. there's a competency cut score: There's a rating for each competency. and then a pass-fail designation.
With this particular person. I'm looking at. in the three categories that were reviewed. dealing with others, command posture. communication. this person received a 3. 3. 4 respectively. Is that what yours shows?
A. Yes.
Q. Now. you would really have no idea why the rater happened to give this person those particular ratings.





other than to go through the application file: is that correct?
A. Actually. no — well. it's correct. but I don't know why the ratings were given. but I could not begin to reproduce them. even by reviewing the file, because they're an interview: they recorded an evaluation of an interview.
Q. Sure. Okay. well. let's look I think quickly at the next page. which is Bates number 1452.
A. Yes. I have it.
Q. And that's the Work Experience Interview Form. and again this was developed by Pearson?
A. Yes.
Q. And those ratings would be the Pearson interviewer's ratings?
A. Yes.
Q. Then let's look at the next page. 1453. and this is the Decision Tool for Credible Experience and Salary Offer. Now, this is a TSA-prepared document?
A. I believe so.
May I refer to my copy of the April document to confirm that statement. of the April guidance document. April 2002?
Q. Sure. Does that document have a number?
A. It does not have a Bates number on it. I don't know if





it's in your -- if it's been provided to you yet.
Q. It's April 2002?
MS. FLORY: I believe that the witness is referring to the April 26. 2002. Salary Guidance that was signed by Jan Character (phonetic). It was produced to you in February; however, it may not have been Bates-stamped. and I believe that Mr. Sheldon's copy is a clean copy that does not have a Bates number on it.
Q. You know. I probably have it. but not here: it may be back in my office.
I do have a document that's dated. at the bottom of it. September 2002. and it's titled. Important Information About Position Assignments and Salary Determination.
A. That's not the document I'm referring to.
Perhaps I could clarify. it's not a significant issue that I'm asking about. if I may?
Q. Sure.
A. This document appears. in my opinion and memory, without reference to the April 26. 2002 guidance on salary setting. it appears to be a document that is based on the attachment to that memo. I cannot tell whether it's an exact reproduction of our document. or one that's based upon it. you know. so as to be similar. but it's actually somebody else's document. but I just wanted to

clarify that statement, that I had said earlier that this was our document, and I'm not confident that it is, looking at it right now. It seems to be a document that they produced, basically to give effect to the instructions that we gave, but it may have been their own document, is the only point I was trying to make.
Q. Yeah, I understand, and actually looking at it, I would come to the same conclusion you just did. It has the look of a Pearson document as opposed to a TSA document. I don't see any designation at the bottom of it that's it's a TSA form --
A. Right.
Q. -- of any sort. Okay.
A. It appears to represent the factors that we were trying to capture in our document accurately and fully.
Q. Right.
A. I don't believe it's our exact document, for whatever distinction that's worth.
Q. Okay, no. I understand, but the factors would reflect, though, the factors that TSA instructed Pearson to look for?
A. Yes, that is true.
Q. So that when we're talking about any one individual that was hired, whatever their rate of pay might be, you of course personally had no involvement in that, and it





doesn't sound like any TSA person would have been there on site at the time those decisions were made, except that TSA apparently would have signed off on the final recommendations or final documents?
A. Yes, that's accurate; that's what I believe is what happened.
Q. To your knowledge, and referring to Sea-Tac airport, did Pearson have more than one person doing the interviewing and the completing of these forms that we've just discussed?
A. Yes, at Sea-Tac that was evident in the documents that I have in these files.
Q. And when you say it's evident, how is it evident?
A. I have unredacted copies of the files, and it shows the different interviewers' names.
Q. Do you know roughly how many interviewers there were at Sea-Tac: Were there five, were there 50, were there 500 interviewers? Do you have any ballpark figure that you can give me?
A. Yes. I would ballpark it in the range of ten.
Q. And these ten interviewers were people that were hired by Pearson, supervised by Pearson, paid by Pearson; is that correct?
A. That's correct.
Q. And further, they would have been trained by Pearson?





A. Yes, for the purposes of this particular assignment.
Q. Yes.
A. My only hesitation here is that from my review of the files, it appears that these people had a good deal of staffing experience and seemed to know what they were doing, is all I'm observing, and I know that Pearson didn't give them all of that training.
Q. Oh, I see what you're saying.
A. In other words, they came with experience that they didn't get from Pearson, I'm sure.
Q. Okay, well, to put it another way, TSA didn't conduct any training of these interviewers?
A. I believe that's correct, yes.
MR. MONTOYA: All right, can we go off the record a second?
MS. MITTET: We're off the record.
(Discussion off the record.)
MR. MONTOYA: On the record.
Q. Paul, correct me if I'm wrong, it's my understanding that when applicants applied for screener positions with TSA, again during this time period, that they would apply for not only a screener position, but a lead and supervisory position as well, too?
A. I know for a fact that it was possible. What I don't know for a fact is if that happened de facto or in every





case.
Q. So it was at least possible?
A. Yes, that I know for a fact.
Q. In the case of an applicant that applied for two or three of these positions, that is, not only the screener, but the lead position or lead and supervisory position, those individuals would have been given tests that would have qualified them, or at least screened them on a pass-fail basis, for a lead or supervisory position; is that correct?
A. Yes, I think you're asking that if they applied for all three, were they in fact checked against the standards for all three; is that your question?
Q. Yes, that's exactly it.
A. And the answer is yes.
Q. Do you know whether, was it Pearson, or was it TSA, that would have set the cutoff, or the benchmark, for the two higher positions, the lead or supervisory position?
A. TSA would have set the standards for each. I do not know to what extent it was the same questions requiring a higher score, or different testing. I just don't know.
Q. So would this have been -- and I just want to be sure: I'm a little confused about this. Let's say an applicant simply applied for a screener position --

let's say that's applicant A, and then applicant B, however, applied for the screener lead and supervisory position. Would both applicant A and B have been given the same paper-and-pencil test?
A. I do not know for a fact; I just don't know.
Q. I see, okay, so there may have been separate tests for applicant B for the lead and supervisory positions?
A. I know there were differences. I cannot tell you -- the answer is true, yes, there may have been.
MR. MONTOYA: Okay. Jamie, I don't think I have anything more.
MS. MITTET: Let's go off the record.
(A recess was taken.)
MS. MITTET: Okay, on the record.

CROSS-EXAMINATION

BY MS. MITTET:
Q. Paul, you indicated, in response to Mr. Montoya's questions, that Pearson, NCS Pearson, made the hiring decisions generally, but a TSA individual would sign off on each particular offer; is that correct?
A. Yes, in one way or another.
Q. And when the TSA person signed the offer, can you tell whether or not that TSA person did an independent review of the application package?
A. With respect to these documents, no, I can't tell. Are





you -- well, I'm not sure I know specifically the range of your question here. Perhaps you could restate it?
Q. Okay. When the TSA person is signing off on the offer that's made to a screener, is that TSA person just accepting NCS Pearson's assessment, or are they doing an individual assessment themselves of the applicant?
A. I can tell you two things from my experience: One was that I know in many, many case, it was a basically a rubber stamp, not even on these documents, the interview or offer document. It was on the appointment, the official appointment document in the -- it's called CRF50; it's the form that appoints the employee officially to government. The TSA signature on that document constituted the sign-off in the vast majority of cases.
And then secondly, I'm quite sure that an independent review was not done regularly; I believe it was seldom done.
MS. MITTET: I have no further questions. Mr. Montoya may have something based on that.
MR. MONTOYA: Yeah, just to follow up on that.

REDIRECT EXAMINATION

BY MR. MONTOYA:
Q. Are there any particular situations in which an independent assessment might have been done; in other





words, were there certain situations that would have been kind of red-flagged?
A. Well, in the policy that we issued in May -- I'm sorry -- in April '02, we did say that offers above the midpoint of the range needed more specialized review, so by policy, those were flagged. Beyond that, I am not aware of any situation, but a high salary is a typical -- you know, it would have called attention.
Q. So for those salary offers that Pearson proposed that were above the midpoint --
A. Yes.
Q. -- are you saying that those would have been subject to an independent assessment by TSA?
A. It required a higher level review, and I believe it is accurate to say that it would be an independent assessment.
Q. And that's for the midpoint on, above?
A. Yes.
MR. MONTOYA: All right, I don't have anything further.
MS. MITTET: I have nothing further.
(The witness was excused at 10:12 a.m.)





CERTIFICATE

STATE OF WASHINGTON )
) ss.
COUNTY OF KING )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

Paul H. Sheldon,

appearing at the instance of the Plaintiff, appearing before me at the time and place indicated in said transcript, said deponent, before examination, was by me duly sworn to testify the truth, and that the testimony thereupon given was stenographically recorded by me and transcribed under my direction.

I further certify that I am in no way related to any party to the cause of action concerned, nor to any of counsel, nor do I have a financial interest in the event of the cause.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 12th day of January 2007.

Mary C. Tevis, Notary Public
of the State of Washington,
residing at Edmonds.