IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PAULA R. MOOREHEAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-654C |
| | ) | (Judge Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDING OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h) of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully submits the following proposed findings of uncontroverted fact in support of its cross motion for summary judgment.

1. Pursuant to the Aviation and Transportation Security Act ("ATSA"), the Transportation and Security Administration ("TSA") became responsible for appointing, training, and deploying screeners for airport employment, instead of the private sector screeners who had, prior to September 11, 2001, been responsible for security screening at airports within the United States. Def Exh. D (Declaration of Paul H. Sheldon ("Sheldon Decl.")) ¶ 4.

2. In order to comply with the Congressionally mandated deadlines and to meet its goal to create a work force of screeners within a year, TSA awarded a contract to NCS Pearson, a Minneapolis-based human resources firm. Sheldon Decl. ¶ 5.

3. NCS Pearson was responsible for the recruitment and hiring of a Federal security screening work force, including screeners, lead screeners, and supervisory transportation security screeners ("supervisors"). Sheldon Decl. ¶ 5.

4. In April 2002, after learning of inconsistencies in the starting salaries NCS Pearson was offering new hires, TSA issued an Interim Human Resource Guidance on Salary Determinations

for Transportation Security Screeners, SV-0019-Pay Band ("Salary Guidance"). Sheldon Decl. ¶¶ 6-7.

5. The Salary Guidance provided that, unless an exception for specialized experience applied, new appointments were to be made at the minimum rate for the pay band established for the job category. Sheldon Decl. ¶¶ 6-7.

6. Screeners were paid at the D pay band, and the base salary (minimum rate) for the D band in 2002, was $23,600. Sheldon Decl. ¶¶ 6-7.

7. A locality adjustment, which was calculated separately for various cities and other locations around the country, was added to the base salary. Sheldon Decl. ¶¶ 6-7.

8. Appointments of screeners could be made at a rate above the minimum rate of the D band when applicants had specialized experience that demonstrated that they possessed the skills and abilities to successfully perform the duties of the position. Sheldon Decl. ¶¶ 6-7.

9. Specialized experience had to be in or related to the work of the screener position to be filled. Sheldon Decl. ¶¶ 6-7.

10. The rationale for this exception was that applicants with specialized experience would likely achieve a higher level of performance more quickly and with less cost than an applicant with no such specialized work experience. Sheldon Decl. ¶¶ 6-7.

11. The ability to offer a higher-than-minimum starting salary to more highly qualified individuals also enhanced TSA's ability to attract and retain those with the highest qualifications to perform important security functions with reduced costs associated with training and other performance start-up costs. Sheldon Decl. ¶¶ 6-7.

12. The one-year requirement addressed the rapidly changing nature, processes, and equipment of security screening, and the threats that screening was intended to counter. Sheldon Decl. ¶¶ 6-7.

13. TSA considered more recent specialized experience to be of greater value to its mission. Sheldon Decl. ¶¶ 6-7.

14. The gender of the applicant was not a factor to be considered by NCS Pearson when they made salary determinations. Sheldon Decl. ¶¶ 6-7.

15. Any applicant could possess or demonstrate current or recent specialized experience, notwithstanding his or her gender, because NCS Pearson evaluated such experience according to the criteria in the Guidance. Sheldon Decl. ¶¶ 6-7.

16. Personnel representatives of NCS Pearson interviewed applicants for screener positions and made starting salary determinations based upon the information and experience indicated on each job application. Sheldon Decl. ¶¶ 8-11.

17. Nationwide, NCS Pearson received over 2.2 million applications for employment. Sheldon Decl. ¶¶ 12-13.

18. NCS Pearson identified qualified candidates using computer based tests, a structured interview, physical tests, medical tests, and information gleaned from background checks. Sheldon Decl. ¶¶ 12-13.

19. NCS Pearson gave job offers only to those applicants who passed all parts of the application process. NCS Pearson's HR representative did not evaluate the prior work experience to see if the applicant rated a starting salary bump until the time of the job offers. Sheldon Decl. ¶¶ 12-13.

20. In less than ten months, NCS Pearson evaluated, assessed, approved, made salary determinations, made job offers, and coordinated orientation of over 60,000 screeners, lead screeners, and supervisors nationwide. Sheldon Decl. ¶¶ 12-13.

21. The speed necessary to accomplish this extremely large task by the Congressionally-mandated deadline inevitably led to some deviation from established policies and procedures. Sheldon Decl. ¶¶ 12-13.

22. In 2002 at SeaTac, NCS Pearson hired 1,039 screeners, including 699 males and 340 females. Sheldon Decl. ¶ 14.

23. Twenty of the women (equaling 5.9 percent) and 50 of the men (equaling 7.1 percent) hired at SeaTac in 2002 were hired at salaries that exceeded the minimum rate. Sheldon Decl. ¶ 14.

24. Before TSA hired Ms. Moorehead as a screener, NCS Pearson reviewed her application package and interviewed her. The NCS Pearson representative determined, based upon his or her assessment of Ms. Moorehead's experience, what her starting salary should be. Sheldon Decl. ¶ 19.

25. Ms. Moorehead was offered a job at the base salary level for screeners, which in 2002 was $23,600 plus a locality pay adjustment. Def.'s Exh. E (Appointment Memorandum for Paula Moorehead).

26. Although most screeners, both male and female also started at the base salary level, as stated previously, some screeners received a slightly higher starting salary depending upon the value NCS Pearson placed upon his or her prior experience. Sheldon Decl. ¶¶ 18-20.

27. At SeaTac, of the 699 men who were hired, 50 received a starting salary bump, and of the 340 women who were hired, 20 received a starting salary bump.[1] Sheldon Decl. ¶ 14.

28. The files of the screeners who received a salary bump show that the NCS Pearson representatives consistently, for both males and females, considered the following criteria in determining whether to give a salary increase: (1) screening or other similar security work experience, including the number and types of equipment certifications and the number of those pieces of equipment with which a candidate had training and/or actual work experience; (2) law enforcement experience, including police, firefighting, and correctional officer experience; (3) military experience; (4) management experience (not limited to security, law enforcement or military); and (5) degrees, perhaps limited to the bachelor's level or higher, without regard to the field of study. Sheldon Decl. ¶¶ 17-18.

29. NCS Pearson took into account whether a candidate had qualified for the higher-paid positions of Lead Screener or Supervisor. Sheldon Decl. ¶¶ 17-18.

30. Ms. Moorehead's application showed that she had four months' experience as a screener and that she was certified in the use of a hand-held wand, but no other factors are indicated, such as law enforcement, military service, an advanced degree, managerial experience, or a higher previous salary. Sheldon Decl. ¶ 19.

---

[1] During the district court proceedings, the files of the individuals who received salary bumps were produced in discovery. To protect the privacy interest of the individuals, they were assigned and identified by number rather than name. Pertinent parts of the files of the 22 males, previously identified by Ms. Moorehead as comparators, have been attached to the Declaration of Paul Sheldon and are also identified by number.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Todd M. Hughes
TODD M. HUGHES
Deputy Director

/s/ David S. Silverbrand
DAVID S. SILVERBRAND
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-3278
Fax: (202) 353-7988

Attorneys for Defendant

Of Counsel:

GILLIAN FLORY
Attorney Advisor
Transportation Security Administration

August 29, 2008

CERTIFICATE OF SERVICE

I certify under that on this 29th day of August, 2008 a copy of the foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ DAVID S. SILVERBRAND