UNITED STATES COURT OF FEDERAL CLAIMS
WASHINGTON, D.C.

| | |
|---|---|
| Paula R. Moorehead, Plaintiff | ) |
| | ) |
| v. | ) C.A. No. 07-654 C |
| | ) GWM |
| The United States, Defendant | ) |
| | ) |

**RESPONSE OF PLAINTIFF PAULA MOOREHEAD TO DEFENDANT'S PROPOSED FINDING OF UNCONTROVERTED FACT**

Plaintiff Paula Moorehead, pursuant to the September 2, 2008 Order of the Court files this Response to Defendant's Proposed Finding of Uncontroverted Fact as follows:

1. Pursuant to the Aviation and Transportation Security Act ("ATSA"), the Transportation and Security Administration ("TSA") became responsible for appointing, training, and deploying screeners for airport employment, instead of the private sector screeners who had, prior to September 11, 2001, been responsible for security screening at airports within the United States. Def Exh. D. (Declaration of Paul H. Sheldon ("Sheldon Dec!.")) ¶ 4.

**Undisputed**

2. In order to comply with the Congressionally mandated deadlines and to meet its goal to create a work force of screeners within a year, TSA awarded a, contract to NCS Pearson, a Minneapolis-based human resources firm. Sheldon Decl. ¶ 5.

**Disputed**. In order to meet the Congressionally mandated deadlines, TSA awarded a contract to NCS Pearson , a Minneapolis-based human resources firm, and other organizations. Mr. Sheldon has no personal knowledge of the initial reasons for the award of a contract to NCS Pearson. Mr. Sheldon did not become employed with the TSA, until September 2002 and played no role in the initial contract with NCS Pearson, *Deposition of Paul Sheldon*, pp.6-7, Exhibit 1 attached hereto.[1]

[1] The Deposition of Paul Sheldon is referred to herein as "Depo.Sheldon____."

3. NCS Pearson was responsible for the recruitment and hiring of a Federal security screening work force, including screeners, lead screeners, and supervisory transportation security screeners ("supervisors"). Sheldon Decl. ¶ 5.

**Disputed**. NCS Pearson had authority to recommend hiring of Transportation Security Screeners. The authority to hire individuals was the responsibility of TSA officials, *Depo Sheldon*., pp. 8, 10.

4. hi April 2002, after learning of inconsistencies in the starting salaries NCS Pearson was offering new hires, TSA issued an Interim Human Resource Guidance on Salary Determination for Transportation Security Screeners, SV-0019-Pay Band ("Salary Guidance")- Sheldon Decl. ¶ ¶ 6-7.

**Disputed.** In April 2002, after learning of inconsistencies in starting salaries, TSA issued an Interim Human Resource Guidance on Salary Determination for Transportation Security Screeners, SV-0019-Pay Band ("Salary Guidance"). Mr. Sheldon was not employed with TSA in April 2002 and had no knowledge of any monitoring or oversight of NCS Pearson by TSA, *Depo. Sheldon* pp. 6-7, 17.

5. The Salary Guidance provided that, unless an exception for specialized experience applied, new appointments were to be made at the minimum rate for the pay band established for the job category. Sheldon Decl. ¶ ¶ 6-7.

**Disputed as to Sheldon Decl. ¶ 6. Undisputed as to Sheldon Decl. ¶ 7.** Mr. Sheldon did not begin employment with TSA until September 2002 and had no personal knowledge or involvement with the development of the TSA salary policy, *Depo.Sheldon*, pp.6-7.

6. Screeners were paid at the D pay band, and the base salary (minimum rate) for the D band in 2002, was $23,600. Sheldon Decl. ¶ ¶ 6-7.

**Disputed as to reliance on Sheldon Decl. ¶ 6.** Screeners were paid at the D pay band, and the base salary(minimum rate) for the D band in 2002, was $23,600. Mr. Sheldon did not begin employment with TSA until September 2002 and had no knowledge or involvement in the development of TSA salary policy, *Depo.Sheldon*, pp.6-7.

7. A locality adjustment, which was calculated separately for various cities and other locations around the country, was added to the base salary. Sheldon Decl. ¶ ¶ 6-7.

**Disputed as to reliance on Sheldon Decl. ¶ 6.** A locality adjustment, which was calculated separately for various cities and other locations around the country, was added to the base salary. Mr. Sheldon did not begin employment with TSA until September 2002 and had no knowledge or involvement in the development of TSA salary policy, *Depo.Sheldon*, pp.6-7.

8. Appointments of screeners could be made at a rate above the minimum rate of the D band when applicants had specialized experience that demonstrated that they possessed the skills and abilities to successfully perform the duties of the position. Sheldon Decl. ¶ ¶ 6-7.

**Disputed.** Screeners could only be hired above the minimum pay band D if the applicant met the criteria of specialized experience stated in the TSA Interim HR Guidance on Salary Determinations for Transportation Security Screeners, SV-0019-Pay Band, dated April 26, 2002 and all applicants had to be hired at the minimum pay B unless the applicant met the specialized experience, *Plaintiff's Proposed Findings of Uncontroverted Facts No. 5-6,* Interrogatory No. 16, Exhibit 4.

9. Specialized experience had to be in or related to the work of the screener position to be filled. Sheldon Decl. ¶ ¶ 6-7

**Disputed**. TSA policy required the specialized experience be within one year of the date of hire and directly related to passenger and baggage screening functions, *Plaintiff's Proposed Findings of Uncontroverted Facts No. 6*, Exhibit 4.

10. The rationale for this exception was that applicants with specialized experience would likely achieve a higher level of performance more quickly and with less cost than an applicant with no such specialized work experience. Sheldon Decl. ¶ ¶ 6-7.

**Disputed.** The requirement of specialized experience was to address inconsistencies in salary offers. Mr. Sheldon was not employed with TSA until September 2002; was not involved in the development of the TSA salary policy; and performed no work on the TSA hiring process, *Depo.Sheldon*, pp.6-7.

11. The ability to offer a higher-than-minimum starting salary to more highly qualified individuals also enhanced TSA's ability to attract and retain those with the highest qualifications to perform important security functions with reduced costs associated with training and other performance start-up costs. Sheldon Decl. ¶ ¶ 6-7.

**Disputed.** The Interim Salary Guidance stated no reasons for the higher starting salaries. Mr. Sheldon was not employed with TSA until September 2002; was not involved in the development of the TSA salary policy; and performed no work on the TSA hiring process, *Depo.Sheldon*, pp.6-7.

12. The one-year requirement addressed the rapidly changing nature, processes, and equipment of security screening, and the threats that screening was intended to counter. Sheldon Decl. ¶ ¶ 6-7.

**Disputed.** The Interim Salary Guidance set forth no reasons for the one year requirement.. Mr. Sheldon was not employed with TSA until September 2002; was not involved in the development of the TSA salary policy; and had no personal knowledge on the reasons for development of the TSA salary policy, *Depo.Sheldon*, pp.6-7.

13. TSA considered more recent specialized experience to be of greater value to its mission. Sheldon Decl. ¶ ¶ 6-7.

**Disputed.** The Interim Salary Guidance stated no reasons or purpose for the requirement of recent specialized experience. Sheldon was not employed with TSA until September 2002; was not involved in the development of the TSA salary policy; and had no personal knowledge on the reasons for development of the TSA salary policy, *Depo.Sheldon*, pp.6-7.

14. The gender of the applicant was not a factor to be considered by NCS Pearson when they made salary determinations. Sheldon Decl. ¶ ¶ 6-7.

**Disputed.** TSA conducted no monitoring of the hiring process to determine any adverse impact based upon sex. Mr. Sheldon was not employed with TSA until September 2002; was not involved in the development of the TSA salary policy; and had no personal knowledge on the reasons for development of the TSA salary policy, *Depo.Sheldon*, pp.6-7, 21-22.

15. Any applicant could possess or demonstrate current or recent specialized experience, notwithstanding his or her gender, because NCS Pearson evaluated such experience according to the criteria in the Guidance. Sheldon Decl.¶ ¶ 6-7.

**Disputed.** TSA conducted no monitoring or review of the salary determination process, for its adverse impact based upon sex. Mr. Sheldon had no involvement in the initial hiring process of Transportation Security Screeners, *Depo.Sheldon,* pp. 21-22.

16. Personnel representatives of NCS Pearson interviewed applicants for screener positions and made starting salary determinations based upon the information and experience indicated on each job application. Sheldon Decl. ¶ ¶ 8-11.

**Disputed.** TSA developed the Salary Decision Tool. NCS Pearson used the TSA Salary Decision Tool to make salary offers, *Depo.Sheldon*, pp. 15-16..

17. Nationwide, NCS Pearson received over 2.2 million applications for employment. Sheldon Decl. ¶ ¶ 12-13.

**Disputed.** Nationwide NCS Pearson and other organizations received applications for Transportation Security Screeners. NCS Pearson was not the sole contractor responsible for hiring at TSA. Mr. Sheldon has no personal knowledge on the initial hiring process, since he began employment in September 2002 and had no involvement in the hiring process, *Depo.Sheldon*, pp. 6-9, 21-22.

18. NCS Pearson identified qualified candidates using computer based tests, a structured interview, physical tests, medical tests, and information gleaned from background checks. Sheldon Decl. ¶ ¶ 12-13.

**Undisputed.**

19. NCS Pearson gave job offers only to those applicants who passed all parts of the application process. NCS Pearson's HR representative did not evaluate the prior work experience to see if the applicant rated a starting salary bump until the time of the job offers. Sheldon Decl. ¶ ¶12-13

**Disputed**. TSA retained hiring authority. NCS Pearson reviewed prior work experience and could only recommend hiring and salary offers. TSA approved hiring of individuals who did not pass all parts of the application process. Male employees 599, 621, and 806 failed the TSA tests and were hired by TSA, *Depo.Sheldon*, 9-13, *Plaintiff's Proposed Findings of Uncontroverted acts No. No. 21-23,* Exhibits 14-16.

20. In less than ten months, NCS Pearson evaluated, assessed, approved, made salary determinations, made job offers, and coordinated orientation of over 60,000 screeners, lead screeners, and supervisors nationwide. Sheldon Decl.¶ ¶ 12-13.

**Disputed.** NCS Pearson had authority to recommend the hiring of applicants. TSA retained hiring authority, *Depo.Sheldon*, pp. 9-11.

21. The speed necessary to accomplish this extremely large task by the Congressionally-mandated deadline inevitably led to some deviation from established policies and procedures. Sheldon Decl. ¶ ¶ 12-13.

**Disputed**. TSA hired male Transportation Security Screeners, at above the minimum pay band D, who had no specialized experience as required by the Interim Salary Guidance. Mr. Sheldon had no personal knowledge of the hiring process; was not employed with TSA until September 2002; and had no involvement in the initial hiring process, *Depo.Sheldon*, pp. 6-9, 21-22, *Plaintiff's Proposed Findings of Uncontroverted acts No. No. 21-23,* Exhibits 14-16.

22. In 2002 at SeaTac, NCS Pearson hired 1,039 screeners, including 699 males and 340 females. Sheldon Decl. ¶ 14.

**Undisputed as to the number of males and females hired. Disputed as to the hiring authority.** TSA retained hiring authority, *Depo.Sheldon*, pp. 9-10.

23. Twenty of the women (equaling 5.9 percent) and 50 of the men (equaling 7.1 percent) hired at SeaTac in 2002 were hired at salaries that exceeded the minimum rate. Sheldon Decl. ¶ 14.

**Disputed.** Eighteen females and 49 males were hired above the minimum pay band D, *Plaintiff's Uncontroverted Statement of Facts No. 5, Defendant's Response to Plaintiff's First Set of Interrogatories, Req. No. 6,* Exhibit 4.

24. Before TSA hired Ms. Moorehead as a screener, NCS Pearson reviewed her application package and interviewed her. The NCS Pearson representative determined, based upon his or her assessment of Ms. Moorehead's experience, what her starting salary should be. Sheldon Decl. ¶ 19.

**Disputed.** On the date of her interview, Ms. Moorehead was employed as a gate screener and acting lead screener; had six and one-half months of experience; had four years experience with the Army Reserves; and had experience with x-ray equipment, trace detection, physical searches, and calibration and maintenance of security equipment. Mr. Sheldon had no personal knowledge of the hiring process of Ms. Moorehead and other Transportation Screeners. Mr. Sheldon had no involvement in the hiring process and testified he could not determine the reasons for salary determinations, *Plaintiff's Proposed Finding of Uncontroverted Fact No. 4*, *Depo.Sheldon*, p. 18.

25. Ms. Moorehead was offered a job at the base salary level for screeners, which in 2002 was $23,600 plus a locality pay adjustment. Def.'s Exh. E (Appointment Memorandum for Paula Moorehead).

**Undisputed.**

26. Although most screeners, both male and female also started at the base salary level, as stated previously, some screeners received a slightly higher starting salary depending upon the value NCS Pearson placed upon his or her prior experience. Sheldon Decl. ¶ ¶ 18-20.

**Disputed.** Males and females started at the minimum pay band D. For the 67 employees starting at above the minimum pay band D, eighteen were female and 49 were males. Mr. Sheldon had no personal knowledge of the hiring process of Transportation Screeners. Mr. Sheldon had no involvement in the hiring process and testified he could not determine the reasons for salary determinations, *Plaintiff's Uncontroverted Statement of Facts No. 5, Defendant's Response to Plaintiff's First Set of Interrogatories, Req. No. 6*, Exhibit 4, *Depo.Sheldon*, pp. 18, 23-24.

27. At SeaTac, of the 699 men who were hired, 50 received a starting salary bump, and of the 340 women who were hired, 20 received a starting salary bump.[1] Sheldon Decl. ¶ 14.

**Disputed.** Eighteen females and 49 males were hired above the minimum pay band D . Seventy-three percent of the individuals who received higher salaries were males. Women represented forty-eight percent of the individuals hired at Seattle-Tacoma Airport, but represented only twenty-six percent of the individuals receiving higher salaries., *Plaintiff's Uncontroverted Statement of Facts No. 5, Defendant's Response to Plaintiff's First Set of Interrogatories, Req. No. 6,* Exhibit 4.

---

[1] During the district court proceedings, the files of the individuals who received salary bumps were produced in discovery. To protect the privacy interest of the individuals, they were assigned and identified by number rather than name. Pertinent parts of the files of the 22 males, previously identified by Ms. Moorehead as comparators, have been attached to the Declaration of Paul Sheldon and are also identified by number.

28. The files of the screeners who received a salary bump show that the NCS Pearson representatives consistently, for both males and females, considered the following criteria in determining whether to give a salary increase: (1) screening or other similar security work experience, including the number and types of equipment certifications and the number of those pieces of equipment with which a candidate had training and/or actual work experience; (2) law enforcement experience, including police, firefighting, and correctional officer experience; (3) military experience; (4) management experience (not limited to security, law enforcement or military); and (5) degrees, perhaps limited to the bachelor's level or higher, without regard to the field of study. Sheldon Decl. ¶ ¶ 17-18.

> **Disputed**. The TSA application files do not show any reasons for the differences in salary. Males with no experience and males who failed to pass the TSA tests received higher starting salaries. Mr. Sheldon had no personal knowledge of the hiring process of Transportation Screeners. Mr. Sheldon had no involvement in the hiring process and testified he could not determine the reasons for salary determinations, *Plaintiff's Proposed Findings of Uncontroverted acts No. No. 21-23,* Exhibits 14-16, *Depo.Sheldon,* pp. 18, 23-24.

29. NCS Pearson took into account whether a candidate had qualified for the higher-paid positions of Lead Screener or Supervisor. Sheldon Decl. ¶¶ 17-18.

> **Disputed**. The TSA application files do not show any reasons for the differences in salary. Males with no experience and males who failed to pass the TSA tests received higher starting salaries. Mr. Sheldon had no personal knowledge of the hiring process of Transportation Screeners. Mr. Sheldon had no involvement in the hiring process and testified he could not determine the reasons for salary determinations, *Plaintiff's Proposed Findings of Uncontroverted acts No. 12-26,* Exhibits 6-19.. *Depo.Sheldon*, pp. 18, 23-24.

30. Ms. Moorehead's application showed that she had four months' experience as a screener and that she was certified in the use of a hand-held wand, but no other factors are indicated, such as law enforcement, military service, an advanced degree, managerial experience, or a higher previous salary, Sheldon Decl. ¶ 19.

> **Disputed.** Ms. Moorehead submitted her work experience and her prior salary. TSA lost Ms. Moorehead's Salary Decision Tool. Mr. Sheldon had no personal knowledge of the hiring process of Transportation Security Screeners, *Depo.Sheldon*, pp. 18, 23-24. , *Plaintiff's Proposed Findings of Uncontroverted Facts No. 4, Exhibit 3* and *Plaintiff's Proposed Findings of Uncontroverted Facts No. 9, Exhibit 5.*

Respectfully Submitted,

/s/________________________

Barbara B. Hutchinson
D.C. Bar No. 418967
7907 Powhatan Street
New Carrollton, MD. 20784
Telephone: (301) 577-3387
Facsimile: (301) 577-3764
Attorney for Plaintiff