UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | | |
|---|---|---|
| PAULA R. MOOREHEAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:05-cv-01767-JLR |
| | ) | |
| MICHAEL CHERTOFF, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY, TRANSPORTATION SECURITY ADMINISTRATOR, | ) | |
| Defendant. | ) | |

DEPOSITION UPON ORAL EXAMINATION OF

PAUL H. SHELDON

9:00 a.m.
January 5, 2007
Suite 5220
Federal Courthouse
700 Steward Street
Seattle, Washington

Reported by Mary C. Tevis, CCR No. 29906



Exhibit 1

APPEARANCES

For the Plaintiff: John C. Montoya
Attorney at Law
Law Office of John C. Montoya
406 Boston Street
Seattle, Washington 98109
Phone: 206-452-0500
email: jcmforlaw@aol.com

For the Defendantm USA: Marion J. Mittet
Assistant United States Attorney
U.S. Department of Justice
United States Attorney's Office
Suite 5220
700 Stewart Street
Seattle, Washington 98101
Phone: 206-553-2055
email: jamie.mittet@usdoj.gov

For the Defendant TSA: Gillian Flory (telephonically)
Attorney Advisor (Litigation)
Office of Chief Counsel
Transportation Security
Administration
601 South 12th Street TSA-2
Arlington, Virginia 22202
Phone: 571-227-2670
email: gillian.flory@dhs.gov

it's a policy division there, and I'm one of the policy writers.
Q. And that's with the Transportation Security Administration?
A. Yes.
Q. And how long have you held that position?
A. It's a little complicated. I'm been in the policy department with TSA since September of '02. Began as a policy analyst, became the director of that unit in '03, early '03, acting, permanently appointed in May of '03, and then because of my medical situation, in May of '05, went back to a policy analyst position so that I could, you know, be accommodated by working at home.
Q. So just to be clear, during the time period that I'm going to be focusing on primarily, which is late -- or probably I guess from the summer of 2002 through the end of 2002, at that time, can you clarify what your position was?
A. Yes, I was a policy analyst at that time.
Q. All right, and just briefly for the record, can you tell me what your duties were in that position at that time?
A. Well, my stated portfolio was in policies related to employment relations primarily. In actuality, we operated in anything that needed to be done in human resources at that time; in other words, I didn't work

only in employee relations; I worked across the board in human resources issues. As examples of the employment relations portfolio, I was working on the screeners uniform policy at that time, the grievance policy, reasonable accommodation, that sort of thing, and outside of that portfolio, an example would be working on developing the statement of work for the renewal of our contract that during '02 was with Pearson. The contract was up for renewal at the end of '02, so I had a lot of involvement with that bidding process.

Q. And by Pearson, you're referring to NCS Pearson?

A. Yes, sir.

Q. And NCS Pearson, as I understand it, was an entity that contracted with TSA to assist TSA with the initial hiring of screeners?

A. Yes, sir, among other things.

Q. Among other things, okay. I'm primarily concerned about the hiring issues and starting salary issues. Was that within the bailiwick of NCS Pearson's responsibilities?

A. Yes.

Q. So am I correct in assuming you were familiar with the relationship between TSA and NCS Pearson at that time with regard to NCS Pearson's hiring of screeners, interviewing of screeners, and salary determinations?

A. Yes.

Q. Now, I am correct in assuming then also that the relationship between Pearson and TSA was set forth in a contract document of some sort?
A. Yes.
Q. With regard to hiring of screeners, can you describe the responsibility that TSA gave to NCS Pearson?
A. In general terms. I may miss a couple of technical points.
Q. That's fine.
A. Essentially, they had the full responsibility up to and including making an offer of salary, establishing the hire dates and that sort of thing, proposed dates for training and hiring, with the caveat that a TSA official had to agree or sign off on the actual authorizing document, you know, the final hire document.
Q. Okay, so I want to kind of walk through that process a little bit, and answer to the extent that you know. Is it fair to assume that, first of all, whatever responsibility Pearson had, was that a responsibility that it had at all the TSA airports across the country, or was this unique to some airports?
A. We had five airports that we called -- I think we called them PPOs. They were airports that were designated by legislation to not be under TSA direct supervision; they were going to be privately run and used as a comparator

to the TSA-run airports. Apart from those five, I believe it is true that they had responsibility for hiring at all of the airports. I have this vague memory that there may have been another contractor that had a small number of airports, also, but I simply do not remember that as a matter of fact, but I know that Pearson had the largest majority by far, and I know that's an accurate statement.

Q. Okay, thank you.

Let me then shift the focus to the Sea-Tac Airport in the Seattle area.

A. Yes.

Q. Was that a TSA airport in the sense that Pearson was responsible for the hiring and interviewing the screeners; in other words, it wasn't one of the five designated PPOs?

A. That is correct: It was not a PPO; it was a TSA airport, and Pearson ran that process.

Q. Now, with regard to that process, Pearson conducted the initial interviewing and the initial screening; is that correct?

A. Yes, that's my understanding.

Q. And Pearson made at least the initial determination of whether an applicant was qualified for whatever position he or she was applying for?

A. Yes.
Q. And Pearson made at least the initial decision with regard to the salary offer of that individual?
A. Yes.
Q. And Pearson made at least the initial decision with respect to the decision to hire?
A. Yes.
Q. Now, you indicated that the TSA official had to sign off on the final actual hiring authorization document or form; is that correct?
A. Yes.
Q. With regard to salary, what was Pearson's authority in that area, and to what extent did TSA have to sign off on salary determinations?
A. I believe that we signed off on every document; in other words, every hire, I mean, so that would include both the screener that was offered the minimum of the starting salary range, or those where Pearson recommended a higher than minimum starting salary. We had to sign off on every hire.
Is that the question?
Q. Yes -- well, let me just go on and kind of clarify that a little bit. With regard to salary, then, if Pearson -- well, if Pearson was offering the minimum Band D salary for a screener, would TSA have to sign off on

that?
A. I believe so, yes, sir. I'm quite certain we had to sign every hiring document, which would -- you know, which would include the salary.
Q. I see, okay. All right, with regard to the eligibility determination, am I correct that there were a series of tests that were given? They might have been pen and pencil, or perhaps computer-screen-type tests?
A. I'm sorry, when you say eligibility determination, can you tell me more specifically what you're referring to?
Q. Yes, sure, I'll clarify that. Was an applicant for -- and let's say a screener position -- was an applicant for a screener position, so far as you know, required to take any type of a test?
A. Yes, sir.
Q. And do you know what type of test they were required to take?
A. I used to know them in detail. There were a variety. Some of them were tests in the nature of what you think of as a test, you know, sort of a pen and paper, sit down and answer questions, or the same sort of thing, but done on a computer. Some of the other tests were things that were medical, things that tested vision acuity and color discernment. Another type of test was a physical test where they had to move and manipulate

pieces of luggage, so the series of all of those would be considered tests in a technical hiring term, and so a series of different types of things like that.

Q. Okay, I understand, and it was Pearson's responsibility to administer those tests?

A. Yes.

Q. And was it Pearson who then also graded or evaluated the results of those tests?

A. Yes. I will clarify that the medical portion of those tests was subbed to a different contractor, and they gave their results to Pearson, which Pearson, you know, used in the final, overall decision.

Q. The pen and pencil tests, or pen and paper tests, or computer tests, those were given by Pearson, and graded, if you will, by Pearson?

A. Yes.

Q. And do you know whether those pen and paper or computer tests, do you know whether those were graded on some sort of numerical or percentage basis, or were they simply graded on a pass-fail basis?

A. I'm quite sure that it depended on the test. For example, I know there were screen-out factors in the physical requirements, so in the luggage manipulation and in things like vision or auditory acuity, that sort of thing, there were screen-outs: You either had it or

you didn't.
Q. Okay.
A. I really -- I'm quite sure that there was a bottom line score on some of the what I think of as pen-and-paper-type tests, with some gradations done in that.
Q. So there would be, in other words, something in the way of a numerical cutoff on the pencil-and-paper tests?
A. I believe so.
Q. And do you know who determined that cutoff; in other words, was that Pearson, or was that TSA?
A. TSA provided all of the qualifications requirements to Pearson. I believe we also developed the actual tests themselves, and yes -- I'm sorry -- we also would have given them whatever cutoffs were required to be implemented.
Q. Okay, so were these tests that TSA then -- and I'm referring to the pencil-and-paper tests -- these were tests then that TSA developed?
A. Yes.
Q. And gave to Pearson to administer?
A. Yes.
Q. Now, in addition to the testing, there was also an interview process; is that correct?
A. Yes.
Q. And it was Pearson people who did the interviewing; is

the interviewers used in evaluating these candidates.
Are you at all familiar with some of those forms?
A. Yes -- yes, I am.
Q. Do you -- and I'll identify them a little more specifically for you later, I guess -- but just in general, were those forms developed by Pearson, or were they developed by TSA?
A. The interviewing form, I have reviewed, for example, the files, the comparator files, I think that we're calling them.
Q. Yes.
A. And using those as an example, if I may, I note in there, there's fairly standardized interviewing forms. I do not believe that TSA developed those.
Q. Okay.
A. The decision tool for the setting of salary form, that is a form that was developed by TSA in the salary-setting guidance that was issued in April of '02, so basically the answer is, there were some developed by Pearson, and some of ours.
Q. Okay, so the decision tool, the decision tool form, was developed by TSA, you're saying?
A. That's correct: It was issued as an attachment to the salary-setting guidance written in April of '02.
Q. Other than the decision tool, then the other forms that

were used by the interviewers to grade the applicants, those forms were developed by Pearson?
A. Those used in the interviewing process with reference to those, yes.
Q. Was there any type of oversight, supervision, for lack of a better word I suppose, that TSA engaged in with regard to Pearson's hiring interviewing and screening of applicants, that you're aware of?
A. Are you referring --
Again using, let's say, Sea-Tac experience as an example.
Q. Yes.
A. -- are you referring to basically having a representative, or representative there on site watching the process, for example?
Q. Well, it was kind of a wide-open question, but we can start there, yes.
A. Okay. I believe that in general, there were some. If the airport had staffed up some of its managerial, and with reference to TSA employees, if they had some of the management and/or administrative staff there, I believe there was some interaction with the administrative officer and/or the HR people that may have been on site.
My belief is that there was no consistent requirement for that to happen beyond the signing of

where in Band D somebody might start; is that correct?
A. Yes.
Q. And within Band D, did Pearson have the authority to make a recommendation of a starting wage, starting salary, higher than the minimum salary in Band D?
A. Yes.
Q. But again, before that could be finalized, and I believe you testified earlier, that TSA would have to sign off on that salary recommendation?
A. Yes.
Q. Were you personally involved in the review of salary determinations?
A. No -- well, I mean, open-ended question. Not at that time, I was not. In '03, I had some involvement resolving problem situations, but not related to this time, or I don't believe I had any specifically for Sea-Tac at any time in my career.
Q. You referred to problem situations. What do you mean by "problem situations"?
A. In the start-up, particularly in '02, with the rush to hire so many people so quickly, by November 19th of '02, there were inconsistencies in how the salary processes worked, and there were a number of times when people were offered higher jobs than when they came to report were available, so you might have someone who qualified

issues; another is conflicting job offer letter issues.
A. Yes.
Q. And cancelled training was another issue?
A. Yes.
Q. In my review of this document, it looks like the final decision in each case, or with regard to each issue, was essentially the same, that is, that no adjustments were going to be made; is that correct?
A. It seems to me there were one or two places where that is not true, but I certainly would agree with the characterization that in the majority of cases, that was true.
Q. But the memo would speak for itself, to the extent --
A. Absolutely, it itemized the decision in each area.
Q. It would appear from this memo, then, that budget restraints were a serious concern to TSA at this time; is that correct?
A. That's very true.
Q. And particularly with regard to pay adjustment issues?
A. Yes, well, in any business's budget, your personnel costs are the largest part of your expense by far.
Q. Were there any subsequent memos issued by TSA that you were aware of other than this June 6th, 2003 memo; were there any subsequent memos issued by TSA, any management person at TSA, regarding pay adjustments?

A. You know, it's so broad, I assume there would be something that fell into that category.
Q. Well, let me be more specific.
A. Yes.
Q. I've been told by my client that she saw a memo from James Loy.
A. Uh-huh.
Q. She doesn't know the date of the memo. She first saw it in about November 2003, in what was referred to as a briefing book at Sea-Tac. She tells me that the Loy memo said essentially what the June 6th memo, the June 6th, 2003 memo stated, except it seemed to be a little broader, that is, that it applied to all pay adjustments, the bottom line of which was that no pay adjustments were going to be made.
Do you recall anything like that, any memo from Loy regarding pay adjustments sometime in 2003?
A. You know, I really do not. The timing that she mentions suggests there may have been some communication about the pay increases that were coming in January, but that was done every year as a matter of course, and I don't remember one being done in November that far in advance of the increase. Normally they were issued right about this time of the year, the 1st of January. I really don't remember that.

Q. Okay, thank you.

(Telephone interruption.)

THE WITNESS: Excuse me. May I just take a call, please?

MS. MITTET: Yes, go ahead.

(Off the record.)

MR. MONTOYA: Okay, back on the record.

Q. Mr. Sheldon, you have some of the comparator -- or you have the comparator documents in front of you?

A. Yes.

Q. I don't want to go through all of those. I'm going to go through two or three of these.

Hang on just a moment.

A. Okay.

Q. I'm going to go through two or three of these. I just want to make sure my understanding is correct here.

Now, again just to back up a little bit, you would not have personally had the occasion to review these hiring documents during the time period in question?

A. That's correct.

Q. Okay, so is your reviewing them, or may have reviewed them very recently, this would be the first time you've seen those documents; is that correct?

A. Yes.

Q. Can you pull out, or however you have them arranged, can

you get your hands on No. 446?
A. Yes, I can. I have pulled it out here and have it available in front of me.
Q. Now, are your copies Bates-stamped at the bottom?
A. Yes.
Q. All right, so with 446, can you turn to Bates number 1451?
A. Yes, I have it.
Q. Okay, looking at 1451, now, what we're looking at is what's referred to as the Interview Decision Form, and again this is a form that would have been developed by Pearson?
A. That's correct.
Q. Okay, and this person, it appears from the form, that, looking at it going across, there's a competency cut score: There's a rating for each competency, and then a pass-fail designation.
With this particular person, I'm looking at, in the three categories that were reviewed, dealing with others, command posture, communication, this person received a 3, 3, 4 respectively. Is that what yours shows?
A. Yes.
Q. Now, you would really have no idea why the rater happened to give this person those particular ratings,

other than to go through the application file; is that correct?

A. Actually, no -- well, it's correct, but I don't know why the ratings were given, but I could not begin to reproduce them, even by reviewing the file, because they're an interview; they recorded an evaluation of an interview.

Q. Sure. Okay, well, let's look I think quickly at the next page, which is Bates number 1452.

A. Yes, I have it.

Q. And that's the Work Experience Interview Form, and again this was developed by Pearson?

A. Yes.

Q. And those ratings would be the Pearson interviewer's ratings?

A. Yes.

Q. Then let's look at the next page, 1453, and this is the Decision Tool for Credible Experience and Salary Offer. Now, this is a TSA-prepared document?

A. I believe so.

May I refer to my copy of the April document to confirm that statement, of the April guidance document, April 2002?

Q. Sure. Does that document have a number?

A. It does not have a Bates number on it. I don't know if