# In the United States Court of Federal Claims

No. 07-654 C
(Filed September 3, 2009)
TO BE PUBLISHED

| | |
|---|---|
| PAULA R. MOOREHEAD, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE UNITED STATES, ) <br> ) <br> Defendant. ) <br> ) | Equal Pay Act, 29 U.S.C. § 206(d)(1) (2006); gender-based pay disparities; Plaintiff's prima facie case; defendant's affirmative defense that differences in initial salary offers to plaintiff and male applicants were based upon factor other than gender; whether asserted gender-neutral factor was pretextual |

Barbara B. Hutchinson, New Carrollton, Maryland, Mark Vinson, American Federation of Government Employees, AFL-CIO, Washington, D.C., for plaintiff.

Jessica R. Toplin, Trial Attorney, Cameron Cohick, Trial Attorney, Todd M. Hughes, Deputy Director, Jeanne E. Davidson, Director, Tony West, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Gillian Flory, Attorney Advisor, Moira Denning, Attorney Advisor, Office of Chief Counsel, Transportation Security Administration, Arlington, Virginia, of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge

Plaintiff Paula R. Moorehead alleges that she was hired as a transportation security screener ("Screener") at the Seattle-Tacoma International Airport ("SeaTac") by the Transportation Security Administration ("TSA") at a lower starting salary than men hired for the same position in violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1) (2006). After a two-day trial, the Court concludes that any pay disparities did not violate the Equal Pay Act.

**I.    Background**[1]

Prior to September 11, 2001, all Screeners were employed by the private sector. In response to the tragic events of September 11, on November 19, 2001, Congress passed the Aviation and Transportation Security Act ("ATSA") creating the TSA and making the TSA responsible for hiring, training, and deploying all Screeners. Joint Proposed Stipulations of Fact ¶ 2a (docket entry 73, April 1, 2009) ("JSF"). Congress gave TSA the daunting task of replacing the entire private work force of Screeners with public employees within one year. Trial Transcript (docket entries 80 & 82, May 21, 2009) ("Trial Tr.") at 133. TSA contracted with a human resource firm, NCS Pearson, to recruit, interview and (subject to TSA approval) hire screeners using the hiring requirements established by TSA. JSF ¶ 2c.

*A. Salary Guidance*

In April 2002, TSA issued an Interim Human Resource Guidance on Salary Determination for Transportation Security Screeners, SV-0019-Pay Band ("Salary Guidance"). JSF ¶ 2d. The Salary Guidance set the starting salary range for Screeners to be between $23,600 and $35,400 defined as "Pay Band D." The salary for each Screener was also subject to a locality adjustment, calculated separately, based upon the geographic location of the airport for which they were hired. Joint Ex. 1 at 1. For the Seattle area, the locality adjustment resulted in an 11.77% increase in base salary for every Screener at SeaTac. Trial Tr. at 258; JSF ¶ 2g.

The Salary Guidance required that new Screeners be offered the minimum base salary of Pay Band D, $23,600, unless the applicant received a higher offer by reason of the individual's specialized experience that was "current or within the prior year" and "directly related to passenger and baggage screening functions" ("Creditable Experience").[2] Joint Ex. 1 at 1. If a

---

[1] This recitation of facts sets forth certain of the Court's findings of fact in accordance with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Additional findings of fact and rulings on mixed questions of fact and law are set forth in later sections of this Opinion and Order. In this section, the Court summarizes necessary background facts relevant to the subject of this opinion. For a more complete account of the background facts and procedural history of this case, the reader is referred to *Moorehead v. Chertoff*, No. C05-1767, 2007 WL 737370 (W.D. Wash. Mar. 5, 2007) ("*Moorehead I*"); *Moorehead v. United States*, 81 Fed. Cl. 353 (2008) ("*Moorehead II*"); and *Moorehead v. United States*, 84 Fed. Cl. 745 (2008) ("*Moorehead III*").

[2] Specifically, Section 2 of the Salary Guidance, "Creditable Experience Requirements and Salary Determinations for Offers Above the Minimum" provided: "Except as provided below, new appointments will be made at the minimum rate of Pay Band D, currently $23,600. Appointments may be made at a rate above the minimum rate of Pay Band D when applicants have specialized experience that demonstrates that they possess the skills and abilities to successfully perform the duties of the position. Specialized experience must be in or related to

new hire did not possess qualifying Creditable Experience, then the salary offer "must be at the minimum pay rate for the pay band, plus locality pay or [cost of living adjustment] for the geographic area" in which the Screener was to work.[3]

The Salary Guidance included a sample document called a "Decision Tool," upon which interviewers recorded any Creditable Experience and salary information for the interviewed candidate. Joint Ex. 1 at 3. In addition, the Decision Tool had a blank for a final salary offer and signature lines for a "Human Resource Representative" and a "TSA Representative." *Id.*

   *B. Salary Offers*

When TSA hired Ms. Moorehead in October 2002 as a Screener for SeaTac, she had already been working in that position for four months with a contract security firm named ICTS. Joint Ex. 2 at 14; Trial Tr. at 34. TSA hired Ms. Moorehead at the Pay Band D minimum base salary of $23,600, with the applicable locality pay increase of 11.77%, for a total salary of $26,377.70. JSF ¶ 2g; Trial Tr. at 45-46. NCS Pearson credited her with four months' experience as a Screener and certification in the use of a hand-held wand. Joint Ex. 2 at 14. No other relevant experience is indicated on her interview form. *Id.*

At approximately the same time, TSA hired several male Screeners for work at SeaTac with initial salaries above the Pay Band D minimum. Plaintiff's Proposed Findings of Fact and Conclusions of Law (docket entry 86, June 22, 2009) ("Pl.'s Proposed Findings") at 7-13, ¶¶ 35-65; Defendant's Proposed Findings of Fact and Conclusions of Law (docket entry 85, June 22, 2009) ("Def.'s Proposed Findings") at 7, ¶¶ 33, 37, 43.

---

the work of the position to be filled. (a) Criteria for experience determinations: (i) Specialized experience must be directly related to the work of passenger and baggage screening functions; (ii) Experience must be current or within the last year." Joint Ex. 1 at 1.

[3] Section 3 of the Salary Guidance, "Salary Offer Determinations," provided: "(a) The appropriate representative from NCS Pearson and the Contract Officer Technical Representative (COTR) must sign all salary offers. A TSA Management Official must approve all salary offers above the midpoint of the Pay Band. (In most cases, a TSA Management official will be on-site.); (b) If an applicant does not meet the creditable specialized experience criteria, the salary offer must be at the minimum pay rate for the pay band, plus locality pay or COLA for the geographic area of the permanent duty station airport; (c) If an applicant meets the creditable experience criteria **and** the current base salary, or written offer of a position with a higher base salary, is below or at the midpoint, then pay will be established to match the applicant's current or offered base salary; (c) [sic] If an applicant meets the creditable experience criteria and current base salary, or written offer of a position with a higher base salary, is above the midpoint, then, with the approval of a TSA Management Official, pay will be established to match the applicant's base or offered salary." Joint Ex. 1 at 2 (emphasis in original).

On October 20, 2005, Ms. Moorehead filed suit in the United States District Court for the Western District of Washington, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (2006) and the Equal Pay Act of 1963, 29 U.S.C. § 206 (2006). Complaint, *Moorehead I*, No. C05-1767 (docket entry 1, Oct. 20, 2005). Pursuant to defendant's motion, the district court transferred Ms. Moorehead's Equal Pay Act claim to this court under 28 U.S.C. § 1631 (2006). *Moorehead I*, 2007 WL 737370, at *5. The Title VII claim remained in the district court, where it was subsequently tried to a jury and a verdict was rendered in favor of defendant. *Moorehead I*, No. C05-1767 (docket entry 47, Apr. 18, 2007) (jury verdict finding in favor of defendant). On November 8, 2007, Ms. Moorehead filed a two-count amended complaint in this court, although the Court ultimately dismissed Count II for lack of jurisdiction.[4] Amended Complaint (docket entry 4) ("Compl.").

On June 13, 2008, defendant filed a motion for summary judgment pursuant to RCFC 56, seeking judgment as a matter of law on Count I of plaintiff's amended complaint. The Court denied defendant's motion because genuine issues of material fact existed that could not be resolved at that stage. *Moorehead III*, 84 Fed. Cl. at 750. The case then proceeded to trial, which was held in Seattle, Washington, on April 20 and 21, 2009. The parties presented their closing arguments on August 17, 2009 at the National Courts Building in Washington, D.C.

## II.  Plaintiff Has Established a Prima Facie Case of Discrimination Pursuant to the Equal Pay Act

Congress enacted the Equal Pay Act in 1963 as an amendment to the Fair Labor Standards Act ("FLSA") to rectify perceived gender-based wage disparities, and extended its protection to federal employees in 1974.[5] 29 U.S.C. §§ 201-219 (2006); *Lissak v. United States*,

---

[4] Count I of Ms. Moorehead's amended complaint alleged that she was hired at a lower starting salary than men in the same position, while Count II contended that Ms. Moorehead was paid less than men doing the same job when she held a position supervising other Screeners. Because Count II of plaintiff's amended complaint asserted the same operative facts and requested the same relief as plaintiff's Title VII claim in district court, Count II of plaintiff's amended complaint was dismissed pursuant to 28 U.S.C. § 1500 (2006) for lack of subject-matter jurisdiction. *Moorehead II*, 81 Fed. Cl. at 357-58.

[5] The Equal Pay Act provides that:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions,

49 Fed. Cl. 281, 284 (2001).

In order to prevail on her Equal Pay Act claim, plaintiff must first establish a prima facie case by demonstrating that "an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974); *Mansfield v. United States*, 71 Fed. Cl. 687, 692 (2006). Proof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act. *Beck-Wilson v. Principi*, 441 F.3d. 353, 360 (6th Cir. 2006). Once plaintiff meets this initial burden, "the statute presumes discrimination and requires defendant to proffer successfully an affirmative defense" based upon one of the statute's four exceptions. *Allison v. United States*, 39 Fed. Cl. 471, 475 (1997).

Plaintiff contends that the application files of fourteen male Screeners ("Male Comparators"), who each received a higher initial starting salary offer than plaintiff, demonstrate that NCS Pearson did not follow the Salary Guidance and gave higher offers to men who should not have received them. Pl.'s Proposed Findings at 16, ¶ 14. Plaintiff also appears to argue that she qualified for a higher salary under the Salary Guidance than she actually received, and that this disparity was due to gender discrimination. Pl.'s Proposed Findings at 16, ¶ 17.

The parties stipulated that male Screeners perform substantially the same duties as female Screeners. JSF ¶ 2h. The Government moved for entry of judgment pursuant to RCFC 52(c) at the close of plaintiff's case and argued that plaintiff had failed to present a prima facie case because she did not show a differential between the salary offers made to male and female Screeners. Trial Tr. at 534. The Government argued that plaintiff needed to show that "essentially all the women at SeaTac were paid less than all the men in order to make a prima facie case." Trial Tr. at 536. The Government provided evidence that the percentage of males and females who received a salary offer above the minimum was almost the same—approximately six percent of the females and approximately seven percent of the males. Joint Ex. 3. The Government argued that since these percentages were so close, the difference was "statistically insignificant" and therefore plaintiff had not met her burden to show a prima facie case of discrimination. Trial Tr. at 152-53, 538-41.

The Government, however, does not dispute that the Male Comparators received higher

---

except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1) (2006).

salary offers than plaintiff. To show a prima facie case, "[t]he plaintiff need not compare herself to all similarly classified male employees, but may choose one or more among those allegedly doing substantially equal work." *Ellison v. United States*, 25 Cl. Ct. 481, 486 (1992) (citing *Goodrich v. Int'l Bhd. of Elec. Workers*, 815 F.2d 1519, 1524 (D.C. Cir. 1987)). In determining whether a comparator is appropriate for the purposes of an Equal Pay Act claim, the focus is on actual job requirements and duties. *See Brennan v. Owensboro-Daviess County Hosp.*, 523 F.2d 1013, 1017 & n.7 (6th Cir. 1975). "Because the comparison at the prima facie stage is of the jobs and not the employees, . . . [f]actors like education and experience are considered as a defense to an employer's liability rather than as part of a plaintiff's prima facie case." *Beck-Wilson*, 441 F.3d at 362-63 (citing *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992)); *See also Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 875 (9th Cir. 1982).

Because plaintiff showed at trial that the fourteen Male Comparators received higher initial salary offers than the offer extended to plaintiff for performing substantially the same work, the Court finds that Ms. Moorehead has surmounted the Equal Pay Act's threshold for establishing a prima facie case of gender discrimination in initial salary offers. During closing argument (which followed post-trial briefing) defendant conceded that plaintiff had established a prima facie case of gender discrimination.[6]

### III. Defendant Has Established the Affirmative Defense that the Gender-Neutral Salary Guidance was Applied to Plaintiff and Male Comparators by TSA and NCS Pearson, and Compliance with the Salary Guidance Explains the Starting Salary Differences Between Plaintiff and the Male Comparators

"Once the plaintiff establishes a prima facie case, the defendant must 'prove' that the wage differential is justified under one of the four affirmative defenses set forth in 29 U.S.C. § 206(d)(1): (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998) (citing *Corning Glass*, 417 U.S. at 196). Because these are affirmative defenses, the defendant bears the burden of proof. *See Corning Glass*, 417 U.S. at 197. The burden on an employer to establish an affirmative defense is "a heavy one." *Mansfield*, 71 Fed. Cl. at 693. To successfully demonstrate that the pay differential is justified under one of the four exceptions, an employer must prove that the gender-neutral factor it identifies is actually the factor causing the wage difference in question. *Stanizale v. Jargowsky*, 200 F.3d 101, 107-08 (3d Cir. 2000).

---

[6] Although plaintiff asserts that the pay disparities between herself and her Male Comparators continue to the present, Pl.'s Proposed Findings at 13-14, ¶ 69, the record contains no evidence regarding how long the alleged pay disparities existed. Plaintiff testified about her own salary history; however, there is no evidence of the post-hiring salaries of any other TSA employees.

The Government relies upon the fourth exception, namely that the reasons for any pay disparity were not based on gender. Def.'s Proposed Findings at 13-16, ¶¶ 7-22. Instead, any pay differences resulted from an interpretation of the Salary Guidance used by NCS Pearson in its evaluation of candidates. The Government argued that reliance upon the facially gender-neutral Salary Guidance is a "factor other than sex," and "even if a man and woman are doing the same work for different pay, there is no violation if the wage difference stems from a factor other than gender." *Lissak*, 49 Fed. Cl. at 284.

Both parties relied upon the application files for the fourteen Male Comparators,[7] and in addition, plaintiff called as witnesses Robert Blunk, former security director for SeaTac, and Barbara Bergano and James McDowell, current human resource specialists for TSA.[8] Trial Tr. at 75-76, 110, 444.

These Screener application files consist of multiple documents compiled by the

---

[7] Defendant introduced the application files of several additional male applicants who were given offers higher than the minimum Pay Band D initial salary; however these applications were not referred to in plaintiff's post-trial briefing and the information in them is cumulative. The Court thus does not refer to them separately. *See* Def.'s Ex. 1E, 1G, 1L, 1N, 1O, 1P, 1Q, 1S, 1U, 1W.

[8] Although plaintiff called these witnesses, she now objects to the Court's relying on their opinions. Plaintiff contends the Court should not rely upon Ms. Bergano's testimony because (1) she did not receive the Salary Guidance until several years after these Screeners were hired; (2) she was not involved with the hiring of these Screeners; and (3) she did not discuss the Salary Guidance with NCS Pearson. Plaintiff's Reply to Defendant's Proposed Findings of Fact and Conclusions of Law (docket entry 90, Aug. 10, 2009) ("Pl.'s Resp. to Def.'s Proposed Findings") at 2-14, ¶¶ 2-12, 15-17, 21-23, 29-30. Plaintiff further contends that the Court should not rely upon Mr. McDowell's testimony because (1) he did not use the Salary Guidance; and (2) he did not participate in the hiring of Screeners. *Id.* at 2-11, ¶¶ 1-5, 7-9, 12, 15-17, 23.

Despite plaintiff's objection, the Court finds that the testimony of these witnesses was based on an adequate foundation, and that their testimony was relevant and credible. The Court finds Ms. Bergano capable of interpreting the Salary Guidance and opining on whether the Salary Guidance was appropriately applied to plaintiff and to the Male Comparators. She has worked in human resources for TSA and the FAA, is currently responsible for all of the local hiring for SeaTac, and has significant training and experience in interviewing, analyzing qualifications and determining salaries for TSA employees. Trial Tr. at 109-10, 119-23. Ms. Bergano currently uses the Salary Guidance in the course of her duties. Trial Tr. at 121-22. Mr. McDowell has a bachelor's degree in human resources management, is currently employed as a human resources specialist at SeaTac, and has experience in hiring and setting salaries for Screeners. Trial Tr. at 451, 454. He is capable of interpreting the Salary Guidance and opining on the manner in which the Salary Guidance was applied to the applicants at issue.

interviewer. Each of the application files on record includes most, if not all, of the following: (1) a work experience interview form ("Interview Form"); (2) a completed Decision Tool;[9] (3) the applicant's resume; (4) a copy of a completed online application questionnaire ("Online Questionnaire"); (5) an interview form with comments and ratings given by the interviewer in several categories including "dealing with others," "command posture," and "oral communications;" and (6) additional assessments and test results including medical and physical assessments, supervisor competency test results, object recognition test results and English fluency assessments. *See* Def.'s Ex. 1A-1X; Pl.'s Ex. 6-23. The Online Questionnaire apparently did not allow applicants to amend their answers and therefore the information was sometimes inaccurate. Trial Tr. at 37-38, 68. Plaintiff in fact testified that her own online application was not an accurate reflection of her qualifications. Trial Tr. at 68. Therefore, at trial, witnesses with general knowledge of TSA's human resource process, Ms. Bergano and Mr. McDowell, stated that information solicited from the in-person interview, and reflected on the Interview Form and Decision Tool (collectively "Interview Notes"), would have been given more weight than answers on the Online Questionnaire. Trial Tr. at 157, 164-67, 429-30, 470-71. During an interview, the interviewer was also able to inquire specifically about an applicant's experiences and thus gather more in-depth information about the type or quality of the experience or training an applicant received. *Id.* This increased the reliability of data collected during the interview. *Id.* Given these facts, the Court concludes that information found in the Interview Notes is more reliable than that found on the Online Application and that NCS Pearson reasonably gave more weight to such information when determining the salary status of an applicant.[10]

At trial, the parties established that the initial starting salaries and the Creditable Experience considered by the TSA in setting those salaries consisted of the following:

---

[9] Ms. Moorehead's application does not include a completed Decision Tool. Defendant explains this omission by stating that "[t]he Decision Tool was only completed if the applicant had the requisite experience for a salary enhancement." Defendant's Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law (docket entry 89, Aug. 10, 2009) ("Def.'s Resp. to Pl.'s Proposed Findings") at 4, ¶ 10; Trial Tr. at 144, 158-60.

[10] In examining an applicant's experience at the time of his or her interview, the Court has considered the entire application, but where information on the Online Application and the Interview Notes conflict, the Court has relied upon the information in the Interview Notes as more accurate.

| **Table 1** | | |
|---|---|---|
| **Employee Number** | **Base Salary** | **Creditable Experience**[11] |
| Male 4 | $28,000 | 28 years of security experience with the Coast Guard; Experience with hand-held metal detector and passenger walkthrough procedures ("Walkthrough"); Training with hazardous material; Bomb threat coordinator in San Francisco; 16 years of management experience |
| Male 41 | $27,500 | 25 years in the National Guard; Experience with x-ray equipment; Bomb check training of luggage and cargo; 19 years of management experience |
| Male 106 | $25,500 | Over 9 months of airport screening experience; 6.5 years with the Army—worked in perimeter control; Experience as customer service supervisor; Experience with x-ray and hand-held metal detector; Certified on Explosive Trace Detection device ("ETD") |
| Male 166 | $26,000 | Experience as school security administrator; College degree; Master's Degree in Teaching; 6 months of management experience |
| Male 281 | $25,500 | 2 months of experience as a security screener; Bachelor's Degree in Business; 20 years of management experience |
| Male 376 | $25,000 | 4 years of experience in retail security; Associate's degree in drafting; 8 months of experience as a corrections officer; Worked at Port of Seattle in security |
| Male 383 | $29,500 | 13 years of experience in the air cargo industry and at airport ticket counters; 20 years in the Air Force; Master of Business Administration |

---

[11] Pl.'s Exs. 8-24; Def.'s Exs. 1A-1D, 1F, 1H-1K, 1M, 1R, 1T, 1V, 1X.

| Male 410 | $26,000 | 8 months of experience as a screener of both passengers and bags; Experience with x-ray, explosives detection baggage screening device ("CTX"), and ETD; Certification on checkpoint, ETD, ION baggage screening device ("ION"), and other screening equipment; 2 years of experience in the military; 4 years of management experience |
|---|---|---|
| Male 446 | $25,350 | 3 years of experience as a police officer; 2 years of experience working for Boeing; Experience with pat down searches, building searches, arrests; 6.5 months of experience in the Navy; Over 3 years of management experience; College degree in business |
| Male 492 | $26,600 | Bachelor's Degree in Chemistry and Chemical Engineering; 2 years of experience as a security guard at a chemical plant |
| Male 621 | $27,750 | 5.5 months of experience as a screener; College Degree; Masters Degree in Economics; Working on Ph.D. in Economics at University of Washington; Experience with CTX; Certified in ETD, x-ray, and hand-held metal detector; 21 years of supervisory experience |
| Male 806 | $26,500 | 7 months experience as a screener including as a checkpoint supervisor; 16 years of supervisory experience; Experience and Certification in hand-held metal detector, Walkthrough, x-ray, and ETD |
| Male 953 | $25,500 | 6 months of experience as a screener; 2 years of college education; Experience and certification on x-ray, ETD, and baggage screening |

10

| Male 1023 | $29,000 | Military experience in the Navy including working as a military patrol, security guard, and aviation electronics technician; Experience working at Tacoma Courthouse security; Experience screening people, hand-held metal detector, and bag searches; Associate's Degree; Management experience; |
|---|---|---|

| Plaintiff | $23,600 | 4 months of experience as a screener; 3 years of experience in customer service; Experience and certification in the use of hand-held metal detector |
|---|---|---|

Plaintiff argues that this evidence demonstrates that the Government improperly relied upon factors outside the description of Creditable Experience in the Salary Guidance in setting these initial salaries. Most notably, TSA gave salary credit to new hires based upon education, military experience and management experience. Thus, plaintiff asserts, NCS Pearson inappropriately applied the Salary Guidance, because the language of that document allowed salary increases only for current airport screening experience or such experience acquired within one year of the interview. Pl.'s Proposed Findings at 15-16, ¶¶ 11-15. Giving salary credit to an employee with significant education or military experience, in plaintiff's view, demonstrated that the Salary Guidance was not "used reasonably in light of its stated purpose" and cannot justify an affirmative defense to the Equal Pay Act. *Id.* at 15, ¶ 12.

The Government, on the other hand, contends that the phrase "directly related to the work of passenger and baggage screening functions" in the Salary Guidance is not appropriately read in the narrow fashion favored by plaintiff, *i.e.*, to encompass only experience in baggage or passenger screening in an airport. Pl.'s Proposed Findings at 16, ¶¶ 14-16; *see also* Pl.'s Proposed Findings at 7-13, ¶¶ 35-65 (summarizing for each Male Comparator the direct airport screening experience the applicant was lacking). Defendant maintains that many other types of experience were properly regarded as "directly related" to the work of a Screener, including: "(1) screening or other similar security work experience; (2) prior law enforcement experience, including police, firefighting and correctional officer experience; (3) prior military experience; (4) prior managerial experience; and (5) advanced education." Def.'s Proposed Findings at 15-16, ¶¶ 20-21; Def.'s Resp. to Pl.'s Proposed Findings at 31-32, ¶ 14. Ms. Bergano described TSA's interpretation of "directly related" as "any experience, any qualifications that demonstrate

11

that the candidate possesses the knowledge, skills, and abilities for the position that they want filled." Trial Tr. at 124-25.

Mr. McDowell described Screeners as "security guards," "professors," "psychologists," "intelligence gatherers," and crowd control experts. Trial Tr. at 461. That is, in order to maximize the safety of airline passengers, Screeners do much more than merely operate the screening equipment. Of course, they must be proficient at using the machinery, interpreting the resulting images, and performing baggage and passenger pat-down searches. Trial Tr. at 95-105. An effective Screener will also observe passengers, detect anomalous behavior, remain attentive to detail under repetitive conditions, communicate effectively with the (often agitated) public and other members of the security team, and make decisions under stressful conditions. Trial Tr. at 95-105. Mr. McDowell testified that "anything that would help [Screeners] do that job more efficiently, better, [was] a specialized skill or experience." Trial Tr. at 461.

Mr. McDowell then explained why each of the five categories for which TSA gave salary credit was "directly related" to the Screeners' job. First, in the category of "screening or other similar security work experience," both parties agreed that prior experience as a Screener, particularly at SeaTac, constituted Creditable Experience. Defendant also stated that non-airport related security work was directly related because many of the same skills apply to all security jobs. *See* Trial Tr. at 270 ("Security is security. Perimeter control is security.").

Individuals employed in law enforcement and the military not only were familiar with following orders and respecting a chain of command, they also understood security procedures, and often had training and certifications on similar passenger and baggage screening equipment. Trial Tr. at 126-28. Like employment in the military and law enforcement, working as a Screener can be boring and repetitive until it is suddenly high-stakes and stressful. Employment in both military and law enforcement involve problem-solving and communications skills. Both foster a sense of security in members of the public. Trial Tr. at 128. All of these attributes make a more effective Screener. Trial Tr. at 423-24. Applicants with managerial experience were trained in communication, leadership, teamwork, and reporting priorities—all skills that improved a Screener's effectiveness. Trial Tr. at 178, 209, 213, 476. These Screeners were also adept at implementing new security procedures and checkpoints. Trial Tr. at 178.

In general, TSA found that Screeners with advanced education were more effective with time management, problem-solving, and organizational and decision-making abilities. Trial Tr. at 128, 204-08, 213. Encouraging the employment of Screeners with a variety of specialized knowledge in a variety of areas improved TSA's overall ability to achieve its goals. For

example, a Screener with an engineering degree would be better able to communicate intelligently about equipment failures. Trial Tr. at 205-06. A Screener with a teaching degree would be better able to help train other Screeners and communicate effectively with other members of the team and with the public. Trial Tr. at 192.

Although plaintiff relies on the published Screener job description, Pl.'s Ex. 2, which does not include any of these categories, as demonstrating their irrelevance, the requirements listed in the job description were merely the minimum qualifications required for the job of Screener. The five categories identified by TSA included experiences that it reasonably determined were valuable enough to merit a higher salary offer, although such qualifications were not prerequisites to employment. The Court has determined that TSA reasonably concluded that the skills it regarded as Creditable Experience were abilities directly related to the duties of a Screener, and that the Salary Guidance, as interpreted, is gender-neutral.

Plaintiff also interprets the phrase "current or within the last year" in the Salary Guidance narrowly—any qualifying Creditable Experience must come from a job in which the applicant was employed at the time of the interview or from a job the applicant had held within the last year. Pl.'s Resp. to Def.'s Proposed Findings at 2-3, ¶¶ 2, 4. Since much of the Creditable Experience attributed to the Male Comparators arose from job experience they had acquired more than one year prior to the interview, plaintiff suggested that defendant did not follow the Salary Guidance. Pl.'s Proposed Findings at 16, ¶ 14. However, the Court finds that defendant's interpretation of the phrase "current or within the last year" is more reasonable than plaintiff's, and included current skills, meaning skills that the applicant currently possessed at the time of the interview that were not obsolete, without regard to when the applicant acquired such skills. Def.'s Proposed Findings at 3, ¶ 15. For instance, Ms. Bergano testified that experience occurring in the past should be considered "current" if it helped the applicant acquire skills that would enhance his or her present ability to perform the duties of the position. Trial Tr. at 125-29. Thus, the Court finds defendant's interpretation is reasonable and in any event did not differentiate based upon gender.

Because the defendant's interpretation of the Salary Guidance was both reasonable and gender-neutral, some courts would look no further. *See, e.g., Fallon v. Illinois*, 882 F.2d 1206 (7th Cir. 1989). Other courts, however, would proceed to investigate whether any pay differential was the result of a "legitimate" business reason. *See, e.g.*, *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520 (2d Cir. 1992); *EEOC v. J.C. Penney Co.*, 843 F.2d 249 (6th Cir. 1988); *Glenn v. Gen. Motors Corp.*, 841 F.2d 1567 (11th Cir. 1988); *Kouba v. Allstate Ins. Co.*, 691 F.2d 873 (9th Cir. 1982). The Court of Appeals for the Federal Circuit has not addressed whether a pay

differential between males and females must be the product of a "legitimate" business reason in order to be within the fourth exception to the Equal Pay Act or if the differential must simply be the product of a gender-neutral business justification, without examining whether the business reason is itself sound.  *See Behm v. United States*, 68 Fed. Cl. 395, 399-400 (2005); *Lissak*, 49 Fed. Cl. at 285.

Even in applying the less deferential standard for purposes of this case, the Court finds that defendant's interpretation of the Salary Guidance had a clear connection to the legitimate goal of TSA—allowing it to offer applicants with experience in the five enumerated categories a higher starting salary, thus empowering TSA to recruit and retain the applicants most likely to perform the duties of a Screener at the highest level.  Defendant's interpretation of the Salary Guidance thus qualifies as an exception to the Equal Pay Act for "any factor other than sex."

Although the five categories of skills defendant chose to favor were not specifically described within the Salary Guidance, the criteria are on their face gender neutral, and were applied in a gender-neutral manner to all applicants.  The even-handed use of those factors caused any disparity in initial salary offers.  *Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 843-44 (6th Cir. 1997) (finding that wage disparity due to a mistake in policy application was not a violation of the Equal Pay Act as long as such error was gender-neutral); *Ritter v. Mount St. Mary's Coll.*, 814 F.2d 986, 993 (4th Cir. 1987) *cert. denied*, 484 U.S. 913 (1987) ("A difference in qualifications between the plaintiff and the 'job comparator,' the person or persons to whom the plaintiff chooses to compare her job status, salary, etc. for the purposes of establishing liability on an EPA claim, can constitute a 'factor other than sex.'").  Plaintiff claims only that defendant's interpretation of the Salary Guidance is wrong.  Plaintiff never asserted, and there is no proof, that defendant applied its interpretation of the Salary Guidance in anything other than a gender-neutral fashion.

Defendant followed the Salary Guidance by awarding salary enhancements to both male and female applicants who possessed experience indicating that they were likely to perform at a high level.  A comparison of Ms. Moorehead's application file to the application files of the Male Comparators shows that each of those males had more Creditable Experience, as interpreted by defendant, than plaintiff.  Both Ms. Bergano and Mr. McDowell testified that based upon their review of the application files in the record, NCS Pearson consistently followed its interpretation of the Salary Guidance and authorized salary offers above the minimum of Pay Band D only when applicable Creditable Experience indicated that the applicant was likely to perform the duties of a Screener at a high level.  Trial Tr. at 225, 465.  Ms. Bergano and Mr. McDowell testified credibly that their review of the application files evidenced that gender was not a

consideration in determining an applicant's initial salary. Trial Tr. at 142, 232, 496-97. The Court has therefore determined that any pay differential between plaintiff and male applicants was not the result of a gender difference, but a difference in pertinent experience.

To support its assertion that NCS Pearson's application of the Salary Guidance was non-discriminatory, the Government cited the total numbers of male and female applicants given offers and the percentage of those who received offers above the minimum of Pay Band D. Def.'s Proposed Findings at 6-7, ¶¶ 29, 32-34. In 2002, TSA hired a total of 1039 Screeners to work at SeaTac. Joint Ex. 3. Of this total, 699 were male and 340 were female. *Id.* Only 70 of the 1039 were hired with an initial salary above the minimum of Pay Band D—50 males and 20 females. *Id.* Therefore, approximately six percent of the females and approximately seven percent of the males hired received a salary offer above the minimum. While the percentages of men and women given enhanced salary offers are not precisely identical, they are very close. Trial Tr. at 152-53. The Court regards these data as additional evidence that application of the Salary Guidance by TSA and NCS Pearson was unrelated to gender and any differences between Ms. Moorehead's initial salary offer and those of the 14 Male Comparators were attributable to factors other than sex.

### IV.     Plaintiff Has Not Shown that Reliance Upon the Salary Guidance was a Pretext for Gender Discrimination

A plaintiff may counter an affirmative defense under the Equal Pay Act by producing evidence that "the reasons the employer seeks to advance are actually a pretext for sex discrimination." *See Aldrich*, 963 F.2d at 526. If the reason relied upon by an employer for a pay difference is shown to be pretextual, the affirmative defense fails. *See Kouba*, 691 F.2d at 876-77. Plaintiff has not offered any evidence that reliance upon the Salary Guidance was simply a pretext for gender discrimination. Accordingly, the Government has proved its affirmative defense, and plaintiff has failed to show that the reliance of TSA and NCS Pearson on the Salary Guidance was pretextual.

## **CONCLUSION**

      For the reasons discussed above, the Court holds that defendant did not violate the Equal Pay Act in its initial salary offerings to Screeners at SeaTac in 2002, including specifically its offer to Ms. Moorehead.  Accordingly, the Clerk is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

                                              s/ George W. Miller
                                              GEORGE W. MILLER
                                                      Judge